UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

DEBRA HALL, Individually and on Behalf of :    Civil Action No. 1:07-cv-08252-SAS
All Others Similarly Situated,            :    **(Consolidated)**
                                     :
              Plaintiff,    :    <u>CLASS ACTION</u>
                                     :
      vs.                                  :
                                     :
THE CHILDRENS PLACE RETAIL         :
STORES, INC., et al.,                 :
                                     :
             Defendants.    :
                                     :
_____ x

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiff Laborers Pension Trust Fund for Northern Nevada ("Plaintiff" or "Northern Nevada Laborers Fund") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by The Children's Place Retail Stores, Inc. ("Children's Place" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company and interviews with former employees of Children's Place, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common stock of Children's Place between March 9, 2006 and August 23, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Children's Place operates as a specialty retailer of merchandise for children ranging from newborn to ten years of age.  The Company designs, contracts to manufacture and sells apparel and accessories and other children-oriented merchandise under Children's Place and Disney Stores brand names.

3.     This case concerns a series of misrepresentations and omissions about Children's Place's earnings, operations and trends in its business.  During the Class Period, Children's Place reported artificially inflated financial results, failed to disclose significant problems with a major business partner and had its Chief Executive Officer ("CEO") knowingly violate its internal control policies.  As these problems and adverse facts have come to light, the price of Children's Place common stock has fallen in response, declining from a Class Period high of $71.08 per share, on October 26, 2006, to $27.43 per share, on August 23, 2007.

4.    The problems at Children's Place emanate, in material part, from the actions of its former CEO, Defendant Ezra Dabah ("Dabah").  From 1991 until he was forced out of the Company in September 2007, Defendant Dabah served as CEO of the Company.  Dabah was effectively ousted from Children's Place after the Company suffered a series of setbacks, which severely damaged the Company's business and burdened Children's Place with a significant "liar's discount."[1]

5.    Dabah was at the helm of the Company while it engaged in options backdating and other problematic option-granting practices.  As detailed herein, Children's Place has admitted: (1) that it improperly backdated option grants; (2) that it improperly accounted for its compensation expense; and (3) that specific option grant dates were selected with a view towards upcoming disclosures.  In other words, option grant dates were selected in order to maximize the economic value of the grant in light of upcoming positive news disclosures – a practice often referred to as "spring-loading."  The Company has now restated its financial statements for the financial periods 2003, 2004 and 2005 (the "Restatement"), thereby admitting that it materially overstated its reported financial results.

6.    During the Class Period, Children's Place was also experiencing significant problems with its relationship with The Walt Disney Company ("Disney") and was failing to meet certain deadlines in the agreement between the two companies.  In 2004, Children's Place acquired Disney Stores from Disney.  Disney Stores sell Disney-related merchandise in malls and shopping centers throughout the country.  In April 2006, Defendant Dabah took over direct responsibility of the Company's Disney-related operations.  Under the agreement between the companies, Children's Place was supposed to conduct the business of Disney Stores according to a code of conduct and was

---

[1]    A term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public.

required to maintain and remodel Disney Stores at various times, as detailed further herein. As part of the acquisition of Disney Stores, Children's Place created a wholly-owned subsidiary called "Hoop." Hoop was responsible for managing the Company's Disney Stores franchise operations in the United States and Canada. By the start of the Class Period, the Company was experiencing significant problems with Disney and was unable to get new products developed and produced on a timely basis or to follow through on its commitment to remodel and refurbish Disney Stores. As a result, many Disney Stores locations were becoming dated and falling into disrepair. This further exacerbated the difficulties the Company was having with Disney, as Disney was contending that the Company was not properly maintaining the condition of the stores.

7.      During the Class Period, Defendants concealed the problems with Disney and the full extent of the issues that the Company was facing – it was unable to satisfy Disney's requirements and was struggling to maintain its relationship with the company. Defendants hid these problems until they could no longer do so. Eventually, Disney sent the Company a letter detailing what it believed were 120 instances of default under the agreement between the companies. Even then, Defendants did not fully and candidly disclose the scope of the problems with Disney to the public. Ultimately, Children's Place was forced to amend its agreement with Disney and sacrifice some of the exclusivity it enjoyed on certain Disney products, among other changes to the agreement.

8.      Finally, during the Class Period, Defendant Dabah knowingly violated the Company's internal policies by, among other things, pledging shares of his common stock as collateral for margin loans in his stock brokerage account at the time that the Company precluded Company insiders from selling shares – the so-called "black-out period." Dabah's pledge of shares, which amounted to a clandestine sale of stock as collateral, provided him with a fiscal motive to conceal the problems at the Company so as not to cause a decrease in the price of Children's Place

stock, which might generate a margin call or a decrease in the amount of margin Defendant Dabah could borrow from.

9.      Ultimately, Dabah's inability to frankly and fully disclose the true condition of Children's Place's business to investors and his violation of internal control policies caused the Company's long-time independent auditor, Deloitte & Touche LLP ("Deloitte") to relinquish its position as the Company's independent auditor, stating that "it was no longer willing to rely on his [Dabah's] representations in connection with its audits."

10.      The following chart graphically depicts Defendants' fraudulent scheme, key events during the Class Period and the devastating impact of the fraud on Lead Plaintiff and the Class:



- 4 -

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and the Company maintains substantial business operations in this District, as detailed herein.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.     By Court Order dated December 17, 2007, Northern Nevada Laborers Fund was appointed Lead Plaintiff in this case.  As set forth in its previously-filed certification, incorporated by reference herein, Lead Plaintiff purchased the common stock of Children's Place during the Class Period and has been damaged thereby.

16.     Defendant Children's Place, through its subsidiaries, operates as a specialty retailer of merchandise for children ranging from newborn to ten years of age.  The Company designs, contracts to manufacture and sells apparel and accessories and other children's-oriented merchandise under Children's Place and Disney Stores brand names.

17.     (a)     Defendant Dabah was, at all relevant times, Chairman and CEO of Children's Place until his forced resignation on or about September 26, 2007.

(b)     Defendant Susan Riley ("Riley") served as Senior Vice President and Chief Financial Officer ("CFO") of Children's Place from April 2006 to January 2007 and has been Executive Vice President of Finance and Administration of Children's Place since January 2007.

(c)     Defendants Dabah and Riley are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Children's Place, were privy to confidential and proprietary information concerning Children's Place, its operations, finances, financial condition, as well as present and future business prospects.  Because of their positions with the Company, the Individual Defendants had access to material adverse non-public information concerning Children's Place via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Children's Place's business.

20.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

21.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Children's Place's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Children's Place common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Children's Place common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Children's Place's business, operations and management and the intrinsic value of Children's Place securities; and (ii) caused

Plaintiff and members of the Class to purchase Children's Place common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Children's Place between March 9, 2006 and August 23, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Children's Place common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Children's Place or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

27.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Children's Place;

(c)    whether the price of Children's Place common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**Confidential Sources**

29.    The allegations made herein are further supported by the first-hand knowledge of seven confidential informants ("CI").  These informants are either former Children's Place employees or independent contractors/former employees from other companies that worked directly with Children's Place.  As detailed below, each CI served in a position at Children's Place or worked closely with Children's Place, which provided them with access to the information they are alleged to possess.

30.     CI 1 worked at Children's Place from February 2003 to June 2007 as a Children's Place Store Manager and later as an Assistant Merchandise Manager for Hoop. CI 1 also carried out responsibilities as a Project Manager for elements of the Disney Stores Remodeling Initiative (defined below).

31.     CI 2 worked at Children's Place from January 2005 to May 2007 as a Regional Human Resources Manager for the Company's Western Division. CI 2's duties involved overseeing all Human Resources matters pertaining to Children's Place and Disney Stores operations in the Western Region. CI 2 also frequently visited individual retail stores throughout the region and attended meetings at the regional headquarters in Pasadena, California and the corporate headquarters in Secaucus, New Jersey.

32.     CI 3 worked at Children's Place from 2002 to October 2006 and served in various roles. Beginning in February 2005, CI 3 was a Purchasing Coordinator and was responsible for purchasing all supply-related items used at both Children's Place and Disney Stores. CI 3 also had some direct involvement in the remodeling and refurbishment of Disney Stores.

33.     CI 4 worked at Children's Place from November 2004 to May 2006 as an Assistant Sourcing Manager and later as a Merchandiser. CI 4 joined Children's Place in connection with the Disney Stores acquisition and had worked for Disney since September 2003.

34.     CI 5 worked at Children's Place from 1994 to June 2006. As of November 2004, CI 5 was a Senior Director of Construction, Procurement, Facilities and Store Openings for Hoop. CI 5 was responsible for all store design/redesign, store construction, non-merchandise materials procurement, store maintenance, store refurbishment and land/property maintenance for new and existing Disney Stores.

35.     CI 6 was a Senior Project Manager for an architecture and design company that worked on projects for Children's Place for over eight years, until March 23, 2007. CI 6 was retained as an architectural design consultant by Children's Place from March 2007 until June 2007. CI 6 was involved in store rollout projects related to Children's Place and Disney Stores, including the remodeling of Disney Stores.

36.     CI 7 worked at Children's Place from 1999 to January 2007 as Director of Store Design and later as Senior Director of Store Design. After the acquisition of Disney Stores, CI 7 worked on the large-scale initiative to design, construct and/or remodel all Disney Stores.

## SUBSTANTIVE ALLEGATIONS

37.     Defendant Children's Place describes itself as a "leading specialty retailer of children's merchandise. The Company designs, contracts to manufacture and sells high-quality, value-priced merchandise under the proprietary "The Children's Place" and licensed "Disney Store" brand names." Children's Place focuses its sales on apparel and accessories for children ranging from newborn to ten years of age. Disney Stores sell Disney branded products such as apparel, toys, plush, souvenirs and media.

### The Disney Debacle

38.     In 2004, Children's Place acquired the Disney Stores retail operations from Disney. The acquisition represented a significant expansion of the Company's business and enabled the Company to align itself with a powerful and successful company and widely-recognized brand name. Disney Stores' retail chain sells Disney-branded clothes, toys and other goods. As a result of the transaction, Children's Place acquired a total of 313 Disney Stores, along with certain other assets used in Disney Stores' business.

39.    On November 23, 2004, Children's Place issued a press release announcing that the acquisition of Disney Stores had successfully been completed.  Defendant Dabah positively commented on the acquisition, stating, in pertinent part, as follows:

> This acquisition marks a significant milestone in the growth of The Children's Place. We believe that the Disney brand together with our retail expertise will be a powerful and profitable combination.

The press release indicated that Children's Place would have the "exclusive right to operate the Disney Stores in the United States and Canada under a long-term license and conduct of business agreement."  Further, the Company would pay Disney $101 million.  The press release stated, in pertinent part, as follows:

> The Children's Place Inc. will operate The Disney Store North America as a wholly owned subsidiary and has the exclusive right to operate the Disney Stores in the United States and Canada under a long-term license and conduct of business agreement.  The new subsidiary will be responsible for the store lease obligations.  The Children's Place acquired the equity of the Disney Store North America from Disney in exchange for a working capital payment to Disney of approximately $101 million, which takes into account the current level of inventory for the upcoming Holiday season as well as a reduction in accounts payable prior to the acquisition. The Children's Place funded the transaction with cash on hand and short-term borrowings.

