UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBRA HALL, Individually and on Behalf of All Others Similarly Situated<br><br>                         Plaintiff,<br><br>   v.<br><br>THE CHILDREN'S PLACE RETAIL STORES, INC., et al.,<br><br>                        Defendants. | No. 07 Civ. 8252 (SAS)<br><br>**(Consolidated)** |

### DEFENDANTS THE CHILDREN'S PLACE RETAIL STORES, INC.'S AND SUSAN RILEY'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Jonathan D. Polkes (JP-4265)
David R. Fertig (DF-5068)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for Defendants The Children's Place Retail Stores, Inc., and Susan Riley*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

Preliminary Statement .............................................................................................. 1

Argument ................................................................................................................... 2

I.      Plaintiffs' Complaint Fails to State a Cause of Action Under §10(b) ............................. 2

        A.      Plaintiffs Have Failed to Plead Any False or Misleading Statement with
                the Particularity Required by Rule 9(b) and the PSLRA ....................................... 3

        B.      None of the Alleged Misstatements or Omissions Were Material ....................... 8

                1.      The Alleged Omissions Were Not Material as a Matter of Law
                        Because They Related to Ordinary Business Disagreements .................. 8

                2.      The Alleged Misstatements Are Immaterial as a Matter of Law as
                        Protected or Otherwise Non-Actionable Statements ............................... 9

                        a.      Defendants' Affirmative Statements Are Protected by the
                                PSLRA "Safe Harbor" and the "Bespeaks Caution"
                                Doctrine ................................................................................... 10

                        b.      Defendants' Alleged Misstatements Are Merely Non-
                                Actionable Statements of Optimism or "Puffery" ...................... 11

                        c.      Defendants' Alleged Misstatements Are Immaterial Under
                                the "Truth-on-the-Market" Doctrine ........................................... 12

        C.      Plaintiffs Have Failed to Plead Scienter with Particularity ................................ 15

                1.      Plaintiffs Have Failed to Plead Particularized Facts Showing
                        Strong Circumstantial Evidence of Conscious Misbehavior or
                        Recklessness ......................................................................................... 15

                        a.      The Confidential Informants Do Not Provide a Basis to
                                Infer Scienter Relating to the Disney-TCP Relationship ............. 16

                        b.      Plaintiffs' Own Allegations Negate Any Inference of
                                Scienter Regarding the Alleged Misstatements Relating to
                                TCP's Stock Option Grant Practices ........................................... 19

                2.      Plaintiffs Have Failed to Plead Particularized Facts Showing That
                        Defendants Had Both Motive and Opportunity to Commit Fraud .......... 20

        D.      The Complaint Fails to Adequately Plead Loss Causation ................................. 22

II.     The Complaint Fails to State a Claim Under §20(a) ....................................................... 24

Conclusion ............................................................................................................... 25

TABLE OF AUTHORITIES

CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
  2008 WL 731971 (S.D.N.Y. Mar. 18, 2008) .....................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................15

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...........................................................................5, 6, 8, 9

*Acterna Corp. Sec. Litig.*,
  378 F.Supp.2d 561 (D. Md. 2005) .....................................................................23

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ...........................................10, 18

*In re Alstom SA Sec. Litig.*,
  406 F.Supp.2d 433 (S.D.N.Y. 2005).................................................................25

*Am. Fin. Int'l Group-Asia, LLC v. Bennett*,
  2007 WL 1732427 (S.D.N.Y. June 14, 2007) ..................................................21

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998).................................................................................25

*Burstyn v. Worldwide Xceed Group, Inc.*,
  2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002).................................................25

*Caiafa v. Sea Containers Ltd.*,
  525 F.Supp.2d 398 (S.D.N.Y. 2007)...........................................................5, 19, 20

*In re Carter-Wallace, Inc. Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000)...................................................................................16

*Dresner v. Utility.com, Inc.*,
  371 F.Supp.2d 476 (S.D.N.Y. 2005)..............................................................3, 4

*In re Duane Reade, Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom, Nadoff v. Duane
  Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) .................................................11

*Dura Pharms. Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................22

*In re eSpeed, Inc. Sec. Litig.*,
  457 F.Supp.2d 266 (S.D.N.Y. 2006)........................................................ *passim*

*Feasby v. Industri-Matematik Int'l Corp.*,
  2000 WL 977673 (S.D.N.Y. July 17, 2000) ................................................4, 16

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..........................................................................13

*Garber* v. *Legg Mason, Inc.*,
    2008 WL 697638 (S.D.N.Y. Mar. 17, 2008) ............................................16

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).........................................10

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) .........................................11

*In re Global Crossing, Ltd. Sec. Litig.*,
    2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005).............................................25

*In re Global Crossing, Ltd. Sec. Litig.*,
    2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)......................................24, 25

*In re H&R Block Sec. Litig.*,
    2008 WL 482403 (W.D. Mo. Feb. 19, 2008) ...........................................17

*Halperin v. eBanker USA.com, Inc.*,
    259 F.3d 352 (2d Cir. 2002) .....................................................................10

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999).......................................................................25

*In re IAC/InterActiveCorp. Sec. Litig.*,
    478 F.Supp.2d 574 (S.D.N.Y. 2007).........................................................11

*JHW Greentree Capital, L.P. v. Whittier Trust Co.*,
    2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005)..........................................25

*Joffee v. Lehman Bros., Inc.*,
    410 F.Supp.2d 187 (S.D.N.Y. 2006).........................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................2, 3, 20

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991).......................................................................7

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).................................................................3, 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ...................................................................20

*Malin v. XL Capital Ltd.*,
    2005 WL 2146089 (D. Conn. Sept. 1, 2005)...........................................22

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    2004 WL 305809 (S.D.N.Y. Feb. 18, 2004)............................................24

*In re NTL, Inc. Sec. Litig.*,
　　347 F.Supp.2d 15 (S.D.N.Y. 2004) ..................................................3, 5, 12, 21

*In re NVE Corp. Sec. Litig.*,
　　2007 WL 1994024 (D. Minn. July 3, 2007) ..........................................17

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000) ........................................................ *passim*

*In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.*,
　　2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ..........................................8, 9

*Pew v. Cardarelli*,
　　2005 WL 3817472 (N.D.N.Y. Mar. 17, 2005),
　　*aff'd*, 164 F. App'x 41 (2d Cir. 2006) .................................................10

*In re QLT Inc. Sec. Litig.*,
　　312 F.Supp.2d 526 (S.D.N.Y. 2004) .....................................................10

*In re Regeneron Pharms, Inc. Sec. Litig.*,
　　2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ..............................................10

*In re Rhodia S.A. Sec. Litig.*,
　　531 F.Supp.2d 527 (S.D.N.Y. 2007) .....................................................23

*Rich v. Maidstone Fin., Inc.*,
　　2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ...........................................20

*Rombach v. Chang*,
　　355 F.3d 164 (2d Cir. 2004) ....................................................8, 9, 12, 24

*S.E.C. v. First Jersey Sec., Inc.*,
　　101 F.3d 1450 (2d Cir. 1996) ...............................................................24

*In re Salomon Analyst Winstar Litig.*,
　　2006 WL 510526 (S.D.N.Y. Feb. 28, 2006) ...........................................15

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos*,
　　75 F.3d 801 (2d Cir. 1996) ........................................................16, 21, 22

*Shields v. Citytrust Bancorp, Inc.*,
　　25 F.3d 1124 (2d Cir. 1994) ........................................................3, 12, 20