> The Disney Store North America will continue to design, source and sell merchandise featuring "Disney-branded" characters, past, present and future, and, following a two-year abatement, will begin to pay royalties to Disney on its physical retail store sales.  Beginning in October 2005, the Disney Store North America will operate an Internet store featuring a select assortment of merchandise offered in the physical retail locations.  The Walt Disney Company will continue to operate the Disney Catalog and will maintain a Disney online retail presence.  The Children's Place has committed to invest up to $100 million into the remodeling and operations of the Disney Store North America.  Of this amount, an initial $50 million was funded at closing.

Through this transaction, Disney turned over its Disney Stores business to Children's Place while maintaining control over aspects of the business that were important to Disney, such as ensuring the quality of the merchandise and the appearance of Disney Stores.

40.     In connection with the acquisition of Disney Stores, Children's Place entered into a long-term License and Conduct of Business Agreement ("License Agreement") with Disney.  Under the License Agreement, Children's Place was obligated to maintain the quality, appearance and presentation standards of the Disney Stores chain in accordance with the highest standards prevailing in the specialty retail industry.  The License Agreement included provisions regarding the manner in which Children's Place, through Hoop, was to operate Disney Stores and required that approvals be obtained from Disney for certain matters, including: (1) all uses of Disney intellectual property; (2) the opening or closing of Disney Stores; and (3) the various design elements of Disney Stores. With regard to Disney approval procedures, the License Agreement stated, in pertinent part, as follows:

TDSF'S[2] APPROVAL PROCEDURES

5.1 Disney Merchandise Approvals.  Licensee shall not create, develop, manufacture, produce or offer for sale, through the Facilities, the Internet Store or otherwise, any article of Disney Merchandise, including any containers and packaging for such Disney Merchandise (collectively, each, an "Article"), regardless of whether such Disney Merchandise bears, features or incorporates any Disney Properties, without first obtaining TDSF's approval in accordance with the provisions set forth in this Section 5.1 in each instance.

*          *          *

9.3.6 Look and Feel.

Approval of Facility Design Elements.  All aspects of the design and appearance of the Facilities (the "Facility Design Elements"), including, without limitation, (i) the store design layout (including the layout of Licensed Materials, Disney Properties and other intellectual property of TDSF or any of its Affiliates), (ii) carpeting and flooring, (iii) furniture, fixtures and equipment, (iv) shelving, (v) appliances, (vi) lighting, (vii) color scheme, (viii) decor, (ix) signage, (x) displays, (xi) cut-outs, (xii) window strips, (xiii) multimedia, (xiv) check-out counters and registers, (xv)

---

[2]     The abbreviation "TDSF" denotes The Disney Store Franchising, LLC, a California limited liability company.

packages, bags, gift wrap and similar items, and (xvi) all other physical attributes of the Facilities, shall be subject to TDSF's written approval in its sole discretion; provided, that (A) the size of the Facilities (in square feet), the location of the check-out counters and registers in the Facilities and the layout of shelving and other furniture, fixtures and equipment in the Facilities shall be subject to TDSF's written approval in its business judgment and (B) the design of the stock rooms located in the Facilities shall not be subject to TDSF's approval so long as such design is not, inconsistent with or inappropriate for the "Disney" image, reputation and brand in any material respect. Any approval required pursuant to this Section 9.3.6(a) shall be sought in accordance with the approval provisions set forth in Section 9.19.2.

41.    In the Company's Annual Report on Form 10-K, filed with the SEC on or about April

14, 2005, Children's Place described its licensing agreement with Disney as follows:

License Agreement With Disney

In connection with the acquisition of the DSNA Business, two of our subsidiaries entered into a license and conduct of business agreement with an affiliate of Disney (the "License Agreement") under which our subsidiaries have the right to use certain Disney intellectual property to operate the Disney Store retail chain in exchange for ongoing royalty payments. The agreement allows our subsidiaries to operate retail stores in the United States and Canada using the "Disney Store" name and to contract, manufacture, source, offer and sell merchandise featuring Disney-branded characters, past, present and future. Our subsidiaries will make royalty payments to Disney beginning in November 2006 equal to 5% of net sales from physical Disney Store locations, subject to an additional royalty holiday period with respect to a limited number of stores. Beginning in April 2007, our subsidiaries will operate the www.disneystore.com Internet store, which will feature a select assortment of merchandise offered in the physical Disney Store locations. The initial term of the License Agreement is through January 2020, and if certain financial performance and other conditions are satisfied, it may be extended at our option for up to three additional ten-year terms.

With regard to a breach of the License Agreement, the Form 10-K stated:

Breach of Disney License Agreement

The Disney Store business operates under a License Agreement with an affiliate of Disney, under which we have the right to use certain Disney intellectual property in the Disney Store business in exchange for ongoing royalty payments. Upon the occurrence of certain specified events, including an uncured breach of royalty non-payment and other repeated material breaches of the License Agreement by our subsidiaries, certain material breaches by us of a guaranty and commitment, and certain changes in ownership or control of The Children's Place Retail Stores, Inc. or the subsidiaries that own and operate the Disney Store business, Disney will have the right to terminate the License Agreement. Some of these events may be beyond our

- 14 -

control. If the License Agreement is terminated, the Disney affiliate may require us to sell the Disney Store business back to Disney or one of its affiliates or to a third party at a price to be determined by appraisal or, in the absence of such sale, to wind down the Disney Store business in an orderly manner.

42.    In April 2006, the License Agreement was amended, requiring Children's Place to: (1) completely remodel each Disney Store within a specified period of time after lease renewals; (2) completely remodel each Disney Store at least once every 12 years; and (3) completely remodel a minimum of 160 of the 313 acquired Disney Stores by January 1, 2009 (the "Remodeling Initiative").

43.    From the time Children's Place acquired Disney Stores, the Disney Franchise Board ("Franchise Board") interacted regularly with Children's Place and its Hoop subsidiary to ensure that the Company complied with all terms of the License Agreement. The Franchise Board served to provide a final approval to Hoop for a variety of issues, including design concepts related the Remodeling Initiative and Disney merchandise. According to CI 4, a long-time Disney Stores employee who joined the Company in the acquisition of Disney Stores, the Franchise Board approval process was an integral element of the License Agreement.

44.    Following its acquisition of Disney Stores and during the Class Period, Children's Place experienced ongoing problems and delays in developing merchandise to sell in Disney Stores and in carrying out the Remodeling Initiative. According to CI 1, who worked as a Project Manager for the Remodeling Initiative, the problems overlapped because problems and delays in store redesigns impacted merchandise development, selection, ordering and, as a result, sales. Furthermore, CI 1 said that many of the problems were exacerbated by Hoop's lack of thoroughness with regard to the processes and protocols that Hoop needed to follow in order to obtain approval from the Franchise Board.

- 15 -

45.     As a result, the Franchise Board frequently disapproved of the manner in which Children's Place was carrying out the design and manufacturing of Disney Stores, as well as the Disney merchandise under the License Agreement. This caused a delay in the Remodeling Initiative and product availability at Disney Stores.

46.     According to CI 1, the Franchise Board's objections were regularly communicated to Hoop personnel. However, the objections were often ignored. According to CI 5, many of Dabah's decisions created problems for Hoop, such as Hoop inability to meet Disney's expectations because Dabah disregarded the desires and expectations of Disney, as set forth in the License Agreement and communicated by the Franchise Board.

47.     As detailed herein, during the Class Period, Defendants regularly represented that their relationship with Disney was a positive one and that they were working closely to carry out the Remodeling Initiative. However, according to CI 1, the continuous disapproval of store and merchandise designs caused the relationship between Hoop and the Franchise Board to be strenuous and tense. CI 2 confirmed that Hoop executives regularly "butted heads" with representatives of the Franchise Board relating to the manner in which Children's Place was carrying out the design and construction of Disney Stores, as required by the License Agreement.

48.     One key conflict between Hoop and the Franchise Board, according to CI 1, related to the manner in which Children's Place carried out the design of Disney Stores and the design and manufacturing of Disney merchandise, as required by the License Agreement. The terms of the License Agreement required Hoop to submit written approval requests for the entire product manufacturing process. The approval requests required signatures from both Hoop personnel and Franchise Board members for every stage of product manufacturing. It was only after Hoop obtained approvals from Disney, through all of the product phases, that Hoop should have placed

manufacturing orders for the finished product with their manufacturing vendors. However, according to CI 1, Hoop often issued manufacturing orders for products that had not been fully approved by the Franchise Board. CI 5, who served as Senior Director of Construction for Hoop, confirmed that Hoop would often carry out initiatives without first obtaining approval from the Franchise Board.

49.     Even prior to the Class Period, Children's Place was having numerous problems satisfying the Franchise Board and meeting the requirements of the License Agreement. For example, as part of the License Agreement, Hoop was required to carry out ongoing store maintenance and renovations for all existing Disney Stores, in addition to Disney Stores remodels. However, according to CI 5, after Hoop took over the operation of Disney Stores, Hoop did not conduct any maintenance or repair on any of the existing stores. The failure to repair caused significant problems with the Franchise Board who, according to CI 5, pointed out that many of the 3-D Disney character sculptures featured throughout Disney Stores had chipped paint and needed regular paint touch-ups.

50.     At all times before and during the Class Period, Defendants were aware of the problems that Hoop was experiencing. According to CI 1, problems with the Disney Stores Remodeling Initiative and Disney merchandise were openly communicated to and discussed amongst Children's Place executives, including Dabah, during various meetings. CI 5 confirmed that Dabah knew about problems regarding Hoop because Dabah was "extremely hands on" and played an integral role in managing all elements of the Company's relationship with Disney. According to CI 5, Dabah was present in about half of all formal meetings with the Franchise Board relating to the Remodeling Initiative of Disney Stores, which took place on a bi-weekly basis.

51.     Disney maintained a variety of different store formats, or "design themes," for their retail stores.  These store formats were comprised of the store layout, types of fixtures, artistic elements and so forth.  Each store format had a name, including Mickey, Castle, Pink and Green, and Millennium.  As part of the Remodeling Initiative, Hoop was required to convert older formats to newer ones.  According to CI 7, who served as Senior Director of Store Design, the Mickey Store format ("Mickey Store Format") was planned to replace all of the existing store formats and approximately 50 existing Disney Stores were scheduled to be remodeled to the Mickey Store Format within the first calendar year after the acquisition.

52.     Children's Place first began constructing stores according to the Mickey Store Format in the fall of 2005.  According to CI 7, throughout the construction process, the Franchise Board expressed their concerns about the design issues and provided guidance (if not strict directives) in terms of how the Mickey Store Format should be designed.

53.     According to CI 7, in early 2006, after the first 50 Disney Stores had been remodeled to the Mickey Store Format, the Franchise Board expressed serious concerns about the Mickey Store Format.  According to CI 7, the Franchise Board felt that the Mickey Store Format was "too abstract" and not child-friendly.  As a result, Children's Place had to design a new prototype for Disney Stores.