*In re Sierra Wireless, Inc. Sec. Litig.*,
　　482 F.Supp.2d 365 (S.D.N.Y. 2007) .......................................................9

*In re Sina Corp. Sec. Litig.*,
　　2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ..........................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　127 S.Ct. 2499 (2007) ............................................................... *passim*

*Weiss v. Amkor Tech., Inc.*,
　　527 F.Supp.2d 938 (D. Ariz. 2007) ......................................................23

*Yung v. Lee,*
    432 F.3d 142 (2d Cir. 2005)............................................................................7

**RULES AND STATUTES**

15 U.S.C. §77z-2(i)(1) ...................................................................................10

15 U.S.C. §78t(a) ..........................................................................................24

15 U.S.C. §78u-4 ............................................................................................3

15 U.S.C. §78u-4(b) ...............................................................................*passim*

15 U.S.C. §78u-4(b)(1)(B) ..............................................................................3

15 U.S.C. §78u-4(b)(2) ..................................................................................15

15 U.S.C. §78u-4(b)(4) ..................................................................................22

15 U.S.C. §78u-5(c)(1)(A) ..............................................................................10

15 U.S.C. §78u-5(c)(1)(B) ..............................................................................11

17 C.F.R. §240.10b-5(b) ........................................................................*passim*

FED. R. CIV. P. 9(b) ..............................................................................*passim*

FED. R. CIV. P. 12(b)(6) ...............................................................................1, 7

Pursuant to FED. R. CIV. P. 12(b)(6) and 9(b) and Section 21D of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(b), Defendants The Children's Place Retail Stores, Inc. ("TCP" or the "Company") and Susan Riley ("Riley," and collectively with TCP, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Consolidated Amended Class Action Complaint.

## PRELIMINARY STATEMENT

In this federal securities class action, Plaintiffs, who owned TCP stock between March 9, 2006 and August 23, 2007, seek to hold Defendants liable for fraud primarily based on Defendants' alleged failure to disclose that TCP was "struggling to maintain its relationship" with its business partner, The Walt Disney Company, under a license agreement through which TCP operates Disney Stores. ¶7.[1]  Specifically, Plaintiffs allege that TCP made positive statements about its relationship with Disney that created a duty to inform investors of alleged delays and "problems" related to the remodeling of Disney stores, and as a result, that its license agreement was in imminent danger of being terminated.  However, TCP did disclose, long before, during, and after the class period that its agreement with Disney could be terminated upon any material breach.  TCP also issued multiple statements when there was even a suggestion of possible breach.

Moreover, TCP's relationship with Disney never was in any imminent danger during the class period, as evidenced by the Complaint, which acknowledges that Disney never invoked or even threatened to invoke its intention to terminate the parties' agreement, and continually reacted to the alleged "problems" by engaging in cooperative, good-faith discussions with TCP

---

[1] All references to "¶" refer to paragraphs in the Consolidated Amended Class Action Complaint.

that resulted in mutually beneficial amendments to the parties' agreement and TCP's remodeling obligations.

Recognizing the weakness of their allegations regarding the Disney "debacle," Plaintiffs add allegations regarding long-since disclosed and unintentional stock options backdating practices at TCP. Plaintiffs allege that on two occasions, TCP misrepresented that its stock options were properly accounted for, and that, in light of the subsequently discovered backdating practices, the reported income figures in TCP's March 9, 2006 and May 18, 2006 press releases were overstated. But the need for a financial restatement was publicly disclosed and resulted in no significant stock price drop. ¶101. Plaintiffs thus do not allege any particularized facts showing that TCP misstated its income figures or inaccurately described its option granting practices with fraudulent intent.

Given these facts, it is not surprising that Plaintiffs are unable to comply with the demanding pleading requirements of Rule 9(b) and the PSLRA. For example, Plaintiffs fail to allege how or why the challenged statements or omissions were false or misleading at the time they were made, and not with the benefit of 20/20 hindsight. Nor do Plaintiffs allege how any of the alleged statements or omissions were material to investors. Moreover, Plaintiffs fail to plead particularized facts showing a strong inference that TCP and Riley acted with scienter or that any fraudulent statement or omission directly caused any economic loss to Plaintiffs. Given these pleading infirmities, Plainitffs' §20(a) claim also fails.

## ARGUMENT

### I.   PLAINTIFFS' COMPLAINT FAILS TO STATE A CAUSE OF ACTION UNDER §10(b).

"To state a [valid] cause of action under §10(b) and Rule 10b-5, a plaintiff must plead that [each] defendant made a false statement or omitted a material fact, with scienter, and that [the] plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264

F.3d 131, 138 (2d Cir. 2001). In addition, a plaintiff must satisfy the heightened pleading requirements of FED. R. CIV. P. 9(b) and the PSLRA, 15 U.S.C. §78u-4. These requirements are "applied assiduously," *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005), and courts "*must* dismiss pleadings that fail to adhere to the[m]." *Dresner v. Utility.com, Inc.*, 371 F.Supp.2d 476, 489-90 (S.D.N.Y. 2005). As explained below, Plaintiffs' Complaint fails to plead the elements of a §10(b) claim in accordance with these requirements.

### A.   Plaintiffs Have Failed to Plead Any False or Misleading Statement with the Particularity Required by Rule 9(b) and the PSLRA.

FED. R. CIV. P. 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs asserting §10(b) claims, therefore, must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain *why the statements were fraudulent*." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (emphasis added). Similarly, the PSLRA requires plaintiffs to plead with particularity "each statement alleged to have been misleading, *the reason or reasons why it is misleading*, and ... all of the facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B) (emphasis added).

Given these dual requirements, plaintiffs must do more than simply allege falsity in conclusory terms. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). Instead, plaintiffs must plead with sufficient particularity "*sufficient facts* to support their belief" as to the false or misleading nature of the challenged statements. *Novak*, 216 F.3d at 312 (emphasis added). Moreover, when the alleged falsity of a statement is predicated on an alleged failure to disclose, the plaintiff must plead particularized facts sufficient to support an inference that the allegedly omitted facts were *material* and *actually existed at the time of the claimed misstatement*. *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 23 (S.D.N.Y. 2004); *Dresner*, 371

F.Supp.2d at 495; *Feasby v. Industri-Matematik Int'l Corp.*, 2000 WL 977673, at *6 (S.D.N.Y. July 17, 2000).

With the exception of the alleged misstatements relating to TCP's stock option practices, Plaintiffs do not allege that any of the purportedly misleading statements made by Defendants were inaccurate on their face, but rather that the challenged statements were false and misleading because they "failed to disclose the problems that the Company was then having with Disney."[2] ¶¶81, 85, 87, 89, 91, 93, 100, 104, 106, 110, 114, 117, 119, 121, 123, 126, 134, 138. Specifically, Plaintiffs allege that Defendants failed to disclose that TCP "was struggling to maintain its relationship with [Disney]." ¶7. Plaintiffs, however, do not allege *any* particularized facts that *even arguably* support an inference that Defendants' relationship with Disney was in imminent danger during the putative class period.