54.     Although Children's Place was required to completely remodel 160 Disney Stores by January 1, 2009 under the License Agreement, by early 2007, Children's Place had not yet arrived at a final, approved design for Disney Stores.  According to CI 3, who served as Purchasing Coordinator, beginning approximately mid-2006, Children's Place began remodeling Disney Stores at an accelerated rate and because there was no finalized or approved floor plan, the Company essentially adopted an "ad hoc" approach to the Remodeling Initiative.  CI 5 confirmed that the

number of scheduled remodels for 2006 "jumped up substantially." According to CI 5, the remodel schedule was unrealistic and the various store design and construction problems that ensued only exacerbated the situation.

55.    Hoop's failure to come up with an approved design for Disney Stores was, in part, a result of disputes between Hoop and the Franchise Board. According to CI 5, one significant disparity between Hoop and the Franchise Board was related to the "look and feel" of the Mickey Store Format. CI 5 explained that Dabah "didn't understand the characters" and felt very strongly that the Mickey Store Format should embody a more modern design with less emphasis on Disney characters themselves.

56.    The lack of a finalized design scheme for Disney Stores caused numerous delays with regard to the Remodeling Initiative. According to CI 6, throughout the Class Period, there was "pressure" on the Remodeling Initiative and occasions when deadlines were overdue by several days. The delays were exacerbated by the fact that, according to CI 5, Hoop would often implement design installations without first obtaining approval from the Franchise Board. For example, according to CI 5, under Dabah's direction, "Geppetto-style" flooring, representing the wooden floor of Geppetto's cottage, was installed in certain Mickey Store Format Disney Stores without the Franchise Board's approval. According to CI 5, the Franchise Board found the flooring to be inappropriate and Hoop was required to replace the flooring at an additional cost.

57.    As part of the License Agreement, as amended in 2006, Children's Place was required to remodel Disney Stores at least once every 12 years and following lease renewals, which amounted to approximately 145 stores by February 3, 2007. However, because of the aforementioned delays, by February 3, 2007, the Company had only remodeled 32 of these Disney Stores since its 2004

acquisition. Thus, there was no way the Company could meet the deadlines set forth in the agreement with Disney.

58. As a result of their failure to meet certain deadlines and other violations of the License Agreement, Children's Place was in breach of the License Agreement throughout 2006 and most of 2007. According to CI 7, Dabah was well aware that Children's Place was not fulfilling its obligations under the License Agreement.

59. In 2007, Disney notified Children's Place that the Company had not complied with store renovation policies and other requirements of the License Agreement. According to Disney, Children's Place had committed 120 breaches of the License Agreement. As a consequence of the breaches, Children's Place and Disney entered into a letter agreement (the "June Letter Agreement").

60. The June Letter Agreement modified certain provisions of the License Agreement. Children's Place and Disney entered into the June Letter Agreement because, according to Disney, Children's Place had failed to comply with certain License Agreement requirements. Under the June Letter Agreement, Children's Place agreed to remodel 234 Disney Stores into a new store prototype by the end of fiscal 2011, of which the first nine were to be completed during the second half of fiscal 2007 and an additional 67 Disney Stores were to be remodeled by the end of fiscal 2008. The June Letter Agreement additionally required Children's Place to complete a "maintenance refresh" program in approximately 165 Disney Stores by June 30, 2008. The June Letter Agreement made other modifications to the License Agreement, including reduced restrictions on Disney's ability to grant direct merchandising licenses to other specialty retail store chains. In its Form 10-Q for the period ended August 4, 2007, filed with the SEC on or about December 5, 2007, Children's Place describes the June Letter Agreement, as follows:

June Letter Agreement

The Company, Hoop and TDSF entered into a letter agreement on June 7, 2007 (dated as of June 6, 2007) (the "June Letter Agreement"), addressing issues that had been raised by TDSF, as previously disclosed by the Company, relating to the compliance by Hoop with certain provisions of the Disney License Agreement. The June Letter Agreement set forth TDSF's position that Hoop has committed 120 uncured material breaches of the License Agreement, primarily relating to Hoop's obligations with respect to store remodeling and store maintenance. TDSF asserted that the existence of these breaches would permit TDSF to exercise its rights and remedies under the License Agreement, which could include termination of the License Agreement.

The June Letter Agreement, among other things, suspended the remodel obligations in the License Agreement for the approximately 4.5 year term of the June Letter Agreement and, in lieu of those provisions, imposed new obligations on the Company with respect to the renovation and maintenance of numerous stores in the Disney Store chain between fiscal 2007 and fiscal 2011 and, for the stores to be remodeled in fiscal 2007, set forth a detailed timetable for submission of plans and completion dates.

61.    The June Letter Agreement extended the Company's remodeling requirements of Disney Stores to fiscal 2011 and imposed new obligations for Children's Place with respect to renovation and maintenance of Disney Stores. The agreement also established a detailed timetable for completion dates. Under the June Letter Agreement, if Children's Place complied with the terms of the agreement, Disney would refrain from exercising rights and remedies it had under the License Agreement for the breaches. If Children's Place violated the June Letter Agreement, however, Disney would be free to exercise its rights and remedies under the License Agreement, including terminating the Company's license to operate Disney Stores.

62.    Two months later, in August 2007, Children's Place disclosed that it had already fallen behind on its obligations under the June Letter Agreement and that there were upcoming deadlines during the third and fourth quarters of fiscal 2007 that the Company would likely miss. As a result of the Company's violation of the June Letter Agreement, Disney was free to terminate its License Agreement with Children's Place.

**Options Backdating Scheme**

63.    From 1997 through 2005, Children's Place engaged in the now well-known improper practice of backdating option grants.  Stock option backdating involves the practice of intentionally altering grant dates to a date when the stock's price was lower.  A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating them so they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start.  For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a "sure thing."

64.    Between at least 1997-2005, Children's Place granted stock options to its officers, directors and employees pursuant to at least two different stock option plans.  Options were granted under the 1997 Stock Option Plan ("1997 Plan") and the 2005 Equity Incentive Plan ("2005 Plan"). As Children's Place has admitted, Defendants backdated option grants under both plans.

65.    On June 23, 2005, the Company's stockholders granted approval of the 2005 Plan. According to the 2005 Plan, "[t]he price per Share of the Shares to be purchased pursuant to the exercise of any Option shall be fixed by the Committee at the time of grant; provided, however, that 'in no event shall such purchase price be less than 100% of the Fair Market Value of a Share on the date of grant of the Option.'"

66.    The same representations were reiterated in the Company's Form 10-K, filed with the SEC on or about April 12, 2006 (the "2005 10-K").  With regard to the 2005 Plan, the 2005 10-K stated the following:

> The Stock Option Plans are administered by the Compensation Committee ("Compensation Committee"), a committee of independent members of the Board of Directors.  Options granted under the Plans have exercise prices established by the Compensation Committee provided that **the exercise price of incentive stock options may not be less than the fair market value of the underlying shares at**

**the date of grant. The Plans also contain certain provisions that require the exercise price of incentive stock options granted to stockholders owning greater than 10% of the Company be at least 110% of the fair market value of the underlying shares.** [Emphasis added.]

67.     The 2005 10-K falsely represented that the Company applied Accounting Principles Board Opinion No. 25 ("APB 25") in accounting for stock option grants. For example, with regard to Children's Place's accounting policy, the Company's 2005 Form 10-K stated, in pertinent part, as follows:

Accounting for Stock-Based Compensation

In accordance with SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123") and the disclosure requirements of SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure" ("SFAS 148"), **the Company accounts for its** 1996 Stock Option Plan (the "1996 Plan"), its **1997 Stock Option Plan (the "1997 Plan"), its 2005 Equity Incentive Plan (the "2005 Plan")** (collectively, the "Plans") and its Employee Stock Purchase Plan (the "ESPP") **under the intrinsic value method described in the provisions of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25")** and related accounting interpretations. Accordingly, **since options were granted at prices that equaled or exceeded their estimated fair market value at the date of grant, no compensation expense was recognized at the date of the grant.** [Emphasis added].

68.     Contrary to the foregoing representations, the options granted under the 2005 Plan (as well as the Company's other options plan) were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the grant date. Rather, the option grants were backdated. In many instances, the grant dates were dated just before a sharp increase in the trading price of Children's Place stock, *i.e.*, the options were "spring-loaded." Defendants have now admitted that certain option grant dates were set with a view towards upcoming disclosures.

69.     Children's Place has since disclosed in its Form 10-K for the year ending February 3, 2007 that "as a result of the inadequacy of the Company's governance, internal financial reporting and other controls over the option grant process, the APB 25 measurement dates ("measurement date") used by the Company for a significant portion of the stock options granted during the Review

Period were incorrect, as the recipients of the grants, number of shares subject to the options granted and exercise prices were not approved and established with finality by the date the Company had recorded as the grant date."

70. Defendants' option backdating scheme caused Children's Place's 2005 Form 10-K to materially understate Children's Place's compensation expense because Defendants failed to expense the in-the-money portion of Children's Place's stock option grants during the period, as required by APB 25. Additionally, in the 2005 Form 10-K, Defendants represented that Children's Place accounts for its stock option plans under the intrinsic value method of APB 25 and related accounting interpretations. These statements were materially false and misleading in each of these years because Children's Place granted stock options to insiders at prices that were below fair market value on the grant date.

71. In fiscal 2005, Defendants caused and received several grants at lows in the Company's stock chart. For example:

(a)     A total of 270,000 Children's Place stock options were purportedly granted on April 29, 2005 at the exercise price of $37.66 per share. The exercise price was the lowest for the month and preceded a sharp increase. Just six trading days later, after the Company announced increased earnings per share guidance in its May 5, 2005 press release, Children's Place stock was trading at $44.72 per share.

(b)     A total of 85,000 Children's Place stock options were also purportedly issued to Defendant Dabah on April 29, 2005 at the exercise price of $41.42 per share. Just six trading days later, after the Company announced increased earnings per share guidance in its May 5, 2005 press release, Children's Place stock was trading at $44.72 per share.

- 24 -

72.     APB 25 required Defendants to record a compensation expense for options that were in-the-money on the grant date, but Defendants did not do so, thereby materially understating Children's Place's compensation expense and materially overstating Children's Place's net income and earnings per share or materially understating the Company's net loss. These statements were designed to conceal, and did in fact conceal, the fact that Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Children's Place insiders in violation of the federal securities laws.

73.     As detailed herein, Children's Place has now restated its historical financial statements to record charges for compensation expenses relating to past stock option grants, and, as a result, "the Company's previously issued financial statements and other historical financial information and related disclosures for periods through the first quarter of fiscal 2006 should no longer be relied upon."