Instead, they have simply seized upon minor delays and ordinary-course disagreements that occurred between 2005 and 2007 and, *looking backward in time* from Defendants' August 23, 2007 press release, have attempted to cast those delays and disagreements as "evidence" that TCP's relationship with Disney was in jeopardy as early as March 9, 2006, the start of the putative class period. But this is *precisely* the kind of "fraud by hindsight" pleading that has long been rejected in this Circuit. *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 294

---

[2] With respect to TCP's stock option practices, Plaintiffs allege that TCP made misstatements concerning the prices at which stock options were granted, the way in which TCP accounted for stock options, and TCP's net income for FY2005 and 1Q FY2006 because, as TCP later discovered and disclosed, there were "various instances in which TCP's records did not correctly reflect the legal grant date for stock options granted to employees and directors of the Company." *See* ¶¶67-74, 94. Plaintiffs, however, have not pleaded *any* particularized facts showing that TCP or its executives made such misstatements with fraudulent intent. *See infra* Part I.C.1.b. Nor have Plaintiffs pleaded *any* facts sufficient to show a decline in the price of TCP's stock upon disclosure of those misstatements. In fact, Plaintiffs actually plead that the price of TCP's stock "*surged*" *upward* upon disclosure of these misstatements. *See infra* Part I.D; *see also* ¶102. Accordingly, Plaintiffs cannot state §10(b) claims based on these misstatements for their failure and inability to plead scienter or loss causation.

(S.D.N.Y. 2006); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (affirming dismissal of fraud-by-hindsight claim that defendant fraudulently concealed that its subsidiary's operations were likely to be shut down due to inspection failures during the 2-year period prior to the ultimate suspension of subsidiary's operations; earlier inspections did not result in any "adverse consequences" and thus, they failed to demonstrate that suspension of subsidiary's business was a "foregone conclusion" at time of alleged omissions); *Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 410-11, 412-14 (S.D.N.Y. 2007) (dismissing fraud-by-hindsight claim based on failure to disclose alleged "problems" with defendant's joint venture partner because confidential informants' statements that the relationship between defendant and its joint venture partner had for months been "strained and threatened" due to disagreements about defendant's performance did not demonstrate either existence or defendant's awareness at time of alleged misstatements of subsequent breach of contract claim and adverse award).[3]

As in *Acito* and *Caiafa*, Plaintiffs here have essentially attempted to state a claim by alleging that there were a number of "issues" between Disney and TCP during 2005-2007, and by alleging – in light of the *subsequent* events of August 2007 – that those earlier, ordinary-course delays and disagreements made it a "foregone conclusion" as early as 2005 that TCP was going to lose its license agreement with Disney or certain valuable rights possessed thereunder.[4]

---

[3] *See also NTL*, 347 F.Supp.2d at 26-27; *eSpeed*, 457 F.Supp.2d at 294 ("'fraud by hindsight' allegations have long been rejected").

[4] Indeed, in reliance on the information allegedly furnished by their "confidential informants," Plaintiffs emphasize that, between late 2005 and August 2007: (i) TCP and Disney "butted heads" regarding the design and construction of Disney Stores; (ii) a significant area of disagreement between the parties related to the "manner in which [TCP] carried out the design and construction of Disney Stores," and to "the 'look and feel' and the Mickey Store Format" in particular; (iii) "continuous disapproval" of store and merchandise designs caused the relationship between TCP and Disney to be "strenuous and tense"; (iv) disagreements regarding the Mickey store format led to delays in the store redesigns that were required under the license agreement and remodeling initiatives; and (v) the resulting "pressure" resulted in various occasions between 2005 and August 23, 2007 when certain deadlines under the parties' agreements were "overdue by several days" and others were unlikely to ever be met. *See* ¶¶47, 55-57.

But none of these "facts" – even if accepted as true – satisfy Plaintiffs' obligations under Rule 9(b) and the PSLRA. For, as in *Acito*, there was never any antagonism between Disney and TCP inasmuch as TCP – even according to the Amended Complaint – routinely agreed, and repeatedly endeavored, to "cure" any delays and disagreements that arose.[5] And as a result, there were never any adverse consequences that flowed from any disagreements or delays that the parties experienced in 2005 and 2006 – and none are alleged. To the contrary, Disney and TCP continued to work together, and continually amended their agreement so as to come up with a mutually agreeable approach to, and a realistic schedule for, the remodeling of Disney Stores.[6] Accordingly, one cannot infer that it was a "foregone conclusion" that TCP stood to lose the Disney relationship. *See Acito*, 47 F.3d at 53. Indeed, even when TCP subsequently missed deadlines imposed by the June letter agreement, Disney gave *no* indication that it was contemplating terminating the parties' relationship. *See* ¶127 ("Neither Disney nor the lenders have notified the Company that they have, or intend to, exercise their rights [of

---

[5] *See, e.g.*, ¶82 (TCP was "looking to enhance [the Mickey Store prototype] … [t]o get it to be more satisfying to all"); ¶105 (TCP's "intentions were to do full force whatever [it could] to complete everything [it] had committed to," TCP had "changed the design" of the Mickey store prototype, and TCP had agreed to "expedit[e] some of the capital investments [it had] made in the [Disney] stores" so as to "address certain issues [relating] to the design, as well as constructions of the store," and "look[ed] forward to roll[ing] out a substantially different design"); ¶118 (Disney and TCP were "working together in such a very special way").

[6] For example, according to the Complaint, TCP was required to redesign Disney Stores under the parties' *original* license agreement, and disagreements and delays attributable to TCP's construction of the Mickey store format existed as early as 2005 and early 2006. *See, e.g.*, ¶¶52, 53. Yet rather than terminate or even threaten termination of the parties' agreement, the Complaint alleges that Disney *amended* the license agreement in April of 2006 – thereby giving rise to the revised remodeling initiative – so as to allow TCP additional time to "tweak[]" the "Mickey store prototype" in an effort to "get it to be more satisfying to *all*." ¶¶42, 82. In February and March of 2007, when TCP fell behind schedule on the remodeling initiative and was in technical breach of the license agreement, ¶108, Disney *once again* refrained from invoking its right to terminate, and instead – in recognition that TCP had done "whatever [it could] to complete everything [it] had committed to" but had been "thr[own] off that schedule" because the Mickey store prototype had "not [been] well received" by *either* Disney *or* TCP, ¶105 – "work[ed] very closely" with TCP, and engaged in protracted, good-faith negotiations that resulted in the June letter agreement, another amendment to the previously amended license agreement that extended the remodeling schedule. ¶¶105, 120.

termination]….").  To the contrary, in recognition that such delays were "*immaterial*" and had

been caused by unforeseeable circumstances "*beyond* [TCP's] control," ¶129, Disney gave TCP

"written confirmation that it *d[id] not* consider th[ose] missed deadlines to constitute breaches of

the June letter agreement" and engaged in discussion aimed at amending the license agreement.

¶¶127, 129.

        In fact, while Plaintiffs conveniently omit this fact, shortly after the close of the putative

class period, Disney and TCP *actually did enter into yet another amendment* "address[ing] the

breach[es] referenced in the August 23rd press release."  *See* Exh.A.[7]  Thus, Disney *never did*

*terminate the parties' relationship*, *even following the breaches disclosed in the August 23, 2007*

*press release* that forms the heart of Plaintiffs' claims.[8]  There is, accordingly, no basis for

inferring that the "problem" Plaintiffs allege was concealed – that TCP was "struggling to

maintain its relationship with [Disney]" – ever actually existed during the class period.[9]  To the

contrary, the facts alleged suggest just the opposite:  that the ostensible "problem" Plaintiffs

---

[7] Citations to "Exh. __" refer to exhibits annexed to the Declaration of Jonathan D. Polkes, Esq., dated March 28, 2008, submitted in connection herewith.  When reviewing a motion to dismiss under Rule 12(b)(6), a court may consider "any written instrument attached to [the complaint] as an exhibit, any statements or documents incorporated in it by reference, and any document not incorporated but that is, nevertheless, integral to the complaint because the complaint relies heavily upon its terms and effect."  *Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (internal quotations omitted).  In addition, the Court may take judicial notice of matters of public record, including public press releases that are germane to a claim of securities fraud.  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[8] Indeed, the parties' relationship continued until just last week when, as evidenced by the Company's March 20, 2008 press release, *TCP* decided to withdraw from the relationship for economic reasons having nothing to do with the "problems" Plaintiffs allege.  *See* TCP Press Release, Mar. 20, 2008, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=120577&p=irol-newsArticle&ID=1120484&highlight=.