74.     With respect to the Company's 2005 fiscal year, the Company restated its financials, as follows:

| Statement of Operations Data (in thousands, except per data share) | Year ended January 28, 2006 | Restatement | Difference |
|---|---|---|---|
| Net sales | $1,668,736 | $1,668,736 | - |
| Cost of sales (exclusive of depreciation shown separately below) | $1,007,496 | $1,008,722 | $1,226 |
| Gross profit | $661,240 | $660,014 | $(1226) |
| Selling, general and administrative expenses | $505,440 | $513,994 | $8,554 |
| Operating income | $102,670 | $92,890 | $(9,780) |
| Income before income taxes and extraordinary gain | $103,233 | $93,453 | $(9,780) |
| Provision for income taxes | $39,323 | $35,149 | $(4,174) |
| Income before extraordinary gain | $63,910 | $58,304 | $(5,606) |
| Net income | $65,575 | $59,969 | $(5,606) |

| Statement of Operations Data (in thousands, except per data share) | Year ended January 28, 2006 | Restatement | Difference |
|---|---|---|---|
| Diluted net income per common share before extraordinary gain | $2.21 | $2.03 | $(0.18) |
| Extraordinary gain, net of taxes | $0.06 | $0.06 | - |
| Diluted net income per common share | $2.27 | $2.09 | $(0.18) |
| Diluted weighted average common shares and common share equivalents outstanding as restated | $28,877 | $28,687 | $(190) |

**Children's Place's False and Misleading Reporting**
**and Certifications of Disclosure and Internal Controls**

75.    As a result of the rash of recent corporate accounting scandals, Congress enacted the Sarbanes-Oxley Act in 2002, in part to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. The SEC revised Item 307 and added Item 308 of Regulation S-K [17. C.F.R. 229.307 and 308] to require companies to disclose the conclusions of its principal executive and principal financial officer on the effectiveness of a company's disclosure controls and procedures and disclose a report by management on its internal control over its financial reporting.

76.    Concerning the Company's internal and disclosure controls, Defendant Dabah signed the following report, which was included in the Company's April 12, 2006 Form 10-K:

Evaluation of Disclosure Controls and Procedures

Management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based on this review, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of January 28, 2006.

<u>Management's Report on Internal Controls Over Financial Reporting</u>

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Securities Exchange Act Rule 13a-15(f). Our system of internal control is evaluated on a cost benefit basis and is designed to provide reasonable, not absolute, assurance that reported financial information is materially accurate.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the design and effectiveness of our internal control over financial reporting based on the Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations ("COSO"). Based on this evaluation, we concluded that the Company's internal control over financial reporting was effective as of January 28, 2006.

Management's assessment of the effectiveness of internal control over financial reporting as of January 28, 2006 was audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report, which is included immediately following Item 9A(c) to this Annual Report on Form 10-K and incorporated herein by reference to the 2006 Annual Report to Shareholders.

<u>Changes in Internal Controls Over Financial Reporting</u>

There have been no changes in the Company's internal controls over financial reporting that occurred during the Company's most recently completed fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

The Company's management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all error and fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected.

77.    Similarly, Defendants Dabah and Riley signed the Company's Forms 10-Q during the Class Period, which included, in all material respects, the following report on the Company's internal and disclosure controls:

<u>Evaluation of Disclosure controls and procedures</u>

Management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded, as of the end of the period covered by this report, that the Company's disclosure controls and procedures are effective in ensuring that information required by the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding disclosure.

<u>Changes in Internal Control Over Financial Reporting</u>

There have been no changes in the Company's internal control over financial reporting that occurred during the Company's most recently completed fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

The Company's management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal controls will prevent all error and fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected.

78.    These representations, which were materially false and misleading for the reasons alleged herein, were then wrongfully certified by Defendants Dabah and Riley and included as part of the Company's Forms 10-K and 10-Q filed with the SEC:

I, ..., certify that:

1.    I have reviewed this ... Report on Form ... of The Children's Place Retail Stores, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

       (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

       (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

       (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

       (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing equivalent functions):

       (a)      All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which

are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

79.    The certifications above were materially false and misleading when made because, as detailed herein, throughout the Class Period, Children's Place did not maintain appropriate internal controls.

### Materially False and Misleading Statements Issued During the Class Period

80.    The Class Period begins on March 9, 2006.  On that date, Children's Place issued a press release announcing its financial results for the fourth quarter of 2005, the period ended January 28, 2006.  For the quarter, the Company reported consolidated net sales of $539.7 million and a net income of $45.7 million.  For fiscal year 2005, the Company reported net income of $65.6 million. Defendant Dabah commented on the results, stating, in pertinent part, as follows:

> Fiscal 2005 was another great year for our Company.  The Children's Place brand continued to gain market share and the growth and leverage achieved in the fourth quarter was a testament to our scaleable systems infrastructure, strong team and management depth.  At Disney Store, while the fourth quarter proved challenging, we have made progress in positioning the business for success and we look to 2006 with excitement.  Disney has a great line-up of new content coming up this year, and we have aligned our merchandise strategies to capitalize on these events in a big way.  **We continue to believe that The Children's Place and Disney Store can grow up to 1,800 stores across North America, leaving us with 700 stores still to open.  I am confident that both brands have substantial opportunity to deliver significant, profitable growth for many years to come.**  [Emphasis added].

81.    The statement above in ¶80 that the Company had net income of $65.6 million for fiscal 2005 was materially false, as the Company's true net income was $60 million.  Children's Place materially understated its compensation expenses, as detailed herein, in violation of Generally Accepted Accounting Principles ("GAAP"), thereby materially overstating its net income. Children's Place has admitted that its net income for fiscal year 2005 was materially overstated at

- 30 -

the time it was reported and has since restated its income figures, among other items. In addition, the statement in ¶80 that "[w]e continue to believe that The Children's Place and Disney Store can grow up to 1,800 stores across North America, leaving us with 700 stores still to open" was materially false and misleading because, given the problems that the Company was then having with Disney, as detailed herein, there was no reasonable basis upon which to state that "The Children's Place and Disney Store can grow up to 1,800 stores across North America." Moreover, the positive statements about Disney Stores and the Company's relationship with Disney, as noted in ¶80, created an obligation to disclose the problems that the Company was then having with Disney, as detailed herein.

82.     Following the issuance of the earnings press release, Children's Place held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Dabah falsely described the facts and circumstances surrounding the Mickey Store Format, stating, in pertinent part, as follows:

> EZRA DABAH.  And as it relates to the Mickey store prototype, we are in the process of, I would say, tweaking that, or more than tweaking that prototype as we speak to get it somewhat more exciting, and there has been some changes as to what we think about it. **So although the Mickey store prototype is actually performing slightly above the chain, we are looking to enhance it, and therefore, we ratcheted down the remodels to the minimum that we could so that we have the opportunity to kind of tweak it, get it to be more satisfying to all before we roll it out.** [Emphasis added.]

83.     The statement above in ¶82 concerning the Mickey Store Format was materially false and misleading because it created the false impression that the Mickey Store Format was being successfully deployed and that the remodels had been scaled down to further improve the design. In truth and in fact, as detailed herein, the Mickey Store Format was causing increasing problems between the Company and Disney, as the Company was unable to create a design scheme that satisfied the Franchise Board and was not following Disney's suggestions and directives for the

Mickey Store Format.  Accordingly, the remodels had been "ratcheted" down because Disney was not satisfied with Children's Place or its designs.

84.    On April 6, 2006, Children's Place issued a press release announcing its sales results for the five-week period ended April 1, 2006.  For the period, the Company reported total sales of $173.4 million.  Defendant Dabah commented, in pertinent part, as follows:

> Our March sales results were particularly strong given the Easter shift into April and the fact that Disney Store was up against last year's very successful DVD release of The Incredibles.  At The Children's Place brand, our momentum was fueled by strong sales of our Easter dressy assortment for which we have become famous.  **At Disney Store, we are pleased with the continued positive trend of the business.** [Emphasis added].

The press release also noted that Dabah would oversee Disney Stores business since the then-president of that business had resigned from his position.

85.    The statement in ¶82 above that "[a]t Disney Store, we are pleased with the continued positive trend of the business" was a positive statement describing the operations of Disney Stores which created an obligation to disclose the problems that the Company was then having with Disney, as detailed herein.  Defendants failed to disclose those problems.

86.    On May 18, 2006, Children's Place issued a press release announcing its financial results for the first quarter of 2006, the period ended April 29, 2006.  For the quarter, the Company reported consolidated net sales of $426.5 million and net income of $15.3 million.  Defendant Dabah commented on the results, stating, in pertinent part, as follows:

> Our first quarter results mark a strong start to fiscal 2006.  This is truly an exciting time for The Children's Place.  Our first quarter performance reflects the progress we are making toward our 2006 goals of: increasing market share; enhancing the customer brand experience; and achieving greater expense efficiency.  **At Disney Store, we are pleased with our first quarter results, which were driven by our increased investment in apparel, a strong inventory position and positive guest response to our merchandise offering.**  [Emphasis added.]

87.     The statement above in ¶86 that the Company had net income of $ 15.3 million for the first fiscal quarter of 2006 was materially false and misleading.  Children's Place materially understated its compensation expenses, as detailed herein, in violation of GAAP, thereby overstating its income.  Children's Place has since admitted that its net income for the first fiscal quarter of 2006 was materially overstated at the time it was reported and has restated its income figures, among other items.  In addition, the statement in ¶86 above that "[a]t Disney Store, we are pleased with our first quarter results, which were driven by our increased investment in apparel, a strong inventory position and positive guest response to our merchandise offering" was a positive statement describing the operations of Disney Stores, which created an obligation to disclose the problems that the Company was then having with Disney, as detailed herein.

88.     On August 3, 2006, Children's Place issued a press release announcing that its July sales were up 28%; it anticipated a second quarter loss of $(0.54) to $(0.56) per share; and it increased its fiscal 2006 earnings per share guidance to $2.85 to $2.95 per share.  Defendant Dabah commented on the announcement, stating, in pertinent part, as follows:

> We are pleased to see our strong sales momentum continue into July, closing off a strong first half for The Children's Place and Disney Store brands.  We are also encouraged by the initial favorable customer response to our Back-to-School offerings at both brands and **we are especially pleased with the continued strength at Disney Store.**  [Emphasis added.]

89.     The statement in ¶88 above that "we are especially pleased with the continued strength at Disney Store" was a positive statement describing the operations of Disney Stores, which created an obligation to disclose the problems that the Company was then having with Disney, as detailed herein.  Defendants failed to disclose those problems.

90.     On August 17, 2006, Children's Place issued a press release announcing its financial results for the second quarter of 2006, the period ended July 29, 2006.  For the quarter, the Company

reported consolidated net sales of $395.6 million and a net loss of $15.2 million, or ($0.53) per share. Defendant Dabah commented on the results, stating, in pertinent part, as follows:

> We are pleased with our second quarter and first half financial results. **We drove substantial improvements at both brands through consistent execution of our strategies.** We are particularly pleased with our first half results, are encouraged by our initial start to the Back-to-School season, and we look forward to the second half of the year. [Emphasis added.]

91.    The statements above in ¶90 were materially false and misleading because they positively described trends in the Company's business, but failed to disclose the problems with Disney and Disney Stores, as detailed herein.

92.    Also on August 17, 2006, Children's Place conducted a conference call with analysts and investors to discuss its second quarter earnings and its business operations. During the conference call, Defendant Dabah positively described the Company's relationship with Disney, stating, in pertinent part, as follows:

> Looking ahead, we are excited about the DVD release of the Walt Disney pictures, the Little Mermaid platinum edition which arrives in stores October 3rd. The movie's popular princess, Ariel, will make a big splash at the Disney Store as we introduce unique, broad and compelling merchandise assortment across both hard lines and soft lines. **Importantly, we are leveraging the ideas and talent across The Children's Place and the Disney Store.**
>
> As an example, during the quarter the Company held its first joint national store conference where we brought together the field organization from The Children's Place and Disney Store. **The conference created valuable opportunities for the teams to collaborate, build relationships, strengthen teamwork and leverage each brands respective core competencies**. [Emphasis added.]