[9] Nor is there any basis for inferring that it was reasonably likely or imminent that TCP would be forced to give up valuable rights under its license agreement with Disney.  The only rights even alleged to have been given up by TCP as a result of the delays and breaches alleged in the Complaint consist of TCP's rights to: (i) operate the flagship Disney Store in Manhattan; and (ii) serve as the exclusive retail distributor of *adult* Disney merchandise.  As the Complaint makes clear, however, neither of those rights were of any material value to TCP.  *See* ¶129 (noting that the Manhattan Disney Store was "really not important to us" and that TCP's exclusive right to distribute *adult* Disney merchandise was "not so relevant to [TCP's] business").

claim was concealed *did not really exist at all.* As evidenced by the facts recounted above, the

Complaint *actually reflects* a pattern and course of dealing among the parties involving delays

and disagreements followed by cooperation, reconciliation, and good-faith *forbearance* from any

rights of termination. Plaintiffs have thus failed to plead any particularized facts sufficient to

show that Defendants' otherwise innocuous statements were false and misleading when made.

### B.     None of the Alleged Misstatements or Omissions Were Material.

Plaintiffs' §10(b) claim also fails because Plaintiffs have not pleaded facts sufficient to

demonstrate that the challenged statements or the alleged omissions were "material." *See*

*eSpeed*, 457 F.Supp.2d at 279 ("An alleged misstatement must be *material* – 'it is not enough

that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.").

### 1.     The Alleged Omissions Were Not Material as a Matter of Law Because They Related to Ordinary Business Disagreements.

"[D]isclosure of an item of information is not required simply because it may be relevant

or of interest to a reasonable investor." *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *6

(S.D.N.Y. Sept. 26, 2006). Disclosure is required only if the fact would be "material," *i.e.*, "only

if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the 'total mix' of information made

available.'" *Id.* at *8. Mere disagreements among business partners, however, do not rise to this

level absent "a clear indication of an adverse business consequence." *In re Open Joint Stock Co.*

*"Vimpel-Communications" Sec. Litig.*, 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006).

Indeed, as the Second Circuit has recognized, large, modern corporations are *bound* to

have myriad setbacks and disagreements, and it would be "unduly burdensome and impractical"

to require them to publicly disclose each and every one of them.[10] Thus, unless attended by

---

[10] *Acito*, 47 F.3d at 52-53; *see also Rombach*, 355 F.3d 164, 173-74 (2d Cir. 2004).

"adverse consequences" or so "significant and irreversible" as to result in "imminent collapse," "financial peril" or instability of a company's business, ordinary course disputes and disagreements among joint business venturers are not deemed "material" as a matter of law. *Acito*, 47 F.3d at 52-53; *Joint Stock Co.*, 2006 WL 647981, at *5-6; *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.Supp.2d 365, 373-74 (S.D.N.Y. 2007). *See also Rombach*, 355 F.3d at 173-74 (rejecting fraud claim based on nondisclosure of events that were "consistent with unremarkable circumstances short of financial peril or instability").

The allegedly concealed "problems" that TCP was having with Disney between 2005 and August 23, 2007 amounted to nothing more than unremarkable and ordinary course delays and business disagreements. Indeed, those "problems," which Disney itself "waived," ¶129, can be summarized simply as: (1) disagreements between TCP and Disney over the Mickey Store design; (2) that TCP was required to replace flooring in stores where it had been installed without Franchise Board approval; and (3) that TCP was behind schedule in the remodeling of certain Disney Stores. *See, e.g.*, ¶¶47, 55-57, 82-83, 105. And as explained in Part I.A., *supra*, none of those supposed "problems" were *ever* attended by "adverse consequences," nor were they so "significant and irreversible" that they resulted in the "imminent collapse," "financial peril," or instability of TCP's business. Thus, they are "consistent with unremarkable circumstances short of financial peril or instability," *Rombach*, 355 F.3d at 174, and do not constitute "material" omissions.

### 2. The Alleged Misstatements Are Immaterial as a Matter of Law as Protected or Otherwise Non-Actionable Statements.

Plaintiffs' claims also fail because the statements that were allegedly rendered false by virtue of the alleged omissions are immaterial as a matter of law.

a.    **Defendants' Affirmative Statements Are Protected by the PSLRA "Safe Harbor" and the "Bespeaks Caution" Doctrine.**

Under the PSLRA's "safe harbor," forward-looking statements are deemed immaterial, and non-actionable as a matter of law, where they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statements." 15 U.S.C. §78u-5(c)(1)(A); *see also In re Regeneron Pharms, Inc. Sec. Litig.*, 2005 WL 225288, *14 (S.D.N.Y. Feb. 1, 2005). Similarly, under the judicially created "bespeaks caution" doctrine, "alleged misrepresentations … are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language…." *Halperin v. eBanker USA.com, Inc.*, 259 F.3d 352, 357 (2d Cir. 2002). The challenged statements in this case are shielded from liability by both the PSLRA "safe harbor" and the common-law "bespeaks caution" doctrine.

First, Plaintiffs' conclusory assertions notwithstanding, *see* ¶144, the statements on which Plaintiffs base their Complaint fall squarely within the PSLRA's definition of "forward-looking statements." *See* 15 U.S.C. §77z-2(i)(1). Indeed, most of the challenged statements consist of: statements regarding management's plans and objectives for future operations; statements of future economic performance (and underlying assumptions relating thereto) made in the context of discussion and analysis of TCP's financial condition; or statements regarding TCP's "expectations," "beliefs," and optimistic "anticipations."[11]

---

[11] *See, e.g.*, ¶103 ("At this time, the Company *anticipates* fiscal 2007 earnings per share of approximately $3.55 to $3.65."); ¶108 ("The Company now *anticipates* fiscal 2007 earnings per share of approximately $3.63 to $3.73"); ¶109 ("[I]n regards to … the negotiation with The Walt Disney Company … we have exchanged proposals and *we believe we are making progress*.") ¶113 ("For fiscal 2007, at this time, the Company *anticipates* earnings per share of $3.45 to $3.55."). *Compare In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *32 (S.D.N.Y. June 23, 2004) (statements reflecting "optimism and expectations about a future event," including plans for defendant's product and projected profits, were "forward-looking"); *Pew v. Cardarelli*, 2005 WL 3817472, at *13 (N.D.N.Y. Mar. 17, 2005) (statements that include "words such as 'believe' and 'expect'" are forward-looking), *aff'd*, 164 F. App'x 41 (2d Cir. 2006); *In re QLT Inc. Sec. Litig.*, 312 F.Supp.2d 526, 533 (S.D.N.Y. 2004); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *65 (S.D.N.Y. Sept. 30, 2004).