93.    The statements referenced above in ¶92 concerning the Company's relationship with Disney were materially false and misleading because they positively described the Company's relationship with Disney, but failed to disclose the significant and substantial problems the Company was then having with Disney.

- 34 -

94.    On September 7, 2006, the Company issued a press release announcing that it was delaying the filing of its second quarter 2006 Form 10-Q in order to complete its review of accounting for past stock option grants.  In that regard, the press release stated:

> On August 24, 2006, at the request of the Company's audit committee, the Company's outside counsel began an investigation into the Company's stock option practices.  Outside counsel delivered its findings to the audit committee on September 6, 2006.  The investigation found various instances in which the Company's records did not correctly reflect the legal grant date for stock options granted to employees and directors of the Company, resulting in errors in the dating of these stock options.  The report concluded that, except for one occasion in 2001, as to which the report was inconclusive, the errors in the granting and recording of stock options were unintentional.
>
> The Company is currently engaged in an analysis of the accounting treatment of its stock option grants since its initial public offering in 1997 to determine the extent of any corrections that may be required to its previously reported financial results.  The Company cannot predict when this analysis will be completed.  While the Company expects that some corrections to its reported financial results will be necessary, it is not yet able to estimate the aggregate amount of any such corrections or whether such corrections would be material.  Accordingly, the Company has not yet determined whether any corrections would be made by recording a non-cash charge to earnings for the second quarter of 2006, or whether it may be necessary to restate its previously filed financial statements for prior fiscal years and the first quarter of fiscal 2006.

95.    In response to this announcement, the price of Children's Place common stock declined from $57.27 per share to $55.91 per share, on heavier than normal trading volume.

96.    On October 5, 2006, Children's Place issued a press release announcing its sales results for the five-week period ended September 30, 2006, and an update concerning its stock option investigation.  For the period, the Company reported total sales of $210.3 million.  With regard to the stock options investigation, the press release stated:

> Separately, in connection with the Company's previously announced investigation into its stock option practices which concluded that there were errors in the dating of various stock option grants, at the request of the Company's audit committee, the Company's outside counsel is continuing its investigation and conducting additional follow-up work regarding these stock option grants.  While the Company is still conducting its accounting analysis and has not yet determined definitively the impact of these errors in the dating of stock options on the Company's historical financial

- 35 -

statements, the Company expects that it will be necessary for it to restate its previously filed financial statements for certain fiscal years and for periods in fiscal 2006. Accordingly, the Company's previously issued financial statements and other historical financial information and related disclosures relating to periods through the second quarter of fiscal 2006 contained in the Company's SEC filings, including applicable auditor reports, and press releases should not be relied upon. The Company believes that this expected restatement will not have a material impact on its fiscal 2006 operating results. The Company is committed to resolving these issues as quickly as possible and will make a further announcement as soon as additional information is available.

In addition, the Company announced that, on September 29, 2006, it was contacted by the Securities and Exchange Commission in connection with an informal investigation of the Company's stock option grants. The Company intends to cooperate fully with the SEC investigation.

97.    On November 13, 2006, Children's Place issued a press release announcing that it was delaying its third quarter 2006 earnings release and conference call pending completion of its review of the Company's stock option practices.

98.    In response to this announcement, the price of Children's Place stock declined from $70.01 per share to $67.37 per share, on heavy trading volume.

99.    On January 4, 2007, Children's Place issued a press release announcing its sales results for the five-week period ended December 30, 2006. For the period, the Company reported total sales of $318.5 million. With regard to the results, the press release stated:

The Company believes that December results at The Children's Place brand were negatively impacted by unseasonable weather, which resulted in higher than planned promotional activity. In addition, the Company believes it would have benefited from increased ownership of key volume drivers and fresh spring goods, given early reads on Spring merchandise.

**At Disney Store, December results reflect the Company's strategies to build a full-price business. The month was driven by strong customer response to the Company's toy and apparel assortments.** [Emphasis added.]

100.    The statement in ¶99 above that "[a]t Disney Store, December results reflect the Company's strategies to build a full-price business. The month was driven by strong customer response to the Company's toy and apparel assortments" was a positive statement describing the

operations of Disney Stores, which created an obligation to disclose the problems that the Company

was then having with Disney, as detailed herein.  Defendants failed to disclose those problems.

101.    On January 31, 2007, Children's Place issued a press release announcing that it had

concluded its stock options investigation.  The Company sought to downplay the significance of the

options backdating scandal, stating, in pertinent part, as follows:

> The special committee's report included the following key findings:
>
> •    There was no conclusive evidence of intentional backdating of options or other misconduct in connection with the option grant process.
>
> •    There was no evidence of an intent to mislead about option grant dates or exercise prices.
>
> •    No member of management and no director engaged in improper self-dealing in connection with the option grants made by the Company.
>
> •    All Company personnel cooperated fully with the investigation.

Further, the Company admitted that grant dates were selected "with a view toward upcoming

disclosures" – *i.e.*, selecting option dates in order to benefit from positive news about the Company

and its business.  This practice, which has been referred to as "spring-loading," is an intentional act.

The press release stated, in pertinent part, as follows:

> The Company did not maintain appropriate governance and other internal controls, which resulted in errors in the dating of options and other irregularities in option grants.  In many instances options were dated before all grant-making processes were finalized.  Consequently, in such instances the option exercise price was lower than it should have been based on the trading price on the date the grant process was completed and incorrect charges were taken for the options for financial reporting purposes.  **Also, in a few instances, the Company may have selected grant dates with a view toward upcoming disclosures.**  [Emphasis added.]

Finally, the Company detailed the financial impact of the options backdating scandal and noted that

the Company would be restating its "previously issued financial statements for the fiscal years 2003,

2004, 2005 and the first fiscal quarter 2006 and may amend the financials disclosed in its fiscal 2006

second quarter press release."  The press release stated, in pertinent part, as follows:

- 37 -

Based on the results of the investigation and its own additional review, management has concluded that incorrect measurement dates were used for financial reporting purposes in respect to option grants. **As previously announced, the Company will restate its previously issued financial statements for the fiscal years 2003, 2004, 2005 and the first fiscal quarter 2006 and may amend the financials disclosed in its fiscal 2006 second quarter press release. At this time, the Company does not expect this cumulative restatement to exceed $24 million, pre-tax, or $17 million, after tax, with the majority of the restatement impacting fiscal 2005.** Approximately $22 million of the total pre-tax restatement amount is expected to be non-cash. As stated previously, the amounts of the restatement and related expenses are subject to significant adjustment pending the review of the Company's determination of the appropriate accounting for its previously issued stock options, related discussions with the staff of the SEC, and clarification of certain tax laws and their accounting impact. The Company intends to complete the restatement of its financial statements as soon as practicable. There is no assurance that, when finally determined, the Company will not be required to make adjustments in a greater amount. [Emphasis added.]

102.    In response to the Company's announcement concerning the conclusion of its options investigation, the price of Children's Place stock surged from $54.21 per share to $59.56 per share as the market was led to believe that the Company's internal control issues were limited to the options backdating issues and that the options backdating was, for the most part, not done intentionally. Defendants, however, continued to conceal the true scope of the internal control problems at the Company. Indeed, the statements in ¶101 did not disclose that during the time that the Audit Committee was investigating the Company's options practices, Defendant Dabah had pledged shares of his Children's Place stock as collateral for margin loans in violation of Company policies. Had the market known the true facts about Defendant Dabah's conduct, the price of Children's Place stock would not have risen as substantially as it did, if at all.

103.    On February 1, 2007, Children's Place issued a press release announcing its preliminary financial results for the third quarter of 2006, the period ended October 28, 2006. For the quarter, the Company reported consolidated net sales of $550.4 million and preliminary net income of $38 million. With regard to the Company's fiscal 2007 outlook, the press release stated, in pertinent part, as follows:

Fiscal 2007

**At this time, the Company anticipates fiscal 2007 earnings per share of approximately $3.55 to $3.65.** The Company anticipates a tax rate of 38% and 31 million diluted shares outstanding. In addition, this guidance includes a provision of approximately $6 million, in pre-tax expense to address issues with certain recently remodeled Disney Stores. This guidance does not reflect any residual expenses the Company may incur as a result of the conclusion of the stock option investigation.

**The Company has recently commenced discussions with the Walt Disney Company regarding potential modifications to certain terms of the Company's long-term license agreement to operate the Disney Store retail chain in North America, some of which may be material. These discussions are still at an early stage and, as such, the Company cannot predict the specific nature of any modifications to the license agreement. If the Company is unable to reach agreement with Disney on the modifications, Disney may assert that certain defaults exist under the license agreement and Disney may reserve its rights and remedies under the agreement.** [Emphasis added.]

104.    The statements referenced above in ¶103 were materially false and misleading because, while making positive statements about the Company, its financial outlook, and its working relationship with Disney, they failed to disclose the full extent of the problems the Company was having with Disney.

105.    Following the earnings press release, on February 1, 2007, Children's Place held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants Dabah and Riley downplayed the problems with Disney and failed to disclose the full extent of the issues between the Company and Disney. The following exchange is illustrative:

EZRA, CEO, THE CHILDREN'S PLACE RETAIL STORES, INC.: And Kimberly, as it relates to the Disney license, as we mentioned in our press release, we are discussion with the Walt Disney Company about changes to the license agreement, which could be material. It's really premature for me to comment on the status of these discussions. But most importantly, I believe that it's in the best interest of both of our companies to resolve these issues, and we look forward to do so in the very near future.

*      *      *

- 39 -

EZRA DABAH: As it relates -- although we were both on the same wavelength at the same time. As it relates to the $6 million charge. [I don't want to say charge] -- estimated capital –

SUE RILEY, EVP, FINANCE AND ADMINISTRATION, THE CHILDREN'S PLACE RETAIL STORES, INC.: Well, it's expense. Basically, because we're going to have to make some changes to some stores that already have been renovated, we expect -- and this is very, very preliminary, but we felt that we had to factor it into our 2007 earnings estimate. We'll have to take some charges or accelerate some depreciation. We're not sure exactly what form this will take. It's pretty fair to say that because we had to make some pretty extensive renovations to stores that have recently been remodeled, we'll have to take some expense associated with that. And that's all in connection with these discussions that are underway with the Walt Disney Company.

With regard to delays with the Disney Store prototypes, Defendant Dabah stated:

JANET KLOPPENBURG, ANALYST, JJK RESEARCH. Where you talk about the provision of $6 million to remodel to address issues with certain remodeled Disney stores. Can you talk about what's going on there? Why that's happening? And secondly, if you think that we should consider that $6 million as an extraordinary item or whether it's part of operations?

EZRA DABAH. It's not the first time we talk about it. This is why we have changed the design and look forward to roll out a substantially different design beginning in the summer of this year. So, to address certain issues as it relates to the design, as well as the constructions of the store, we are expediting some of the capital investments that we have made in the stores because we have to make some changes.