Second, and again contrary to Plaintiffs' conclusory assertions, *see* ¶144, all of the alleged misstatements were *identified* as forward-looking and contained *adequate, immunizing cautionary language*. Indeed, *each* of the alleged misstatements was made either in a Company press release or on one of the Company's investor conference calls. *See passim*. And *each* press release and conference call transcript (i) stated that the statements contained therein were "forward-looking" and (ii) contained "cautionary language that [was] 'too prominent and specific to be disregarded.'"[12] *In re Duane Reade, Inc. Sec. Litig.*, 2003 WL 22801416, *6 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom, Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004). Accordingly, the alleged misstatements are immaterial, and non-actionable as a matter of law, under the PSLRA "safe harbor" and the common law "bespeaks caution" doctrine. *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 586-87 (S.D.N.Y. 2007).[13]

> **b.    Defendants' Alleged Misstatements Are Merely Non-Actionable Statements of Optimism or "Puffery."**

To the extent not protected under the PSLRA and the "bespeaks caution" doctrine, the misstatements alleged by Plaintiffs are immaterial as matter of law because they are merely

---

[12] *See, e.g.*, Exh.B (April 6, 2006 TCP Press Release); Exh.C (June 1, 2007 Analyst Conference Call Transcript). Notably, in its SEC Form 10-K, filed on April 14, 2005 and incorporated by reference into each subsequent press release issued by TCP, TCP expressly identified the risk that Disney might terminate its relationship with TCP "upon the occurrence of certain specified events, including an uncured breach … of the License Agreement" and that the possibility of breach and/or termination "may be beyond [TCP's] control." *See* ¶41. Moreover, in February of 2007, TCP revised the cautionary language in its press releases to caution readers that the statements contained therein were further subject to, among other things, "*the risks and uncertainties relating to the Company's stock option grants and procedures and the recently completed investigation by the special committee of the Company's Board of Directors, the previously announced pending restatement of the Company's historical financial statements … as well as matters relating to the Company's discussions with the Walt Disney Company*." *See* Exh.D (Feb. 1, 2007 press release) (emphasis added).

[13] Even if the alleged misstatements were *not* accompanied by adequate cautionary language, they *still* would not be actionable because, as explained in Part I.A., *supra*, Plaintiffs have not alleged that Defendants' alleged misstatements were made with *actual knowledge* of their falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B); *see also In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *12 (E.D.N.Y. Sept. 19, 2005) (even "forward-looking statements not accompanied by cautionary language … are immunized so long as they were not knowingly false").

vague expressions of optimism or puffery. *See NTL*, 347 F.Supp.2d at 34 ("Vague expressions

of optimism, or puffery, are insufficient to support a claim for securities fraud."). As the Second

Circuit has explained, "[p]eople in charge of an enterprise are not required to take a gloomy,

fearful or defeatist view of the future; subject to what current data indicates, they can be

expected to be confident about their stewardship and the prospects of the business that they

manage." *Shields*, 25 F.3d at 1129-30. Thus, "loosely optimistic statements that are so vague, so

lacking in specificity, or so clearly constituting the opinions of the speaker that no reasonable

investor could find them important to the total mix of information available," are immaterial as a

matter of law. *eSpeed*, 457 F.Supp.2d at 280 (citations and alteration omitted); *see also*

*Rombach*, 355 F.3d at 174; *Novak*, 216 F.2d at 315.

Here, substantially all of the alleged misstatements boil down to the same type of

optimistic puffery properly held to be immaterial in the foregoing cases:

- "At Disney Store … we have made progress in positioning the business for success and we look to 2006 with excitement. Disney has a great line-up of new content coming up this year, and we have aligned our merchandise strategies to capitalize on these events in a big way."
- "We continue to believe that TCP and Disney Store can grow up to 1,800 stores across North America… [and are] confident that both brands have substantial opportunity to deliver significant, profitable growth for many years to come."
- "[W]e are especially pleased with the continued strength at Disney Store."
- "[W]e are leveraging the ideas and talent across The Children's Place and the Disney Store [and have] created valuable opportunities for the teams to collaborate, build relationships, strengthen teamwork and leverage each brand['s] respective core competencies."

¶¶80, 84, 88, 90, 92, 99; *see also* ¶¶109, 118.

> **c.    Defendants' Alleged Misstatements Are Immaterial Under the "Truth-on-the-Market" Doctrine.**

The alleged misstatements are also immaterial as a matter of law under the "truth-on-the-

market" doctrine. This theory proceeds on the assumption that "a misrepresentation is

immaterial if the information is already known to the market because the misrepresentation

cannot then defraud the market." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (citations omitted). Thus, "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Id*. As Plaintiffs' own allegations confirm, TCP adequately and continually disclosed the alleged "problems" with Disney to the public throughout the entire putative class period.

For example, Plaintiffs allege that, "during the Class Period, Children's Place experienced ongoing problems and delays in developing merchandise to sell in the Disney Stores and in carrying out the Remodeling Initiative." ¶44. But Plaintiffs also allege that "the problems [all] overlapped because problems and delays in store redesigns impacted merchandise development, selection, ordering and, as a result, sales." *Id*. Indeed, Plaintiffs allege that the "key conflict" between TCP and Disney "related to the manner in which [TCP] carried out the design of Disney Stores," ¶48, *and to the design of the Mickey Store Format in particular*, ¶¶52-55, and that "[t]he lack of a finalized design scheme … caused [the] delays with regard to the Remodeling Initiative." ¶56.[14] Yet as far back as March 9, 2006 – the *very same day* the putative class period is alleged to begin – the Company disclosed these very facts. Indeed, Plaintiffs' own admissions establish that Defendant Dabah unequivocally kept the market abreast of the allegedly "concealed" facts and of the "truth" concerning the Mickey store format and the remodeling delays it was causing: Dabah explained on March 9, 2006 that the Company was "ratchet[ing] down" its Disney Store remodeling efforts in order to "tweak" and "enhance" the Mickey store format in an effort to "get it to be more satisfying to *all.*" ¶82 (emphasis added).

---

[14] *See also* ¶83 (alleging that Defendants' alleged misstatements were false and misleading because "the Mickey Store Format was causing increasing problems between the Company and Disney, as the Company was unable to create a design scheme that satisfied [Disney]").

Similarly, on February 1, 2007 – six months prior to the end of the class period – Defendants Riley and Dabah, after hearkening back to the Company's earlier disclosures regarding the Disney remodeling delays, *see* ¶105 ("It's not the first time we talk about [this]"), further disclosed in a conference call with analysts that "we['ve] had to make some pretty extensive renovations to stores that have recently been remodeled, [and] we'll have to take some expense associated with that," and that "that's all in connection with the[ ] discussions that are underway with The Walt Disney Company." *Id.* They specifically explained that TCP had been "thr[own] off schedule" under the Remodeling Initiative, and that the delay was attributable to the fact that the Mickey Store Format had not been well received by Disney:

> *The thing that really threw us back, unfortunately, was the fact that we **all** were not happy with the outcome of the Mickey prototype, which delayed our remodel programs*. So, our intentions were to full force do whatever we can [sic] to complete everything we had committed to. *But unfortunately, **because of the Mickey prototype that was not well received, frankly, both by us as well as the Walt Disney Company**, is what **threw us off that schedule**…*

¶105 (emphases added).[15] Thus, the allegedly "concealed" facts regarding TCP's relationship with Disney were clearly and unambiguously disclosed by, at the very latest, February 1, 2007.[16]

In short, from the very inception of the purported class period through its end, the Company adequately and accurately disclosed the very "problems" with the Disney relationship that Plaintiffs contend were fraudulently concealed, and thus, each of the alleged misstatements relating to the Disney relationship were immaterial and cannot support Plaintiffs' fraud claim.