JANET KLOPPENBURG. Okay. And I have read the agreement that you have with Disney and they do have some right to have say with respect to how stores are remodeled. So, could that charge of $6 million be related to this negotiation that you're involved with, with Disney?

EZRA DABAH. We're working very closely with them.

With regard to the License Agreement and the Remodeling Initiative, the following exchange took

place:

KIMBERLY GREENBERGER, ANALYST, CITIGROUP. Great. Thank you. I just had two quick questions. Looking back to the Disney Stores purchase agreement. Can you remind us how many years you had to conduct the store remolding program? And was the agreement that you'd remodel the entire chain or invest, for example, $100 million in store remodels and kind of do as much as you could?

EZRA DABAH. Yeah, Kimberly, it was a complex dates for certain stores at certain times so it'd be hard for me to tell you one specific time as to when we had to do what. **The thing that really threw us back, unfortunately, was the fact that we all were not happy with the outcome of the Mickey prototype, which delayed our remodel programs.** So, our intentions were to full force do whatever we can to complete everything we had committed to. **But unfortunately because of the Mickey prototype that was not well received, frankly, both by us as well as the Walt Disney Company, is what threw us off that schedule**. So, we look forward to do our very best to complete that program as soon as we possibly can. [Emphasis added].

106.    The statements above in ¶105 concerning Children's Place's relationship with Disney, the remodeling of Disney Stores and the Mickey Store Format were materially false and misleading because they misrepresented and failed to disclose the true extent of the problems between the Company and Disney, as detailed herein. Indeed, Defendants' statements created the false and misleading impression that the problems with Disney were limited in scope and easily remedied. In truth and in fact, the problems with Disney were extensive and substantial, as detailed herein, and would eventually lead to substantial revisions to the agreement between the companies.

107.    In response to the Company's earnings release and the conference call, the price of Children's Place common stock declined from $59.56 per share to $57.60 per share on February 5, 2007.

108.    On March 15, 2007, Children's Place issued a press release announcing its preliminary financial results for the fourth quarter and year end of 2006, the period ended February 3, 2007. For the quarter, the Company reported consolidated net sales of $645.2 million and preliminary net income of $46.8 million. The press release also provided disclosure about the Company's negotiations with Disney, stating, in pertinent part, as follows:

Fiscal Year 2007 Guidance

*The Company now anticipates fiscal 2007 earnings per share of approximately $3.63 to $3.73, $0.08 higher than previous guidance due to an approximate $4 million reduction in the Company's previously anticipated $6 million pre-tax expense for fiscal 2007 to address issues with certain recently remodeled Disney*

*Stores.* The Company anticipates a tax rate of 38% and diluted shares outstanding of 31 million. This guidance does not reflect any residual expenses the Company may incur as a result of the conclusion of the stock option investigation.

As previously reported, the Company is in discussions with the Walt Disney Company regarding potential modifications to certain terms of the Company's long-term license agreement to operate the Disney Store retail chain in North America, some of which may be material. These discussions began after the Company was notified by Disney that the Company had failed to comply with certain of its obligations under the license agreement, including, among others, obligations with respect to renovation of stores and store maintenance. Disney has asserted that these failures constitute material breaches of the license agreement. The Company and Disney have engaged in a dialogue and have exchanged proposals regarding the resolution of these issues. To date, no agreement has been reached. Accordingly, the Company cannot predict the specific nature of any modifications to be made to the license agreement and no assurances can be made as to the outcome of these negotiations. If the Company is unable to reach agreement with Disney on the modifications, Disney may exercise its rights and remedies under the agreement. [Emphasis added].

109.    Following the earnings announcement, the Company held a conference call with

analysts and investors. With regard to Disney, Defendant Dabah stated:

DOROTHY LAKNER: . . . . And one last question. Just anything you can say about a timetable we should think about in terms of the negotiations with Disney. Thanks.

*        *        *

EZRA DABAH: And, Dorothy, in regards to your last questions about potential timing on the negotiation with The Walt Disney Company, as you can imagine that is something we cannot put a timing on. **As we mentioned in this morning's press release, we have exchanged proposals and we believe we are making progress.** And at this moment we'll leave it as such.

*        *        *

JOHN MORRIS, ANALYST, WACHOVIA SECURITIES: Thanks. So a couple questions. Ezra, to extent you can talk about it, and I know you've got to be careful on this, but it would probably help us just to kind of clarify a little bit. Is the nature of the discussions with Disney pretty much solely about the remodels and maintenance, as mentioned in the release, or are there other factors? Can you just speak to that?

EZRA DABAH: Yes. We would rather not get into details. Please refer -- refer to the announcement that we made this morning in that -- in that regard. [Emphasis added].

110.    The statements referenced above in ¶¶108-109 were materially false and misleading because, while making positive statements about the Company, its financial outlook, and its working relationship with Disney, they failed to disclose the full extent of the problems that the Company was having with Disney.

111.    On April 12, 2007, Children's Place issued a press release announcing its total sales for the five-week period ended April 7, 2007.  For the period, the Company reported total sales of $204.7 million.  With regard to the Company's outlook, the press release stated:

> At this time, the Company anticipates first quarter 2007 earnings per share to be approximately even with last year's first quarter.  **The Company continues to expect fiscal 2007 earnings per share of approximately $3.63 to $3.73**, before any residual expenses the Company may incur as a result of the conclusion of the stock option investigation.  [Emphasis added.]

112.    In response to the Company's weak sales and earnings forecast, the price of Children's Place common stock declined from $53.75 per share to $51.23 per share, on extremely heavy trading volume.

113.    On May 10, 2007, Children's Place issued a press release announcing its total sales for the four-week period ended May 5, 2007.  For the period, the Company reported total sales of $140.3 million.  With regard to the Company's outlook, the press release stated:

> At this time, the Company anticipates reporting preliminary earnings per share of $0.40 to $0.42 for the first quarter of fiscal 2007, below previous guidance.  While consolidated comparable stores sales results came in at the low end of previous guidance, **sales were lower than planned and markdowns were higher at both brands than previously anticipated**, primarily due to continued poor Spring performance at The Children's Place, **lack of newness at Disney Store** and the unfavorable weather experienced in April.  This earnings per share range also includes approximately $2.5 million, pre-tax, in costs paid or accrued in association with the stock option investigation and related expenses.
>
> **For fiscal 2007, at this time, the Company anticipates earnings per share of $3.45 to $3.55, also below previous guidance**.  While the Company remains cautiously optimistic regarding the second half of the year, April results and current business trends have made it more difficult to achieve the Company's previous earnings expectation.  This updated guidance reflects the $2.5 million, pre-tax, in

stock option investigation and related expenses incurred in the first quarter but does not contemplate additional residual expenses the Company may incur as a result of the conclusion of the investigation.  [Emphasis added.]

114.    The statements above in ¶113 were materially false and misleading because they failed to disclose that, as a result of the numerous remodeling delays of Disney Stores, the Company was experiencing a decrease in sales and was subsequently forced to discount its Disney merchandise.

115.    In response to this announcement, shares of the Company's common stock fell from $53.46 per share to $52.09 per share, on heavy trading volume.

116.    On May 22, 2007, Children's Place issued a press release announcing its preliminary financial results for the fiscal first quarter, the period ended May 5, 2007.  For the quarter, the Company reported consolidated net sales of $478.9 million and preliminary net income of $13.1 million.  With regard to Disney, the press release stated:

> As previously reported, the Company has been in discussions with The Walt Disney Company (Disney) regarding potential modifications to certain terms of the Company's long-term license agreement to operate the Disney Store retail chain in North America.  These discussions began after the Company was notified by Disney that the Company had failed to comply with certain of its obligations under the license agreement, including, among others, obligations with respect to renovation of stores and store maintenance.  Disney has asserted that these failures constitute material breaches of the license agreement.

> The Company believes that the discussions between the Company and Disney are nearing conclusion and the parties have exchanged drafts of a letter agreement which contemplates that various modifications would be made to the license agreement. Among other things, it is expected that the Company would commit to renovate or upgrade a substantial number of Disney Stores over the next five years, beginning immediately, and to expend approximately $175 million for this purpose.  If the Company fails to adhere to the new schedule of compliance and renovations or otherwise comply with the modified terms, the agreement is expected to require the Company to pay Disney a significant fee.  Disney would continue to retain all its other rights and remedies under the license agreement.

> As the final agreement is still pending, the terms are subject to change.  Further, there is no assurance that the Company and Disney will enter into a definitive agreement with respect to these matters.  If the Company is unable to reach agreement with

Disney on the new terms, the Company anticipates that Disney may exercise its rights and remedies under the license agreement. The Company will provide a further update once the agreement is executed or other developments occur.

117.    The statements referenced above in ¶116 were materially false and misleading because they failed to disclose the full extent of the problems that the Company was having with Disney and for the reasons set forth in ¶105.

118.    On June 1, 2007, the Company held a conference call with analysts and investors. With regard to the new Disney Stores prototype and the Company's relationship with Disney, Defendant Dabah stated, in pertinent part, as follows:

> EZRA DABAH: . . . .We are extremely excited about the remodel. You guys like the store, like the remodel, like the prototype? Yes, yes, yes. We need to hear you on the -- okay. (LAUGHTER) Okay. What's important for you to note is that what Disney is requiring of us to do is what we want to do as well, so it's a win-win. It's not that they're asking us to do something that we don't think is right to do. **Again, at Disney we have assembled a great team. Again, extremely talented but more importantly working together in such a very special way and I must tell you that the energy and the culture that we used to hear is transferred to [there] and it's --and it's really, really beautiful to see what's been accomplished there.** [Emphasis added].

119.    The statements referenced above in ¶118 were materially false and misleading for the reasons set forth in ¶¶105 and 117 above.

120.    On June 8, 2007, the Company issued a press release announcing that "it has executed a letter agreement with a subsidiary of The Walt Disney Company (Disney) to resolve assertions by Disney that the Company committed numerous material breaches of its long-term license agreement under which the Company operates the Disney Store retail chain in North America." Defendant Dabah, commenting on the agreement, stated, in pertinent part, as follows:

> We are pleased to have come to an understanding with The Walt Disney Company. We are committed to executing on this important remodel program which will contribute to our goal of elevating the guest experience.

With regard to the June Letter Agreement, the press release stated:

Under the letter agreement, the Company has agreed to, among other things, remodel a total of 234 existing Disney Stores into a new store prototype being developed by the Company, by the end of fiscal 2011. The first nine remodels, which will include two stores bearing the "Mickey" format, will be completed during the second half of fiscal 2007. The Company is required to remodel at least 67 additional Disney Stores, 33 of which will be "Mickey" stores, into the new store prototype by the end of fiscal 2008 and to remodel an additional 53, 70 and 35 Disney Stores during fiscal 2009, 2010 and 2011, respectively. In addition, by the end of fiscal 2008, the Company will open at least 18 new Disney Stores using the new store prototype.

In addition, under the terms of the letter agreement, the Company will complete a "maintenance refresh" program in approximately 165 Disney Stores, including the flagship store located on Michigan Avenue in Chicago, by no later than June 30, 2008.

As previously announced, the Company's Board of Directors has committed $175 million of capital to fund the remodel and refresh programs described above between now and the end of fiscal 2011.