---

[15] TCP also disclosed that it was in "*discussions with [Disney] regarding potential modifications to certain terms of the Company's long-term license agreement to operate the Disney Store retail chain* in North America," that *some of the modifications under discussion "may be material*," and that "*[i]f the Company [were] unable to reach agreement with Disney on the modifications, Disney may assert that certain defaults exist under the license agreement and … may reserve its rights and remedies under the agreement*." *See* ¶103 (emphasis added).

[16] Moreover, as evidenced by Plaintiffs' Complaint, TCP thereafter continually updated the public concerning material developments relating to the Disney relationship. *See* ¶¶108, 109, 116, 120, 127.

### C.    Plaintiffs Have Failed to Plead Scienter with Particularity.

Plaintiffs' §10(b) claim must also be dismissed because they have failed to plead *any* particularized facts evidencing that TCP or Riley made the allegedly misleading statements with an intent to deceive, manipulate or defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504 (2007). Rule 9(b) and the PSLRA require a plaintiff to "state with particularity facts giving rise to a *strong inference* that [*each*] defendant acted with the required state of mind" – that is, with scienter. 15 U.S.C. §78u-4(b)(2). This "strong inference" may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter," however, the court "must take into account plausible opposing inferences." *Tellabs*, 127 S.Ct. at 2509. An inference is strong "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 2510. As demonstrated below, Plaintiffs' allegations do not support any inference that Defendants' made the challenged statements with scienter.

### 1.    Plaintiffs Have Failed to Plead Particularized Facts Showing Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

The standards for pleading conscious misbehavior or recklessness are stringent. As to conscious misbehavior, a plaintiff must plead particularized facts, not conclusory allegations, that "point strongly to an inference that defendants harbored an intent to deceive, manipulate or defraud." *In re Salomon Analyst Winstar Litig.*, 2006 WL 510526, at *7 n.11, *14 (S.D.N.Y. Feb. 28, 2006). Alternatively, to establish recklessness, plaintiff must allege particularized facts with respect to each defendant demonstrating "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to

the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). In all events, however, "[i]n order to plead *either* conscious misbehavior or recklessness, Plaintiffs must '*specifically allege defendants' knowledge of facts or access to information contradicting their public statements.*'" *eSpeed*, 457 F.Supp.2d at 292 (quoting *Novak*, 216 F.3d at 308 (emphasis added)).

As set forth in Parts I.A and I.B, *supra*, Plaintiffs have failed to allege with sufficient particularity that any of the Company's statements regarding Disney were, in fact, false when made. Necessarily, therefore, Plaintiffs have also failed to allege that Defendants *knew* or *believed* that those statements were false, that they deliberately participated in any fraud, or that they were reckless for not knowing of the purported falsity of the Company's statements. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) ("Since we have already determined that the Complaint fails adequately to allege that defendants' statements were false … the Complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements."); *Feasby*, 2000 WL 977673, at *5. But Plaintiffs fail to plead conscious misbehavior or recklessness for the following reasons as well.

### a.     The Confidential Informants Do Not Provide a Basis to Infer Scienter Relating to the Disney–TCP Relationship.

It is well known that, since *Tellabs*, plaintiffs face a *very high burden* to plead particularized facts showing a strong inference of scienter. Indeed, courts routinely dismiss §10(b) complaints for failure to satisfy this burden alone. *See, e.g., Garber v. Legg Mason, Inc.*, 2008 WL 697638, at *16 n.7 (S.D.N.Y. Mar. 17, 2008) (granting motion to dismiss and noting that the "Supreme Court recently noted that this circuit's formulation of the pleading demands

for scienter have historically been 'the most stringent' of all the circuits." (quoting *Tellabs*, 127 S.Ct. at 2508)).  One strategy frequently employed by plaintiffs is to plead information offered by "confidential informants."  But in order to satisfy *Tellabs*' demanding standard, such information must supply *meaningful* facts that show that defendants "planned to hide . . . information from the public."  *In re H&R Block Sec. Litig.*, 2008 WL 482403, at *6 (W.D. Mo. Feb. 19, 2008).[17]

Recognizing their inability to satisfy *Tellabs*' demanding standard, Plaintiffs attempt to dress up their complaint by adding alleged statements from seven confidential informants, but a review of these statements reveals that the CIs are merely window dressing.  As with the alleged misstatements ascribed to TCP executives, all of which amount to vague puffery, *see supra* Part I.B, the CIs offer only vague, trivial facts that have no bearing on Defendants' state of mind.  For example, the CIs state that Disney approval "was an integral element" of the Disney relationship, that certain Disney stores had "chipped paint and needed regular paint touch-ups," that Dabah felt the Mickey store format "should embody a more modern design," and that TCP was required to uninstall "'Geppetto-style' flooring" in certain stores.  ¶¶43, 49, 53, 55, 56,  As this representative sampling demonstrates, *see* ¶¶44-58, the alleged "facts" offered by the CIs fail to raise any inference, let alone a strong one, that Defendants' statements regarding Disney were made with intent to "hide information from the public."

Plaintiffs emphasize that, according to one of the CIs, "[Disney's] objections were regularly communicated to Hoop personnel" and that "problems with the Disney Stores

---

[17] *Compare In re NVE Corp. Sec. Litig.*, 2007 WL 1994024, at *25-26 (D. Minn. July 3, 2007) (no inference of scienter where "the confidential sources offer general descriptions of . . . problems that were being experienced") *with 380544 Canada, Inc. v. Aspen Tech., Inc.*, 2008 WL 731971, at *20 (S.D.N.Y. Mar. 18, 2008) ("strong inference" of scienter raised by confidential informant's account that defendant's officer said "we are going to keep this in the freezer" so as to "smooth out the numbers").

Remodeling Initiative and Disney merchandise were openly communicated to and discussed amongst Children's Place executives, including Dabah." ¶¶46, 50. But none of those "problems" ever resulted or even appeared likely to result in any imminent, adverse consequences – an inference amply supported by the Complaint's acknowledgement that Disney consistently (i) "waived" TCP's delays and technical breaches, (ii) refrained from invoking or claiming that it intended to invoke its right of termination, and (iii) entered into good-faith negotiations over the alleged "breaches" and agreed to continue the parties' cooperative relationship. *See supra* Parts I.A and I.B. Thus, the fact that TCP's executives may have been aware of those problems hardly supports a "strong inference" that they acted with an intent to defraud when they failed to disclose those "problems," or that TCP was "struggling to maintain its relationship" with Disney. ¶7. To the contrary, *precisely because* the allegedly undisclosed "problems" never resulted – or appeared imminently likely to result – in termination of the license agreement or other adverse consequences, and because the TCP consistently agreed and endeavored to "cure" any non-compliant performance and to "remodel[ ] Disney Stores at an accelerated rate," ¶54, the CI allegations do not give rise to the inference intended by Plaintiff. In fact, these allegations, even if accepted as reliable and true, give rise to the opposite inference: that Defendants reasonably did *not* believe that the "problems" with Disney were so material so as to undermine TCP's business or their positive statements.[18]