The Company and Disney also agreed to make certain other modifications to the provisions of the license agreement, including eliminating the extended royalty abatement for some of the Disney Stores that were identified as "Non-Core Stores" in the license agreement, reducing the restrictions on Disney's ability to grant direct merchandising licenses to other specialty retail store chains, requiring the potential implementation of a differentiated merchandise plan for the Disney Store outlets and modifying the provisions of the license agreement that would apply to a potential wind-down of the Disney Store business following any termination of the license agreement.

If the Company fully complies with the terms of the letter agreement, Disney has agreed to refrain from exercising any rights or remedies that it would have based on the existing breaches of the license agreement that are identified in the letter agreement. However, if the Company violates any of the provisions of the letter agreement, Disney has the right to terminate this forbearance and the letter agreement, in which case Disney would be free to exercise any or all of its rights and remedies under the license agreement, including terminating the Company's license to operate the Disney Stores.

In addition, if the Company breaches any of the provisions of the letter agreement on three or more occasions, Disney can require the Company to make a payment of $18.0 million to Disney.

If the Company violates any of the provisions of the letter agreement on five or more occasions, Disney has the right to terminate the license agreement, without any right on the part of the Company to defend, counterclaim, protest or cure. Disney continues to retain all its other rights and remedies under the license agreement with respect to any other breaches that may occur.

- 46 -

121.    The statements referenced above in ¶120 were materially false and misleading when made because they failed to disclose that, given the problems with the Remodeling Initiative, the Company would not be able to meet the deadlines in the June Letter Agreement.

### The Truth Begins to Emerge

122.    On July 9, 2007, Children's Place issued a press release announcing its total consolidated sales for the five-week period ended July 7, 2007.  For the period, the Company reported total consolidated sales of approximately $154.7 million.  With regard to the Company's outlook, the press release stated:

> Based on quarter-to-date sales trends, the Company anticipates reporting a loss per share of approximately $(0.94) to $(0.98) for the second quarter ending August 4, 2007.  This earnings per share range includes approximately $2.0 million, pre-tax, in costs paid or accrued in association with the Company's previously disclosed stock option investigation and related expenses.

> "In the month of June, sales came in below our expectations at both brands," said Ezra Dabah, Chief Executive Officer of The Children's Place Retail Stores, Inc.  **"As a result, we took significantly more markdowns which are negatively impacting our gross margin.**  We believe our assortments at both brands were not as focused and compelling as last year, which has been compounded by continuing mall traffic declines."

> "As we look at our back-to-school and holiday assortments at both brands, we remain cautiously optimistic about the second half.  Our merchandise is focused and we remain true to our formula of fashion, quality and value."

> The Company stated that inventory per square foot at the end of the second quarter is anticipated to be in-line to below previous guidance at The Children's Place and in-line with guidance at Disney Store, as previously provided by the Company on its first quarter conference call.  [Emphasis added].

123.    In response to this announcement, the price of Children's Place common stock declined from $52.54 per share to $46.42 per share, on extremely heavy trading volume. Defendants, however, continued to conceal the true scope of the problems at the Company, as the Company's delay in remodeling Disney Stores was slowing sales and requiring inventory to be marked down.

124.    On July 11, 2007, Children's Place issued a press release announcing its sales for the five-week period ended July 7, 2007.  For the period, the Company reported sales of $155.4 million.  With regard to the Company's outlook, the press release stated:

> As announced on July 9, 2007, the Company anticipates reporting a loss per share of approximately $(0.94) to $(0.98) for the second fiscal quarter ending August 4, 2007.  This loss per share range includes approximately $2.0 million, pre-tax, in costs paid or accrued in association with the Company's previously disclosed stock option investigation and related expenses.
>
> Further, as stated in the Company's press release on July 9, 2007, at this time, the Company anticipates becoming current in its quarterly and annual filings with the Securities and Exchange Commission by the end of August.

125.    From July 16, 2007 to August 1, 2007, as investors continued to digest the negative developments at the Company, the price of Children's Place common stock dropped from $43.92 per share to $33.08 per share.

126.    On August 9, 2007, the Company issued a press release announcing its sales results for the four-week period ended August 4, 2007.  For the period, the Company reported total sales of $141.2 million.  Defendants continued to conceal that they could not comply with the June Letter Agreement.  With regard to the Company's outlook, the press release stated:

> The Company continues to anticipate reporting a loss per share of approximately $(0.94) to $(0.98) for the second quarter of fiscal 2007.  As a reminder, this loss per share range includes approximately $2.0 million, pre-tax, in costs paid or accrued in association with the Company's previously disclosed stock option investigation and related expenses, which is in line with previous guidance.  Further, as stated in its July 9, 2007 press release, the Company expects to provide an update to full fiscal year earnings guidance on its second quarter conference call, scheduled for Thursday, August 23, 2007.
>
> The Company stated that inventory per square foot at the end of the second quarter is anticipated to be below previous guidance at The Children's Place and in-line with guidance at Disney Store, as previously provided by the Company on its first quarter conference call.

127.    Then, on August 23, 2007, the Company issued a press release announcing its preliminary fiscal 2007 second quarter financial results, the Company's earnings guidance and an

- 48 -

update with regard to the Disney agreement. For the fiscal second quarter, the period ended August 4, 2007, the Company reported consolidated net sales of $424.3 million and a preliminary net loss of $27.1 million. Moreover, the Company reduced earnings guidance by approximately 33%. With regard to the Company's outlook, the press release stated:

> Fiscal Year 2007 Guidance
>
> **At this time, the Company anticipates reporting earnings per share of $2.25 to $2.40 for fiscal 2007.** This updated guidance includes the $3.4 million, pre-tax, in stock option investigation and related expenses incurred in the first half of fiscal 2007.
>
> The Company's full year guidance assumes it will earn $0.94 to $1.02 per share in the third fiscal quarter and $1.79 to $1.86 per share in the fourth fiscal quarter.
>
> Ezra Dabah, Chief Executive Officer of The Children's Place Retail Stores, Inc. commented, "We remain cautiously optimistic regarding the second half and are pleased with month-to-date sales trends. However, in view of the sales and margin trends we have experienced through the first half, we believe it's best to take a conservative view for the remainder of the year." [Emphasis added.]

With regard to its agreement with Disney, the Company admitted that it was unable to meet the recently agreed-to remodeling deadlines and that it was forced to relinquish some of its rights under its agreements with Disney. The press release stated, in pertinent part, as follows:

> Disney Update
>
> The Company also provided an update regarding its License Agreement with The Walt Disney Company under which the Company operates the Disney Store chain in the United States and Canada.
>
> As previously announced, on June 8, 2007, the Company and Disney executed a letter agreement which modified certain provisions of the parties' long-term license agreement, to address claims by Disney that the Company had committed numerous material breaches of the license agreement. The June letter agreement provided that Disney would treat the Company's breaches as having been cured so long as the Company complied with the terms of the June letter agreement. The June letter agreement imposed specific obligations on the Company with respect to the remodeling and refreshing of numerous stores in the Disney Store chain between fiscal 2007 and fiscal 2011 and, for the stores to be remodeled in fiscal 2007 and fiscal 2008, set forth a detailed timetable for submission of plans and completion dates.

**To date the Company has been unable to meet several of the deadlines set forth in the June letter agreement.**  In every instance except for this most recent one, Disney has provided the Company with written confirmation that it does not consider these missed deadlines to constitute breaches of the June letter agreement.  While the Company expects that the amendment to the license agreement described below will defer the one remaining deadline that was missed, unless and until this amendment agreement is signed, the Company will be in breach of the June letter agreement, entitling Disney to exercise its remedies under the June letter agreement and the license agreement, including possible termination of the license agreement.  In addition, this breach constitutes a cross-default under the secured credit facility for the Disney Store chain, entitling the lenders to exercise their contractual remedies.  Neither Disney nor the lenders have notified the Company that they have, or intend to, exercise their rights mentioned above, but there can be no assurance that they will not exercise their rights in the future.

**In addition, the Company has identified various upcoming deadlines during the third and fourth quarters of fiscal 2007 that it will likely miss.**  The Company and Disney have been engaged in recent discussions regarding potential changes to the requirements of the June letter agreement that would postpone the due dates of certain of the Company's remodel obligations until later in fiscal 2007, fiscal 2008 and fiscal 2009.  In consideration for these changes, the parties have also been discussing changes to the original license agreement to allow Disney to relocate its flagship store in Manhattan.

**In addition, the parties have been discussing modifications so that Disney's ability to grant direct licenses to other specialty retailers for the sale of Disney merchandise will apply only to specialty retailers primarily focused on the sale of children's merchandise.**  It is expected that these various changes would be incorporated in an amendment to the license agreement.

There can be no assurance that the Company's discussions with Disney will result in any agreement or that the dates for the Company's remodel obligations will be deferred.  Whether or not these dates are deferred, the Company's ability to meet its obligations under the June letter agreement will depend on numerous factors, some of which are beyond the Company's control, and there can be no assurance that it will be able to fully comply.  If the Company fails to comply with these obligations, it will be in breach of the June letter agreement, entitling Disney to exercise its remedies under the June letter agreement and the license agreement.  [Emphasis added.]

With regard to the Company's inability to file its quarterly reports with the SEC, the Company disclosed that it had "identified certain violations of the Company's policies and procedures by two executives of the Company."  The press release stated, in pertinent part, as follows:

- 50 -

SEC/Nasdaq Update

The Company has been working diligently on completing its delayed financial statements and SEC reports, including its Annual Report on Form 10-K for the fiscal year ended February 3, 2007, and its quarterly reports on Form 10-Q for the second and third quarters of fiscal 2006 and first quarter of fiscal 2007. The Company remains committed to making every effort to complete these filings by August 31, 2007, as previously announced. However, these filings may not be completed by August 31st, in which case the Company would expect to file its SEC reports in September. While the Company believes the work surrounding the accounting for its historical stock option grants is substantially completed, additional factors have arisen causing further delay, which include the above mentioned discussions with Disney. The Company currently does not anticipate that it will complete its delinquent SEC filings until the current discussions with Disney regarding possible modifications to the June letter agreement and the license agreement are completed and full disclosure regarding any such modifications is included in its SEC reports. **In addition, in connection with the Board's ongoing review of internal controls and compliance, the Company has identified certain violations of the Company's policies and procedures by two executives of the Company.** The Board expects to complete its consideration of these matters prior to filing the Form 10-K.

As previously announced, the Company has been advised by the Nasdaq Stock Market on several occasions that the Company is not in compliance with Nasdaq listing requirements because of its delinquent SEC filings and that the Company will be delisted if it does not file these reports with the SEC. The Nasdaq Listing and Hearing Review Council granted the Company an extension of the time in which to file these reports with the SEC through September 4, 2007. The Company has since received notification that the Nasdaq Board of Directors has put on hold any future action by the Council to delist the Company's stock from Nasdaq pending further consideration by the Nasdaq Board. If the Company is unable to file its delinquent SEC reports by the end of August, the Company will request that the Nasdaq Board grant it an additional period of time to file the required reports with the SEC. There is no assurance that the Nasdaq Board will grant additional time to file with the SEC the required reports or, if granted, that the Company will be able to file the reports by such new deadline. [Emphasis added.]