---

[18] Plaintiffs also attempt to establish scienter based on the general and all too familiar allegation that Defendants had access to "material adverse non-public information" by virtue of their "positions" at TCP. *See* ¶¶18, 136. But such conclusory allegations are insufficient to satisfy Rule 9(b) and the PSLRA. *In re Aegon*, 2004 WL 1415973, at *17.

   b.   **Plaintiffs' Own Allegations Negate Any Inference of Scienter Regarding the Alleged Misstatements Relating to TCP's Stock Option Grant Practices.**

Plaintiffs fail to allege any strong circumstantial evidence of conscious misbehavior or recklessness with respect to the allegedly false and misleading statements regarding TCP's stock option grant practices and the resulting overstatement of TCP's net income in 2005 and 2006. Plaintiffs allege that, in June 2005 and April 2006, TCP misrepresented both that options granted under its 1997 and 2005 stock option plans were granted at prices equal to their fair market value as of the date they were granted, and also that the Company properly accounted for such options in accordance with APB 25 principles, because, as was later reported in the Company's January 31, 2007 press release, in some instances "options [had been] dated before all grant-making processes were finalized." ¶¶65-70, 101. Plaintiffs further allege that, as a result of the incorrect measurement dates that had been used for financial reporting purposes, two statements in TCP's March 9, 2006 and May 18, 2006 press releases – that TCP had net income of $65.6 million for the fiscal year 2005 and net income of $15.3 million for the first fiscal quarter of 2006 – were false and misleading. *See* ¶¶81, 87. *Nowhere*, however, do Plaintiffs plead *any* particularized facts showing that TCP intentionally misstated its income figures, issued backdated options with an intent to defraud, or knew the reported financial results were false as a result of backdating.

Nor could Plaintiffs possibly make any such statements, as the pleadings themselves negate an inference of scienter. Indeed, the Complaint acknowledges that the investigation conducted by a committee of independent TCP directors found "*no conclusive evidence of intentional backdating of options or other misconduct.*" ¶101 (emphasis added). Accordingly, without any allegations other than the fact that the Company restated previously issued financial statements, Plaintiffs cannot state a securities fraud claim based on Defendants' erroneous statements relating to the Company's 2005 and 2006 net income figures. *See, e.g., Caiafa,* 525

F.Supp.2d at 411 ("Only where [alleged GAAP violations or accounting irregularities] are coupled with evidence of corresponding fraudulent intent might they be deemed sufficient."). Given the complete lack of any inference of fraudulent intent, the opposing inference in Plaintiffs' Complaint that no intentional backdating or other misconduct occurred is far more compelling.  See *Tellabs*, 127 S.Ct. at 2510.

**2.    Plaintiffs Have Failed to Plead Particularized Facts Showing That Defendants Had Both Motive and Opportunity to Commit Fraud.**

Plaintiffs likewise fail to plead any particularized facts supporting an inference of scienter based on motive and opportunity.  To plead scienter through allegations of motive and opportunity, a plaintiff must demonstrate the presence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," as well as "the means and likely prospect of achieving concrete benefits by the means alleged."  *Shields*, 25 F.3d at 1130.  General allegations that a defendant acted in his or her own economic self-interest are not enough, and allegations regarding motives common to most directors and officers – such as the desire to maintain compensation levels – are similarly insufficient.[19]

With respect to Defendant Riley, Plaintiffs fail to allege *any* specific personal benefit to be derived from any of the alleged misstatements or omissions.  Plaintiffs' allegations with regard to her, therefore, unquestionably fail to establish scienter with the particularity required by Rule 9(b) and the PSLRA, and all claims against her should accordingly be dismissed.[20]

---

[19] *See Novak*, 216 F.3d at 307-08; *Shields*, 25 F.3d at 1130; *see also Kalnit*, 264 F.3d at 139 ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to [each] individual defendant[ ] resulting from the fraud.").

[20] Plaintiffs allege that problems with Disney "were openly communicated to and discussed amongst *Children's Place executives*," ¶50 (emphasis added), but this runs afoul of the rule that "[a] complaint may not simply 'clump[ ] defendants together in vague allegations' to meet the pleading requirements."  *Rich v. Maidstone Fin., Inc.*, 2001 WL 286757, at *6 (S.D.N.Y. Mar. 23, 2001); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) (group pleading may not be used to show scienter on the part of "each individual defendant in multiple defendant cases"), *vacated*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

20

With respect to Defendant TCP, Plaintiffs' sole allegation of motive and opportunity consists of their allegation that its former CEO, Defendant Dabah, "pledg[ed] shares of his common stock as collateral for margin loans in his stock brokerage account" – an act that Plaintiffs strain to characterize as "a clandestine sale of stock." ¶¶8, 137. But this allegation is insufficient to demonstrate scienter on the part of TCP for a number of reasons.

First, the pledging of stock as collateral for a loan is not the equivalent of a sale of stock. Unlike a sale, the pledging of stock does not result in any profit to the seller. Accordingly, such an act does not suggest any motive to defraud. *See, e.g.*, *Novak*, 216 F.3d at 308 ("motive [arises] from the desire to profit"); *NTL*, 347 F.Supp.2d at 31 (noting that "[r]elevant factors" in determining whether insider trading activity demonstrates a motive to commit fraud include "the amount of profit" the seller obtained or stood to obtain).

Second, the mere sale of stock by an insider does not give rise to a "strong inference" of scienter absent factual allegations showing "extensive insider sales" or that the sale was "unusual" or "out of the normal course."[21] Plaintiffs do not allege that Dabah's stock "sale" involved a large percentage of his holdings, nor do they allege that any other executive engaged in any stock transaction during the putative class period. Thus, *even if* it could be considered a "sale," Dabah's alleged stock pledge does not permit any inference of fraudulent intent. *See, e.g.*, *San Leandro*, 75 F.3d at 813-14 ("the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive").

---

127 S.Ct. 2499 (2007); *Am. Fin. Int'l Group-Asia, LLC v. Bennett*, 2007 WL 1732427, at *11 (S.D.N.Y. June 14, 2007) ("plaintiff[s] cannot satisfy Rule 9(b) by filing a complaint in which defendants are clumped together in vague allegations").

[21] *See, e.g.*, *NTL*, 347 F.Supp.2d at 31 ("While allegations of insider trading may permit an inference of scienter, plaintiffs must allege also that the insider trades were unusual. Relevant factors . . . include the amount of profit, the percentage of defendant's holdings that were sold, and the number of insiders who sold stock.").

Finally, whatever inference may drawn regarding Dabah's own personal motives, Dabah's alleged stock pledge cannot support an inference that *the Company* possessed an intent to defraud investors. Generally, "the sale of stock by one company executive does not give rise to a strong inference of *the company's* fraudulent intent." *San Leandro*, 75 F.3d at 814 (emphasis added). And in this case, that conclusion is unavoidable given that, as Plaintiffs themselves allege, TCP *did not even know of Dabah's alleged stock pledge until in or around August 2007* – long *after* all of the alleged misrepresentations. *See* ¶127. Thus, Plaintiffs have failed to plead any particularized facts supporting a "strong inference" of scienter.

## D. The Complaint Fails to Adequately Plead Loss Causation.

Plaintiffs' §10(b) claim must also be dismissed because Plaintiffs have failed to plead any direct, causal link between an economic loss and the disclosure of the allegedly concealed or misrepresented facts as required by the PSLRA. *See* 15 U.S.C. §78u-4(b)(4); *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005). Indeed, in two general respects, the failure to plead loss causation is fatal to the Complaint.