128.    In response to these announcements, the price of Children's Place common stock dropped from $33.02 per share to $27.43 per share, on extremely heavy trading volume.

129.    Following the earnings press release, the Company held a conference call with analysts and investors. With regard to the June Letter Agreement and the Company's relationship with Disney, Defendant Dabah stated, in pertinent part, as follows:

EZRA DABAH: Kimberly, I will take the first one as it relates to Disney. One, it is important to note that we are working very, very closely together. And our relationship to date has been one of, a good relationship that is based on what is right for our business, and what is right for their business. As you know, we signed a letter agreement in June, and we bound ourselves to certain deadlines, especially as it relates to '07 remodels and refreshes. Unfortunately, in view of these deadlines, we were not able to meet, mostly because of circumstances beyond our control. Disney, understanding that, basically gave us waivers, and at the same time, I wanted you to know, so far the waivers regard were for immaterial delays in what we were supposed to, what we were supposed to do. What they are asking us is to release some of the constraints that we had on them, as to their ability to direct to retail license in Specialty retail, and they have asked us to do that in the area of adult merchandise. One that is not so relevant to our business and we actually believe that to the extent they can increase their adult offering, it is actually going to be good to our business. So that is one. The other is, they wanted some flexibility regarding their New York store, which is really not important to us and important to them, so in view of our good relationship, we just work together on what we need on our end, and what they need on their end, and we basically have an understanding that we look forward to document very quickly.

*      *      *

JOHN MORRIS, ANALYST, WACHOVIA SECURITIES. . . . [W]ith respect to the June agreement, I guess as I understand it, just explain to us a little bit why the company would have agreed to the original calendar timing of those remodels in June? Presumably you all would have known at that point in time, that you would have been able to schedule those remodels and make them accordingly or not. So I think if you can answer that question, that will probably shed some light on it. [Emphasis added].

EZRA DABAH. John, as it relates to obligation in the June agreement, all of us, including the team in charge, felt that the dates that we obligated ourselves to are executable. Unfortunately, we encountered certain things beyond our control. An example would be that a tenant did not vacate the store that we needed to remodel. That is on one end. The other end, we just wanted to make sure that both us and Disney, the quality of the stores we do is absolutely 100% perfect, and we both felt that taking a little more time, and relieving some of those date obligations will be best suited for both of us. That is why we are working together to extend a few dates.

With regard to violations by two Children's Place executives, Defendant Riley stated, in pertinent part, as follows:

SUSAN RILEY: Kimberly, on the internal controls. Basically, we had two violations of our policies and procedures on the part of senior executives. One was by a nonexecutive, one was not an executive officer, or a named executive officer,

and the other was. As I characterize the control violations, I would say that the violation on the part of the named executive officer was relatively small, although given that there is a heightened sensitivity to control to our control environment right now, given what happened with stock options. The internal control violation or policy violation on the part of the executive who is not a named executive officer is more serious, and can be characterized as a very serious lapse of judgment. There will be remedial actions. We expect there to be remedial actions that will be taken by our Board, but we do expect the executives to remain in place. As to our filings, yes, you are correct that the filing is being delayed, because we want to reach, we feel we need to reach resolution with the Walt Disney Company before we file, and further the internal controls, the evaluation of our internal control framework has also resulted in the delay in filing. As I said, we are committed to August 31st, but there may be some delays to that date. Then you asked about gross margin at both brands, and in this quarter gross margin was in fact down at both brands. The external gross margin was down at both Disney and at Children's Place, due primarily to markdowns.

130.    On September 26, 2007, Children's Place issued a press release announcing "that its

Board of Directors had completed its previously reported consideration of investigations by its Audit

Committee into violations by two members of the Company's senior management of the Company's

policies and procedures." With regard to the internal investigations, the press release stated:

> In one case, irregularities in expense reimbursement practices were involved on the part of the Chief Creative Officer at The Children's Place brand. The Board concluded that the irregularities violated the Company's Code of Business Conduct, involving gross inattention to the pertinent requirements of the Company's policies, but did not involve an intentional effort to obtain an improper personal benefit. The Board imposed significant sanctions on the individual involved, including refund of amounts erroneously charged to the Company, a change in position so that the individual will no longer be an officer of the Company and reimbursement of the Company's out-of-pocket costs incurred in connection with its investigation of the matter, but concluded that dismissal from employment was not warranted.

> The other case involved two instances where the Company's former Chief Executive Officer did not comply with the Company's internal policies related to securities trades. **In one instance, he did not properly report to the Company an immaterial increase in his wife's ownership of Company shares as a result of a trust distribution. In the second, on two occasions he pledged shares of the Company pursuant to a customary margin account during a "black-out period" when prior approval of the Company's Board was required for such pledges.** The Board concluded that these actions violated the Company's Code of Business Conduct, but that no improper personal benefit was obtained nor did the violations have a material adverse affect on the Company. The Board imposed significant sanctions for committing the violations, including new requirements pertaining to

- 53 -

securities transactions by the individual and a requirement that he reimburse the Company for its out-of-pocket costs in investigating the violations.  [Emphasis added].

131.    As a result of the internal investigations and Defendant Dabah's violations of internal policies, on September 26, 2007, the Company announced that "Ezra Dabah has resigned from his position as the Company's Chief Executive Officer, at the request of the Board of Directors, effective immediately."

132.    On October 11, 2007, the Company issued a press release announcing its independent auditor, Deloitte, would not stand for re-election for fiscal 2007.  With regard to Deloitte's decision not to continue its affiliation with Children's Place, the press release stated:

> Prior to the resignation of the Company's former chief executive officer on September 24, 2007, Deloitte & Touche advised the Company that it had determined, in its professional judgment, that it was no longer willing to rely on his representations in connection with its audits.
>
> In light of the independent auditor's decision not to stand for re-election, the Company is also reporting that Company management has determined that certain previously disclosed matters will be classified, in the Company's Annual Report on Form 10-K for fiscal 2006, as reflecting two material weaknesses in the Company's internal control over financial reporting:
>
> **\* As reported in the Company's January 31, 2007 press release, in connection with its internal investigation of option granting practices, the Company found that it did not maintain appropriate governance and other internal controls relating to its option grants.  Management has determined that the lack of adequate controls over the granting of stock options and the related documentation constituted a material weakness, which resulted in the use of incorrect accounting measurement dates for certain stock option grants and related errors in recording compensation expense.**
>
> **\* As reported in the Company's August 23, 2007 press release, two violations of the Company's Code of Business Conduct by members of the Company's senior management had occurred in the past year.  Considering these incidents, taken in the context of other relevant circumstances, management has determined that deficiencies exist in the implementation of the Company's policies and procedures, resulting in a material weakness in the Company's control environment.**

- 54 -

A material weakness is a control deficiency, or a combination of control deficiencies, that result in a more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. In connection with the completion of the Company's Annual Report on Form 10-K for fiscal 2006, management will assess the Company's internal control over financial reporting as of the end of fiscal 2006. Because this report has not yet been completed, it is possible that additional material weaknesses in the Company's internal control over financial reporting may yet be identified and be discussed in such report. [Emphasis added].

133. The market for Children's Place common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Children's Place securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Children's Place common stock relying upon the integrity of the market price of Children's Place common stock and market information relating to Children's Place, and have been damaged thereby.

134. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Children's Place common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

135. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Children's Place's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Children's Place and its business, prospects and operations, thus causing the

Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

136.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Children's Place, their control over, and/or receipt and/or modification of Children's Place's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Children's Place, participated in the fraudulent scheme alleged herein.

137.    Defendant Dabah was motivated to engage in the fraudulent scheme detained herein in order to protect the value of Children's Place shares he had pledged as collateral for margin loans. Defendant Dabah pledged Children's Place shares to a margin account during a "black-out period" when he was not permitted to sell shares in the market.  His "pledge" constituted a clandestine sale, which he also hid from the Company.

### Loss Causation/Economic Loss

138.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Children's Place common stock and operated as a fraud or deceit on Class Period purchasers of Children's Place

common stock by failing to disclose the problems with the license agreement with Disney and the Company's improper internal controls. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Children's Place common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Children's Place common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

139.    By failing to disclose the problems with the licensing agreement with Disney and its inappropriate internal controls, among other things, Defendants presented a misleading picture of Children's Place's business and prospects. Defendants' false and misleading statements had the intended effect and caused Children's Place common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.08 per share on October 26, 2006.

140.    As a direct result of Defendants' disclosures on July 9, 2007 and August 22, 2007, the price of Children's Place common stock fell precipitously, falling by a collective $11.71 per share, or 30%. These drops removed the inflation from the price of Children's Place common stock, causing real economic loss to investors who had purchased Children's Place common stock during the Class Period.

141.    The 30% decline in the price of Children's Place common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in Children's Place common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants'

fraudulent scheme to artificially inflate the prices of Children's Place common stock and the subsequent significant decline in the value of Children's Place common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

142.    At all relevant times, the market for Children's Place common stock was an efficient market for the following reasons, among others:

(a)    Children's Place common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Children's Place filed periodic public reports with the SEC and the NASDAQ;

(c)    Children's Place regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Children's Place was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

143.    As a result of the foregoing, the market for Children's Place common stock promptly digested current information regarding Children's Place from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Children's Place common stock during the Class Period suffered similar injury through their

purchase of Children's Place common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

144.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Children's Place, who knew that those statements were false when made.

### COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

145.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 59 -

147.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

148.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Children's Place common stock.  Plaintiff and the Class would not have purchased Children's Place common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Children's Place common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

150.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

151.    The Individual Defendants acted as controlling persons of Children's Place within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By reason of their positions as officers and/or directors of Children's Place, and their ownership of Children's Place stock, the Individual Defendants had the power and authority to cause Children's Place to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, costs and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

152.    Plaintiff hereby demands a trial by jury.

DATED: February 28, 2008      COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP
     SAMUEL H. RUDMAN
     DAVID A. ROSENFELD
     MARK S. REICH
     MARIO ALBA, JR.

         SAMUEL H. RUDMAN

     58 South Service Road, Suite 200
     Melville, NY 11747
     Telephone: 631/367-7100
     631/367-1173 (fax)

     *Lead Counsel for Plaintiffs*

JENKINS & CARTER
NATHAN M. JENKINS
501 Hammill Lane
Reno, NV 89511-1004
Telephone: 775/829-7800
775/829-0511 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on February 28, 2008, I caused a true

and correct copy of the attached:

Consolidated Amended Class Action Complaint for Violations of Federal
Securities Laws,

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to

all counsel on the attached service list.

/s/ Samuel H. Rudman
Samuel H. Rudman

CHILDREN'S PLACE
Service List - 2/28/2008    (07-0201)
Page 1 of 1

**Counsel For Defendant(s)**

Richard P. Swanson
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
  212/715-1179
  212/715-1399 (Fax)

Michael J. Gilbert
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112
  212/698-3500
  212/698-3599 (Fax)

Jonathan D. Polkes
Anthony J. Albanese
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
  212/310-8000
  212/310-8007 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)

Nathan M. Jenkins
Jenkins & Carter
501 Hammill Lane
Reno, NV 89511-1004
  775/829-7800
  775/829-0511 (Fax)