First, although Plaintiffs allege that they purchased TCP stock at artificially inflated prices, *see* ¶¶15, 22, 133, 135, 138, 141, Plaintiffs fail to allege, as they must, that they sold their shares at a deflated price after a supposed corrective disclosure. *Dura*, 544 U.S. at 340, 342 ("an inflated purchase price will not itself constitute or proximately cause the [required] economic loss"). Plaintiffs' Complaint thus attempts to plead the very type of loss causation that was rejected by the Supreme Court in *Dura*. *Id*. at 340, 346-47. Indeed, there is not a single allegation in Plaintiffs' 151-paragraph Complaint establishing that Plaintiffs sold their shares at an allegedly depressed stock price. *This pleading infirmity alone compels the dismissal of Plaintiffs' Complaint*. *See, e.g., id.* at 347; *Joffee v. Lehman Bros., Inc.*, 410 F.Supp.2d 187, 192 (S.D.N.Y. 2006); *Malin v. XL Capital Ltd.*, 2005 WL 2146089, at *4 (D. Conn. Sept. 1, 2005).

Second, Plaintiffs fail to allege that the disclosure of any alleged fraud caused the decline in TCP's stock price. The failure to do so serves as an independent and sufficient basis to dismiss Plaintiffs' Complaint. Specifically, although Plaintiffs allege that TCP stock suffered a nearly $44 decline in price per share during the class period, Plaintiffs have failed to allege facts showing that the drop was related to, or proximately caused by, the alleged misstatements or omissions as opposed to other potential causes. *See Acterna Corp. Sec. Litig.*, 378 F.Supp.2d 561, 588 (D. Md. 2005); *Lentell v. Merrill Lynch & Co.*, 396 F.3d at 173.

In order to make such a showing, Plaintiffs must plead facts confirming that the relevant decline in a defendant's stock price was "caused by the materialization of the [allegedly] concealed risk." *eSpeed*, 457 F.Supp.2d at 283. Plaintiffs, however, plead no such facts. Plaintiffs plead only that the price of TCP stock fell precipitously "[a]s a direct result of the disclosures on July 9, 2007 and August 22, 2007." ¶140. But no disclosures were made on July 9, 2007 or August 22, 2007 that even arguably "revealed" the allegedly concealed facts – *i.e.*, that the Company's relationship with Disney was in jeopardy and in imminent danger of being terminated, and that TCP had intentionally backdated stock options and misstated its financial results.[22] In fact, no disclosure was made *at all* on August 22, 2007. And the press release issued on July 9, 2007 merely stated that "sales came in below expectations" and that the Company had thus taken "significantly more markdowns which [were] negatively impacting [its] gross margin." ¶122. Plaintiffs thus fail to adequately plead loss causation. *See In re Rhodia S.A. Sec. Litig.*, 531 F.Supp.2d 527, 545 (S.D.N.Y. 2007) ("loss causation requirement is

---

[22] Plaintiffs have not alleged any economic loss directly caused by Company's backdating of stock options, *see* ¶¶138-141, nor could they. When the Company disclosed the results of its stock option investigation and that earlier financials would have to be restated, TCP stock "surged" from $54.21 to $59.56. ¶102. *See Weiss v. Amkor Tech., Inc.*, 527 F.Supp.2d 938, 948 (D. Ariz. 2007) (granting defendants' motion to dismiss because plaintiffs failed to alleged that the defendant's stock price fell upon the revelation the defendant's backdating of stock options).

satisfied only if the public disclosure causing the injury addressed the specific fact allegedly concealed"); *In re Merrill Lynch Tyco Research Sec. Litig.*, 2004 WL 305809, at *3 (S.D.N.Y. Feb. 18, 2004).[23]

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER §20(a).

Plaintiffs' claim that the Individual Defendants were control persons of TCP and thus secondarily liable under §20(a) for the Company's alleged primary violations of §10(b) and Rule 10b-5 must also be dismissed because they fail to allege:  (1) "a primary violation by a controlled person"; (2) control of the primary violator by the targeted defendant; and (3) "that the controlling person was in some meaningful sense [a] culpable participant [] in the fraud."  *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks omitted); 15 U.S.C. §78t(a).

Specifically, because Plaintiffs' §10(b) claim must be dismissed, the Complaint fails to allege a primary violation of §10(b) against any of the Defendants, and Plaintiffs' claim for secondary liability must be dismissed as well.  *See Rombach*, 355 F.3d at 177-78.  In any event, Plaintiffs have failed to allege "control" by a primary violator, meaning "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  *In re Global Crossing, Ltd. Sec. Litig.*, 2005

---

[23] Notably, Plaintiffs repeatedly allege that the "concealed" facts remained concealed even after July 9, 2007.  *See* ¶¶123, 138-41.  Thus, as a matter of law, Plaintiffs cannot establish loss causation based on the decline in TCP's stock price on July 9, 2007 or at any time prior to August 23, 2007, when, according to Plaintiffs, "the nature and extent of Defendants' fraud [was] finally revealed to investors and the market."  *See eSpeed*, 457 F.Supp.2d at 296 ("a concealed fact cannot cause a decrease in the value of a stock *before* the concealment is made public") (emphasis added).  Nor can Plaintiffs establish loss causation based on the decline in TCP's stock on August 23, 2007 since, as explained above, *see supra,* Parts I.B.2.c, I.C.1.b, the alleged "problems" the Company was having with Disney, as well as the results of its options backdating investigation and the fact that it had misstated income in 2005 and 1Q 2006, had all been disclosed months earlier.

WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005).[24]  Plaintiffs rely on boilerplate allegations that the Individual Defendants were control persons "[b]y reason of their positions as officers and/or directors of Children's Place, and their ownership of Children's Place stock, [and therefore] the Individual Defendants had the power and authority to cause Children's Place to engage in the wrongful conduct complained of herein."  ¶151.  This is simply not enough to adequately plead a §20 claim.  *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 488 n.51, 490 (S.D.N.Y. 2005); *JHW Greentree Capital*, 2005 WL 3008452, at *9; *see also In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005).  Plaintiffs' conclusory assertions of control status are thus not enough.[25]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.  *See, e.g., Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (affirming denial of motion for leave to amend dismissed complaint: "where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied").

---

[24] Notably, "'actual control, not merely control person status,'" is required.  *Global Crossing*, 2005 WL 2990646, at *8.  "Conclusory allegations of control are insufficient."  *JHW Greentree Capital, L.P. v. Whittier Trust Co.*, 2005 WL 3008452, at *8 (S.D.N.Y. Nov. 10, 2005).

[25] Finally, even if Plaintiffs' control allegations were sufficient, their §20(a) claim must still be dismissed because they have not pleaded that each Defendant "was in some meaningful sense a culpable participant' in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted); *see also Burstyn v. Worldwide Xceed Group, Inc.*, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002).  A complaint that does not contain "detailed allegations regarding the state of mind of the control person must be dismissed."  *In re Global Crossing*, 2005 WL 1907005, at *12 (internal quotation marks omitted).  For the same reasons Plaintiffs' scienter allegations fail as a matter of law, their control allegations with them.

Dated: March 28, 2008
New York, New York

WEIL, GOTSHAL & MANGES LLP


By: /s/ Jonathan D. Polkes
    Jonathan D. Polkes (JP-4265)
    David R. Fertig (DF-5068)
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY  10153-0119
    Telephone: (212) 310-8000

    *Attorneys for Defendants The Children's Place*
    *Retail Stores, Inc. and Susan Riley*