UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
──────────────────────────────── x
DEBRA HALL, Individually and on Behalf of  :    Civil Action No. 07-cv-8252 (SAS)
All Others Similarly Situated,             :    (Consolidated)
                                           :
                    Plaintiff,             :    CLASS ACTION
                                           :
       vs.                                 :
                                           :
THE CHILDREN'S PLACE RETAIL                :
STORES, INC., et al.,                      :
                                           :
                    Defendants.            :
                                           :
──────────────────────────────── x
```

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................1

II. STATEMENT OF FACTS ........................................................................2

    A.  The Company Engaged in an Illegal Options Backdating Scheme ........................3

    B.  Defendants Concealed Significant Problems with Disney .......................................3

    C.  Defendant Dabah Violated the Company's Internal Control Policies ....................4

III. ARGUMENT ..............................................................................................4

    A.  The CAC Sufficiently Particularizes the Fraud ......................................................4

        1.  Defendants Have Admitted that the Company's Financial Statements and Statements Concerning Its Stock Option Practices Were False ...............................................................................................5

        2.  Defendants' Representations Concerning the Company's Dispute with Disney Were False and Misleading When Made.................................6

    B.  Defendants' Misrepresentations and Omissions Are Actionable Under Section 10(b) of the Exchange Act and Rule 10b-5 ..................................................9

        1.  Defendants' Statements and Omissions Are Material ...............................10

        2.  Defendants Were Required to Disclose Facts Necessary to Make Their Statements Concerning Disney Complete and Accurate.................12

        3.  The Truth on the Market Defense is Inapplicable Here.............................15

    C.  The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter ...............17

        1.  The CAC Alleges that Defendants Were At Least Reckless ....................17

        2.  The CAC Alleges Defendants' Motive to Commit Fraud ........................20

    D.  The CAC Adequately Alleges Loss Causation....................................................22

IV. The CAC Adequately Alleges a Control Person Claim....................................................25

V.  CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*380544 Can., Inc. v. Aspen Tech., Inc.*,
No. 07 Civ. 1204 (JFK), 2008 U.S. Dist. LEXIS 20968
(S.D.N.Y. Mar. 18, 2008) ........................................................................................5, 15, 20

*Acito v. IMCERA Group, Inc.*
47 F.3d 47 (2d Cir. 1995) ........................................................................................8, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)................................................................................................22

*Babaev v. Grossman*,
No. 03-CV-5076 (DLI) (WDW), 2007 U.S. Dist. LEXIS 13087
(E.D.N.Y. Feb. 26, 2007)................................................................................................11

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)............................................................................6, 8

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002)............................................................................................13

*Chemical Bank v. Arthur Andersen & Co.*,
726 F.2d 930 (2d Cir. 1984), *cert. denied*, 469 U.S. 884 (1984)......................................21

*Citadel Equity Fund v. Aquila, Inc.*,
168 Fed. Appx. 474 (2d Cir. Feb. 22, 2006)................................................................4, 18

*Cortec Ind., Inc. v. Sum Holding L.P.*,
949 F.2d 42, 48 (2d Cir. 1991) ......................................................................................25

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989) ..............................................................................................19

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................24

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
122 F. Supp. 2d 407 (S.D.N.Y. 2000)............................................................................14

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..........................................................................10, 12, 15, 16

*Page*

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) ...............................................................8

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................................................8, 13, 19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................................ *passim*

*In re CINAR Corp. Secs. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................................20

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y 2001)..............................................................14

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG) (RER), 2008 U.S. Dist. LEXIS 12351
    (E.D.N.Y. Feb. 20, 2008)........................................................................6, 16

*In re Emex Corp. Sec. Litig.*,
    No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528
    (S.D.N.Y. Sept. 18, 2002)..........................................................................25

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..........................................8, 19, 22, 24

*In re Globalstar Sec. Litig.*,
    No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
    (S.D.N.Y. Dec. 15, 2003) ...........................................................................15

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..........................................................4, 14

*In re Initial Pub. Offering Sec. Litig.*,
    No. 21 MC 92 (SAS), 2008 U.S. Dist. LEXIS 24148
    (S.D.N.Y. Mar. 26, 2008) .......................................................................22, 24

*In re MarketXT Holdings Corp.*,
    No. 04-12078 (ALG), 2007 Bankr. LEXIS 740
    (Bankr. S.D.N.Y. Mar. 1, 2007)....................................................................24

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ....................................................18, 19

**Page**

*In re Monster Worldwide, Inc. Sec. Litig.*,
  No. 07 Civ. 2237 (JSR), 2008 U.S. Dist. LEXIS 19573
  (S.D.N.Y. Mar. 4, 2008) ......................................................................................6

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003)..............................................14, 15, 17

*In re Omnicom Group, Inc. Sec. Litig.*,
  No. 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272
  (S.D.N.Y. Mar. 30, 2005) ..................................................................................16

*In re Open Joint Stock Co. "Vimpel-Commc'ns" Sec. Litig.*,
  No. 04 Civ. 9742 (NRB), 2006 U.S. Dist. LEXIS 10256
  (S.D.N.Y. Mar. 14, 2006) ..................................................................................11

*In re Openwave Sys. Sec. Litig.*,
  528 F. Supp. 2d 236 (S.D.N.Y. 2007)................................................... *passim*

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................... *passim*

*In re Par Pharm., Inc. Sec. Litig.*,
  733 F. Supp. 668 (S.D.N.Y. 1990).................................................................12

*In re Priceline.com Inc. Sec. Litig.*,
  236 F.R.D. 89 (D. Conn. 2006)......................................................................24

*In re Prudential Sec. Ltd. P'shps Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ..................................................................16

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
  (S.D.N.Y. Feb. 3, 2005) ..............................................................................5, 10

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..........................................................................8, 17

*In re Scottish Re Group Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................................19, 25

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)............................................................11

*In re Time Warner, Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993), *cert. denied*, 511 U.S. 1017 (1994)..................12, 20

**Page**

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)................................................................25

*In re UnitedHealth Group PSLRA Litig.*,
    No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623
    (D. Minn. June 4, 2007) ..............................................................................6

*In re Veeco Instruments, Inc., Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ..............................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
    No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015
    (S.D.N.Y. Apr. 22, 2004)..............................................................................8

*In re Winstar Commc'ns*,
    No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
    (S.D.N.Y. Feb. 27, 2006) ....................................................................18, 19

*Joffee v. Lehman Bros., Inc.*,
    410 F. Supp. 2d 187 (S.D.N.Y. 2006)........................................................24

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)..........................................12, 13, 14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................22, 24

*Malin v. XL Capital Ltd.*,
    No. 3:03-cv-2001 (PCD), 2005 U.S. Dist. LEXIS 27089
    (D. Conn. Sept. 1, 2005) ..........................................................................24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................17, 18

*P. Stolz Family P'shp L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)........................................................................14

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002)........................................................................4

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)......................................................................11

**Page**

*SEC v. Collins & Aikman Corp.*,
    524 F. Supp. 2d 477 (S.D.N.Y. 2007).............................................................10

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)...........................................................................13

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)........................................................................20, 21

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
    (S.D.N.Y. Sept. 6, 2005)..........................................................................17, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)...................................................................7, 16, 17, 21

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006)..............................................................................6

*Waltree Ltd. v. ING Furman Selz LLC*,
    97 F. Supp. 2d 464 (S.D.N.Y. 2000)................................................................5

**RULES**

Federal Rules of Civil Procedure
    Rule 8......................................................................................................25
    Rule 9(b) ...................................................................................................5

15 U.S.C.
    §78u-4 .....................................................................................................9

17 C.F.R
    §210.4-01(a)(1) ..........................................................................................6
    §210.4-10b-5 ..............................................................................................9

**OTHER AUTHORITIES**

Statement of Financial Accounting Standards No. 154 ...............................................10

Lead Plaintiff Laborers Pension Trust Fund for Northern Nevada ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] motions to dismiss the Consolidated Amended Class Action Complaint, dated February 28, 2008 (the "CAC," cited herein as "¶__").

## I.    PRELIMINARY STATEMENT

Contrary to Defendants' portrayal, this is not a case of fraud-by-hindsight based on ordinary business developments.  Rather, this is a clear case of securities fraud in which Children's Place, while on Defendants Dabah's and Riley's watch, *admittedly* engaged in a widespread stock options backdating scheme that violated its publicly disclosed stock option policies, as well as its internal controls and generally accepted accounting principles (GAAP), resulting in the restatement during the Class Period[2] of nearly four years of financial results.  At the same time, Defendants concealed and misrepresented serious problems the Company was experiencing in its business relationship with The Walt Disney Company ("Disney"), resulting from its violations of the terms of a licensing agreement (the "License Agreement") – an agreement that Disney had twice threatened to terminate, including once after identifying 120 individual breaches by the Company.  While the stock price traded at artificial levels as a result of these misrepresentations, Dabah received mispriced options, exercised *expired* options and admittedly violated internal controls again, by improperly pledging shares of stock as collateral for margin loans in his brokerage account during a black-out period.  Dabah's conduct resulted in his forced resignation and the voluntary resignation of the Company's auditor, which "was no longer willing to rely on his representations in connection with its audits."

---

[1]    Defendants are The Children's Place Retail Stores, Inc. ("Children's Place" or the "Company") and two of its executives:  Ezra Dabah ("Dabah"), its Chairman and CEO from 1991 until September 2007; and Susan Riley ("Riley"), its Senior VP and CFO from April 2006 to January 2007 and its Executive VP of Finance and Administration thereafter.

[2]    The putative Class Period is from March 9, 2006 to August 23, 2007.  ¶1.

Disregarding the well-pleaded allegations of the CAC, Defendants inappropriately engage in factual disputation to claim that the CAC pleads fraud-by-hindsight and lacks particularity in an effort to insulate their admitted conduct. Ignoring their omissions and the fact that many of their statements actually related to objective matters of *present* or *past* fact, Defendants also contend that their statements are non-actionable "puffery," while they claim others are forward-looking in nature and protected by the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA") and the bespeaks caution doctrine. Defendants further argue that the factually-intensive "truth-on-the-market" defense applies here, by claiming that much of the information that forms the basis of Plaintiff's securities fraud claims was already known by the market – a falsity itself, since Defendants took great pains to conceal the adverse information within their possession.

Defendants also contend that the CAC's scienter allegations are deficient. But this argument disregards, among other things: the backdating scheme, pursuant to which Dabah received and exercised options and Defendants certified false financial statements; the widespread yet undisclosed problems involving Disney; and Dabah's intentional violation of internal controls by improperly pledging his common stock as collateral while the stock price was artificially inflated. Defendants finally argue that the CAC fails to plead loss causation, although it alleges that the fraud damaged investors when the price of the stock declined as the artificial inflation was removed each time that the truth concerning the Company and its operations leaked out – which is all that it must do.

In sum, the CAC alleges viable securities fraud claims that this Court should sustain.

## II.    STATEMENT OF FACTS

Defendant Children's Place purports to be a specialty retailer of children's merchandise (¶¶2, 16), which it sells at "The Children's Place" and sold at "Disney Stores" retail store chains. ¶37. The Company's problems emanated, in material part, from the actions of its former CEO, Dabah, who served in that capacity from 1991 until he was forced to resign in September 2007. ¶4.

### A.    The Company Engaged in an Illegal Options Backdating Scheme

From 1997 to 2005, Children's Place issued stock options that were not granted at the "fair market value" as of the grant date, but were instead backdated at lower prices, or "spring-loaded" to ensure that the grant dates preceded positive news announcements (and hence a rise in stock price). ¶68. These practices violated the Company's publicly disclosed policies and had the intended effect of benefiting insiders, including Dabah. ¶¶5; 71(b). These practices also had the intended effect of enabling the Company to materially *understate* compensation expenses, thereby *overstating* net income and earnings per share, because the Company failed to record a compensation expense for the options in violation of its accounting policies and GAAP. ¶72. Eventually, the Company was forced to restate its financial statements for fiscal years 2003, 2004, 2005 and part of 2006, thereby admitting that the prior publicly disclosed financial statements were materially false. ¶¶73-74.

### B.    Defendants Concealed Significant Problems with Disney

From nearly the start of the Class Period, Dabah was responsible for day-to-day Disney-related operations. ¶6. Even then, Children's Place was unable to satisfy its obligations to Disney under the License Agreement, which caused many Disney Store locations to fall into disrepair. ¶¶38-50. Instead of candidly disclosing these problems (or choosing not to speak on the topic), Defendants improperly continued to speak positively about the Company's relationship with Disney and its performance under the License Agreement. *See, e.g.*, ¶¶80, 82, 84, 86, 88, 90. However, Defendants never told investors the full story of how the Company's repeated breaches prompted Disney to raise the possibility of terminating the License Agreement. ¶¶59-60, 102. Rather, Defendants led the public to believe that *both* companies were dissatisfied with the progress of renovations. *See* ¶105. When the truth was revealed, the stock price plummeted as Children's Place was forced to sacrifice some of the exclusivity it enjoyed on certain Disney products. ¶127. In the wake of this debacle, the Company was forced to place a subsidiary technically responsible for the

- 3 -

Disney Store operations in bankruptcy, and has since agreed to sell-off a substantial stake in the Disney Stores to Disney in furtherance of exiting the business.  *See* Form 8-K, filed April 7, 2008.[3]

### C.    Defendant Dabah Violated the Company's Internal Control Policies

During the Class Period, Dabah admittedly violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans in his brokerage account during a black-out period which prohibited such conduct.  ¶8.  This pledge amounted to a clandestine sale of stock that gave Dabah a motive to conceal the Company's problems.  ¶¶8, 137.  When it came to light, this conduct resulted in Dabah's forced resignation in September 2007, as well as the voluntary resignation of the Company's outside auditor, Deloitte & Touche LLP ("Deloitte"), which "was no longer willing to rely on his representations in connection with its audits."  ¶¶131-132.

## III.    ARGUMENT

The PSLRA "d[id] not change the standard of review for a motion to dismiss."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003) ("*IPO I*").  A court must still accept the complaint's allegations as true and construe all reasonable inferences in the plaintiff's favor.  *Id*. at 331.  The issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  *Phelps v. Kapnolas,* 308 F.3d 180, 184 (2d Cir. 2002).  The CAC meets this standard.

### A.    The CAC Sufficiently Particularizes the Fraud

Defendants concede that the CAC adequately sets forth the allegedly false and misleading statements, identifies the speakers, sets forth where and when the statements were made, and alleges

---

[3]    *See*  http://sec.gov/Archives/edgar/data/1041859/000114420408020983/v109749_8k.htm. The Court may take judicial notice of the Company's SEC filings.  *See Citadel Equity Fund v. Aquila, Inc.*, 168 Fed. Appx. 474, 476 (2d Cir. Feb. 22, 2006).

the circumstances surrounding the fraud, as required by Federal Rule 9(b) and the PSLRA.[4] *See In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *34-35 (S.D.N.Y. Feb. 3, 2005). Ignoring the omissions alleged in the CAC, Defendants only question whether the CAC sufficiently alleges that the statements were false and misleading when made. *See* Def. Mem. at p.3.[5] But the CAC also satisfies this requirement.

> **1.    Defendants Have Admitted that the Company's Financial Statements and Statements Concerning Its Stock Option Practices Were False**

The CAC alleges that Defendants made a series of fraudulent statements concerning the Company's financials and stock option practices. Specifically, Defendants told investors that the price of stock options would be set "at the time of grant" and "in no event" less than the fair market value of a share as of that date. ¶¶65-66. Contrary to these representations, however, the Company did not issue options at the "fair market value" on the grant date. ¶68. Rather, as the Company later admitted, "[i]n many instances options were dated before all grant-making processes were finalized," resulting in an "option exercise price [that] was lower than it should have been based on the trading price on the date the grant process was completed." ¶101; *see also* ¶69. In other cases, options were spring-loaded, permitting recipients – including Dabah – to benefit from future announcements that Defendants knew would result in sharp increases in the stock price. ¶68; *see also* ¶¶71(b), 101.

---

[4]     The false and misleading statements and omissions alleged in the CAC that Riley did not personally make are nevertheless attributable to her under the group pleading doctrine. *See Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 469 n.6 (S.D.N.Y. 2000); *see also 380544 Can., Inc. v. Aspen Tech., Inc*., No. 07 Civ. 1204 (JFK), 2008 U.S. Dist. LEXIS 20968, at *52 (S.D.N.Y. Mar. 18, 2008) (applying the doctrine to false financial statements and SEC filings).

[5]     "Def. Mem. at p.__" refers to a page of the Memorandum of Law submitted in support of the motion to dismiss filed by Defendants Children's Place and Riley. "Def. Mem. II at p.__" refers to the Memorandum of Law submitted by Defendant Dabah in support of his motion to dismiss.

Defendants also represented that because the Company granted stock options at or above the fair market value (which was false), "no compensation expense was recognized at the date of the grant," as permitted by GAAP. ¶¶67, 70. Defendants have now admitted that the Company in fact *materially understated* its compensation expenses when it failed to expense the in-the-money portion of backdated grants, in violation of GAAP. ¶70. The Company's financial statements were thus presumptively misleading and inaccurate. *See United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) (citing 17 C.F.R. §210.4-01(a)(1)). Defendants have also admitted that the Company's financial statements for 2003, 2004, 2005 and part of 2006 were *false*, because the Company had to restate them to record charges for the compensation expenses. ¶¶73, 80-81, 101. These restatements provide a "'sufficient basis for pleading that th[e financial] statements were false when made.'" *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486-487 (S.D.N.Y. 2004)); *see also In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623, at *8 (D. Minn. June 4, 2007) (statements in backdating case were false and misleading when made).[6]

## 2.    Defendants' Representations Concerning the Company's Dispute with Disney Were False and Misleading When Made

Incredibly, Defendants argue that the CAC "do[es] not allege *any* particularized facts that *even arguably* support an inference that Defendants' relationship with Disney was in imminent danger during the putative class period." *See* Def. Mem. at p.4 (emphasis in original). Aside from

_____

[6]    Numerous courts have sustained fraud claims involving backdating. *See, e.g.*, *In re Monster Worldwide, Inc. Sec. Litig.*, No. 07 Civ. 2237 (JSR), 2008 U.S. Dist. LEXIS 19573 (S.D.N.Y. Mar. 4, 2008); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2008 U.S. Dist. LEXIS 12351 (E.D.N.Y. Feb. 20, 2008); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007); *In re UnitedHealth*, 2007 U.S. Dist. LEXIS 40623, at *8.

the fact that Defendants inappropriately ask this Court to disregard the well-pleaded allegations of the CAC and give *them* the benefit of every favorable inference, this is simply not true.[7]

As the CAC alleges, Defendants made highly positive statements regarding the Company's relationship with Disney and its ongoing performance under the terms of the License Agreement (*see* ¶¶80, 82, 84, 86, 88, 90, 92, 99), at the same time that, *inter alia*, the Company omitted to disclose: that it had failed and was refusing to adequately perform its contractual obligations (*see* ¶¶6, 44, 48-49, 54-56, 62, 108); a number of Disney Stores fell into disrepair or were not renovated on time or to Disney's satisfaction (¶¶49, 54-56); and Disney had twice threatened to terminate the License Agreement, and the relationship, as a result of those breaches (*see* ¶¶59-60, 103, 108, 127). Many of these issues occurred while Dabah, who attended meetings with Disney, ran day-to-day Disney Store operations. ¶¶6, 50. Moreover, these allegations are substantiated by the firsthand knowledge of seven high-level confidential informants who were intimately involved in the operations. ¶¶29-36.

For example, the informants described the consistent delays and complications that resulted from the Company's failure to comply with the pre-approval processes imposed by the License Agreement. ¶¶44-46. According to an informant, these issues first began when Children's Place acquired the Disney Stores, because it failed to maintain or repair existing stores in violation of the License Agreement. ¶49. This resulted in a tense relationship between Children's Place and Disney, in which they regularly "butted heads" regarding the design and renovation of the stores. ¶47. In fact, an informant confirmed that Dabah was aware of these issues because he was "extremely hands on," managed the Disney relationship, and was present at many bi-weekly meetings with Disney

---

[7]     As noted below, while the Court is permitted to weigh competing inferences on the issue of scienter, a similar comparative analysis is not appropriate on other issues. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).

regarding the remodeling. ¶50. Moreover, Dabah was directly responsible for implementing the failed Mickey Store format in a series of stores without the required approval of Disney. ¶¶52-56. These stores again had to be remodeled when Disney discovered the unauthorized renovations. *Id.*; ¶105. This constituted a complete disregard for Disney's right to approve such work under the License Agreement, because Disney had repeatedly expressed concerns about the format. ¶¶52-54.

Contrary to Defendants' contentions, the CAC does not present a claim of fraud-by-hindsight. First, as addressed below, the CAC alleges omissions of fact that gave rise to a duty to disclose additional information in order to render prior statements not misleading. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 454 (S.D.N.Y. 2005) (material omission triggered duty to disclose that insulated claim from fraud-by-hindsight). Second, the CAC alleges that Defendants ignored or failed to take into account information that was available to them when they made their statements, which removes this case from the realm of fraud-by-hindsight.[8] *See In re Atlas Air*, 324 F. Supp. 2d at 494; *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 330 (D. Mass. 2002).

Furthermore, Plaintiff is entitled to rely on statements that Defendants made at the end of the Class Period or after, because they shed light on what Defendants knew or should have known during the Class Period. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS

---

[8]    Defendants' authorities on this point are factually inapposite. *See, e.g., Caifa*, 525 F. Supp. 2d at 412 (noting that the "allegations amount[ed] to no more than an assertion that the Company violated GAAP . . . ."); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 (S.D.N.Y. 2006) (plaintiffs essentially alleged "that defendants should have *anticipated* that PI would eventually damage the company, even at a time that the company was enjoying growing revenues") (emphasis in original). Moreover, in *Acito v. IMCERA Group, Inc.*, dismissal was warranted because the facts at issue were simply not material and there were no allegations that the company reasonably could have predicted an adverse consequence from its actions. 47 F.3d 47, 53 (2d Cir. 1995).

7015, at *22 (S.D.N.Y. Apr. 22, 2004) (noting that "plaintiffs may reply on post-class period data to confirm what a defendant should have known during the class period."). Those statements also support an inference that the problems were so pervasive that they continued even beyond the Class Period. *See In re Oxford Health Plans, Inc. Sec. Litig*., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (noting that "Oxford to this day has not fully remedied its computer and internal control problems").

Defendants' contention that the Disney relationship was never in danger because Disney refrained from terminating the License Agreement is simply not supported by the facts, which demonstrate that Disney repeatedly reserved its right to do so based on the Company's breaches. *See* Def. Mem. at pp.7-8. Moreover, the fact that Disney did not actually invoke this right does not mean that the problems alleged in the CAC during the Class Period were not material or did not exist – a defense that is peculiarly based in hindsight. *See id*. The fact that Disney did not immediately terminate the License Agreement and instead chose to work through the problems with Children's Place also does not undercut Plaintiff's claims that the Company breached the License Agreement. Disney could have maintained the relationship for any number of reasons, including the fact that abandoning the License Agreement would have caused Disney huge operational, financial and reputational issues that would have arisen from the efforts needed to retake control of the Disney Stores. Disney's suspected rationale, however, is not a basis upon which to insist that the issues described in the CAC were immaterial or never existed.

**B.    Defendants' Misrepresentations and Omissions Are Actionable Under Section 10(b) of the Exchange Act and Rule 10b-5**

Defendants' statements and omissions are actionable because they concern material facts that Defendants had a duty to disclose and are not otherwise insulated from liability.

### 1.    Defendants' Statements and Omissions Are Material

"[M]ateriality is a mixed question of law and fact and is thus not generally suitable for treatment on a motion to dismiss." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 496 (S.D.N.Y. 2007).  It is satisfied at the pleading stage merely "'by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *In re Regeneron*, 2005 U.S. Dist. LEXIS 1350, at *61 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).  Here, Defendants concede that issues relating to the Company's backdating practices and financial statements are material – because they must.  *See, e.g., Collins*, 524 F. Supp. 2d at 496 (scheme to inflate income material); *see also* Statement of Financial Accounting Standards No. 154 (requiring restatement of material financial errors).  Instead, they challenge only the materiality of facts regarding the Disney relationship.  *See* Def. Mem. at p.8.

However, the alleged fraud related directly to the License Agreement, which investors would have considered material to their investment decisions – a fact Defendants *admit*.  *See* Def. Mem. II at p.3.  This is because the License Agreement (and its amendments) governed the Company's exclusive right to operate 313 Disney Store locations throughout the U.S. and Canada.  ¶¶38-39.  In addition, Children's Place made a substantial monetary investment in the franchise:  it paid nearly $100 million to acquire the stores and agreed to invest up to another $100 million to remodel them.  ¶39.  Moreover, the remodeling initiative required by the License Agreement related to a substantial number of stores.   ¶42.  Defendants also publicly emphasized the importance of the License Agreement and the Disney relationship, and later attributed the Company's reduced guidance and failure to achieve its estimated financial results to the failed renovations.  *See* ¶¶105, 108, 113, 122.

Moreover, Disney had a right to terminate the License Agreement based on "repeated material breaches" by Children's Place, which carried with it a right to require the Company to sell the stores.  ¶41.  It was thus imperative for the Company to comply with the License Agreement's

terms and to maintain a productive ongoing relationship with Disney. Once Defendants chose to make statements about the License Agreement, they were required to provide investors with a complete and accurate account of whether it was doing so. Instead, Defendants concealed and downplayed the severity and extent of breaches that triggered Disney's right to terminate the License Agreement and endangered the relationship.[9] *See* ¶¶103-105. The materiality of the License Agreement and the disputes relating to it is beyond question. *See, e.g., Babaev v. Grossman*, No. 03-CV-5076 (DLI) (WDW), 2007 U.S. Dist. LEXIS 13087, at *10 (E.D.N.Y. Feb. 26, 2007) (holding that company's receipt of default notice from customer was material, where company denied breach but possible termination of exclusive contracts would affect its future); *see also In re Oxford Health*, 187 F.R.D. at 140 (internal computer problems that defendants downplayed were material).[10]

Defendants' contention that Disney waived the breaches by entering into the June 2007 letter agreement (or any amendment thereafter) is solely predicated on factual disputation and Dabah's self-serving characterization of the delays as "immaterial" and Disney's election not to terminate the License Agreement as a "waiver." *See* Def. Mem. at p.7. Moreover, at the time Disney regarded the defaults as "material breaches" – a fact later acknowledged multiple times by the Company. ¶¶108,

---

[9] The Company has acknowledged that termination would result in "significant financial and other obligations to Disney" and others. *See* 2007 Form 10-K, filed April 2, 2008, at p.13. *See* http://sec.gov/Archives/edgar/data/1041859/000104746908004012/a2184415z10-k.htm.

[10] Defendants' cited authorities are once again inapposite. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173-4 (2d Cir. 2004) (statements about integration were not misleading/actionable); *Acito*, 47 F.3d at 52-53 (two inspection reports were not material where manufacturing plant was one of 30 *worldwide* locations and it was "impractical to publicly disseminate the results of every inspection of every plant"; here, one contract is at issue); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373-4 (S.D.N.Y. 2007) (failure to win new contract was immaterial because it would not impact company until 2005 or doom a business segment); *In re Open Joint Stock Co. "Vimpel-Commc'ns" Sec. Litig.*, No. 04 Civ. 9742 (NRB), 2006 U.S. Dist. LEXIS 10256, at *19 (S.D.N.Y. Mar. 14, 2006) (mere initiation of tax inspection was not material "[w]ithout a ballpark estimate of liability"; here, the Company has admitted that termination of the License Agreement would have material impact).

116; *see also* ¶120 ("breaches"). In addition, Disney continued to reserve its right to terminate the License Agreement as a result of those breaches. ¶¶103, 108, 116, 127. A fair reading of the CAC thus compels the conclusion that the Company's breaches were regarded by Disney as much more than mere delays. The fact that Disney did not actually terminate the License Agreement does not undermine the material nature of the breaches, *because the breaches gave rise to Disney's right to invoke termination* – a fact that any investor would regard as highly significant. *See Ganino*, 228 F.3d at 165 (materiality is based on existing circumstances). Disney's attempt to work through these issues with Children's Place may simply reflect the fact that Disney had a large investment in the relationship and did not have any meaningful alternatives. It is not appropriate to resolve this factual issue on a motion to dismiss. Moreover, in no way can Disney's failure to immediately terminate the License Agreement be construed as meaning that the breaches did not occur or that Defendants had an excuse to leave investors in the dark.

### 2. Defendants Were Required to Disclose Facts Necessary to Make Their Statements Concerning Disney Complete and Accurate

Throughout the Class Period, Defendants repeatedly made statements concerning the License Agreement and the Disney relationship. *See, e.g.,* ¶¶80, 82, 84, 86, 88, 90, 92, 99, 105, 108-109, 113, 116, 118, 120. For example, with respect to the Disney Stores, Defendants favorably discussed the Mickey Store format, the "continued positive trend of the business," the "continued strength at Disney Store," and the "consistent execution of our strategies." ¶¶82, 84, 88, 90. Once Defendants made these statements, they undertook a duty "to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990); *see also In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (holding that "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading"), *cert. denied*, 511 U.S. 1017 (1994); *Lapin v.*

- 12 -

*Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete,'" quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). Defendants nevertheless concealed information regarding the true extent of the Company's issues. "This alleged deception, in itself, gave rise to the duty to disclose." *In re Alstom*, 406 F. Supp. 2d at 454.

Specifically, Defendants failed to inform investors of significant problems relating to the operation of the Disney Stores. In fact, despite their positive statements about the stores, Defendants never fully informed investors about the extent of the problems concerning the redesign of stores, or the impact those problems had on merchandise development, selection and ordering, (¶¶44-45), nor did they advise investors about the Company's failure to meet Disney's expectations because of Dabah's disregard for the obligations imposed by the License Agreement. ¶¶44-45, 52-56. For example, the Company would order manufacturing products before obtaining Disney's required approval. ¶48. The Company also implemented the Mickey Store format without Disney's approval, which had to be redone when Disney discovered it; this further delayed the remodeling schedule. ¶¶51-56. Nevertheless, Defendants led investors to believe that the delays were caused by a *mutual* dissatisfaction with the design, even though that was clearly not the case. *See* ¶105.

Not surprisingly, Defendants fail to address the fact that their positive statements concerning the Disney relationship required them to disclose sufficient additional information to make their prior statements not misleading. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (where a defendant makes a statement reasonably calculated to influence the investing public, he must ensure that the statement is not "so incomplete as to mislead"). Rather, in their motions to dismiss, Defendants attempt to refashion Plaintiff's allegations into a theory that Defendants were obligated to predict that the Company's relationship with Disney was doomed to fail. *See* Def.

- 13 -

Mem. at p.9.  Aside from the fact that this is plainly *not* what Plaintiff has alleged, Defendants cannot recast the CAC's allegations into a theory they believe they can defeat; rather, they must address the claims, as alleged.  *See IPO I*, 241 F. Supp. 2d at 332.  Defendants have failed to do so.

Moreover, as shown above, Defendants had no reasonable basis for their positive statements concerning the relationship, which takes the statements out of the realm of "puffery."  *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (statements that a company was "financially solid" were actionable where defendants did not have a reasonable basis for them); *In re Oxford Health*, 187 F.R.D. at 140 (statements downplaying computer and internal control problems were actionable because they misled investors into believing that the problems were not as extensive or serious as they were); *see also Lapin*, 506 F. Supp. 2d at 240 (reasoning that even vague statements can be considered "statements that implied certainty when, in fact, Defendants purportedly had little reason to believe them").  For the very same reason, Defendants' statements – even if forward-looking – are not protected by the bespeaks caution doctrine or the PSLRA's safe harbor provision.  *See, e.g.*, *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (statements not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality"); *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

Further, neither defense applies to material omissions or misstatements of present or historical fact.  *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y 2001) (citation omitted); *In re Oxford Health*, 187 F.R.D. at 141; *see also P. Stolz Family P'shp L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) (exempting misrepresentation of present or historical facts from scope of bespeaks caution doctrine).  In fact, "even when an allegedly false statement has both

a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re Nortel*, 238 F. Supp. 2d at 629 (citation omitted). Here, most of the challenged statements are not forward-looking. For example, statements concerning the Company's stock option practices and financial results related to *prior* practices and *historical* financial results. *See Aspen*, 2008 U.S. Dist. LEXIS 20968, at *53 n.12 (statements in press releases reporting financial information were actionable). Likewise, many of the statements concerning the License Agreement related to the Company's past or current performance (or compliance) thereunder. *See In re Oxford Health*, 187 F.R.D. at 141 (statements that downplayed significance of internal computer problems related to present or past fact). Moreover, as Defendants cannot dispute, the CAC alleges omissions of material fact that render these defenses inapplicable.

Finally, to the extent that some statements are forward-looking in nature, Defendants' cautionary language is not "sufficiently specific to render reliance on the false or omitted statement unreasonable." *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, *24 (S.D.N.Y. Dec. 15, 2003); *see also In re Nortel*, 238 F. Supp. 2d at 628-9 (holding that the language must "precisely address the substance of the specific statement or omission that is challenged" (citations omitted)); *In re Oxford Health*, 187 F.R.D. at 141 (observing that "adding boiler plate language to the effect that estimates can never be one hundred percent accurate does not mitigate a failure to disclose the severity of the computer problem.").

### 3.    The Truth on the Market Defense is Inapplicable Here

Despite the fact that Defendants made false statements in press releases and SEC filings, they rely upon the truth-on-the-market defense in arguing that they disclosed the true facts concerning the Disney relationship. To establish this defense, "'the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatement.'" *Ganino*, 228 F.3d at 167; *see also*

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *24 (S.D.N.Y. Sept. 6, 2005). Moreover, the defense "'is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint for failure to plead materiality.'" *Ganino*, 228 F.3d at 167; *see also In re Comverse*, 2008 U.S. Dist. LEXIS 12351, at *40. "This is not one of those rare situations." *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272, at *20-21 (S.D.N.Y. Mar. 30, 2005).

While Defendants referred to the renovations from time to time during the Class Period, they did so in a deceptive manner which failed adequately to apprise investors that the Company had substantially failed to discharge its obligations under the License Agreement. *See* Def. Mem. at pp.13-14. Moreover, their statements were not conveyed with a degree of intensity and credibility sufficient to counter-balance their misrepresentations and omissions regarding those issues. Thus, for example, although Defendants indicated that the License Agreement was being renegotiated, they failed to advise investors that the renegotiations resulted from Children's Place's breaches or to disclose enough information to permit investors to appreciate the true extent of the adverse consequences that could result from those breaches. A speaker receives no protection where he "warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *See In re Prudential Sec. Ltd. P'shps Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). Here, Defendants dug that huge hole by constantly violating the License Agreement but failed to apprise investors of that fact. Likewise, the mere fact that they disclosed certain delays does not negate the fact that they downplayed the significance of those delays. *See* Def. Mem. II at pp.7-8 (citing statements downplaying the Mickey Store issues). Moreover, the adequacy of Defendants' disclosures poses questions of fact that cannot be resolved now, and, in any event, the CAC's allegations are accepted as true. *See Tellabs*, 127 S. Ct. at 2509.

- 16 -

### C.    The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter

Scienter is established by facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or which show that defendants had motive and opportunity to commit fraud. *In re Scholastic*, 252 F.3d at 74 (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). Even in light of this standard, great specificity is not required. *See, e.g., Teamsters*, 2005 U.S. Dist. LEXIS 19506, at *29. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original). The inference must merely be "*at least as likely* as any plausible opposing inference." *Id.* at 2513 (emphasis in original).

Here, the following facts, considered collectively as *Tellabs* requires, give rise to an inference of scienter that is at least as likely as any *plausible* opposing inference: (a) the statements and omissions that Defendants made with reckless, if not knowing, disregard for the truth; (b) the admitted backdating scheme, pursuant to which Dabah received options and exercised a substantial number of expired options; (c) the extensive restatements; (d) the false/inaccurate SEC filings and Sarbanes-Oxley Certifications that Defendants signed; (e) the resignations of Dabah and Deloitte; and (f) Defendants' repeated and knowing violations of the Company's internal controls.

#### 1.    The CAC Alleges that Defendants Were At Least Reckless

Recklessness is conduct "which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Nortel*, 238 F. Supp. 2d at 631. The key question is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308. Here, there is no question.

During the Class Period, Defendants knowingly violated the Company's internal control policies by issuing backdated options and accounting for them in contravention of GAAP. ¶¶63-74.

*See, e.g.*, *Novak*, 216 F.3d at 311 (approval of procedures violating Company's markdown policy); *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *24 (S.D.N.Y. Feb. 27, 2006) (omissions of "material facts relating to GAAP violations" coupled with violations of internal policies).   Moreover, as members of management, they were admittedly "responsible for the Company's internal controls and the financial reporting process."   *See* Schedule 14A, filed May 14, 2004, at p.6.[11]   And, Dabah was integrally involved in the backdating scheme:  he approved grants without Board approval; received illicit options; and, as noted below, exercised a substantial number of options after they had expired.   *See* 2006 Form 10-K, filed December 5, 2007, at pp.46-47, 50-51.[12]   This conduct was clearly intentional:  just as the "books do not cook themselves," *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000), stock options do not backdate themselves.

Dabah also intentionally violated internal controls when he pledged shares of stock as collateral during a black-out period in which a Company policy prohibited him from doing so, and he knowingly committed an additional yet purportedly unrelated violation.   ¶¶8, 130; *see also* Def. Mem. II at p.11, n.7 (admitting the pledge violation).   In the wake of an internal investigation into the backdating practices and this conduct, the Company has admitted to having material weaknesses

---

[11]   http://sec.gov/Archives/edgar/data/1041859/000104746904017389/a2136424zdef14a.htm.

[12]   http://sec.gov/Archives/edgar/data/1041859/000110465907087151/a07-20912_410k.htm. The Form 10-K is cited and expressly relied upon in the CAC (*see* ¶¶69-70, 74).   Moreover, the Company's other SEC filings also support Plaintiff's claims, demonstrating that Dabah served on the Company's Compensation Committee during 2003 (*see* May 14, 2004 Schedule 14A, at p.3 – one of the restated fiscal years – and that, as a result of the backdating investigation, Dabah lost the Chairman position.   *See* Form 8-K, filed February 1, 2007, Ex. 99.2 at p.2 (January 31, 2007 press release), at http://sec.gov/Archives/edgar/data/1041859/000114420407004592/v064123_ex99-2.htm. In addition, the Company's Chief Administrative Officer, General Counsel and Secretary, Steve Balasiano, "relinquished" his positions but remained a Senior VP.   *See id.*   As noted above, the Court may take judicial notice of these filings.   *See Citadel Equity*, 168 Fed. Appx. at 476.

in its internal controls (¶¶127, 130, 132), which is also probative of scienter.  *See In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that "a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter").  Dabah's forced resignation, coupled with Deloitte's voluntary resignation, "add to the overall pleading of circumstantial evidence of fraud" – a fact that Defendants conspicuously ignore.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007); *see also In re Alstom*, 406 F. Supp. 2d at 505 (firing supported scienter); *In re McKesson*, 126 F. Supp. 2d at 1273-74 (same).

Moreover, as noted above, Defendants' statements regarding the Company's financials and the Disney relationship were contradicted by available facts, giving rise to an inference that they "had intimate knowledge of those facts or should have known them."[13]  *In re Atlas Air*, 324 F. Supp. 2d at 489.  Under these circumstances, knowledge of the Company's core operations is also properly imputed to Defendants.  *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (imputing knowledge of loss of "potentially significant source of income"); *In re Atlas Air*, 324 F. Supp. 2d at 491 (imputing knowledge about impairment in value of inventory).  And, Defendants signed SEC filings and Sarbanes-Oxley Certifications (¶¶75-79), which gave rise to a duty to familiarize themselves with the operations that would have revealed the improprieties (if unknown).  *See Teamsters*, 2005 U.S. Dist. LEXIS 19506, at *63 (citing *In re Atlas Air*, 324 F. Supp. 2d at 491); *see also In re Scottish Re*, 524 F. Supp. 2d at 391 (false certifications supported securities fraud claim).

---

[13]    "[E]ven in the absence of specific information contradicting their public statements," knowledge of contradictory information may be imputed to individual defendants where the statements concern matters that are "sufficiently significant" to the company.  *In re eSpeed*, 457 F. Supp. 2d at 293; *see also In re Winstar*, 2006 U.S. Dist. LEXIS 7618, at *22 (imputing scienter for false financial statements).

Finally, Defendants "signed statements that materially misrepresented certain aspects of [Children's Place's] practices and/or financial condition as a result of the backdating scheme," which were followed by several years' restatements.  *See In re Openwave*, 528 F. Supp. 2d at 250; *see also* ¶¶75-79.  These "'subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate knowledge of company affairs' is [sic] enough to adequately infer scienter" on their part.  *In re CINAR Corp. Secs. Litig.*, 186 F. Supp. 2d 279, 316 (E.D.N.Y. 2002) (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84-85 (2d Cir. 1999)); *see also Aspen*, 2008 U.S. Dist. LEXIS 20968, at *61 (attributing scienter to executive who disseminated false financials).[14]

Neither Defendants' unfounded denials nor their demand for more detail regarding their own roles in the backdating scheme countermands a finding of scienter.  *See Aspen*, 2008 U.S. Dist. LEXIS 20968, at *80 (noting that a plaintiff need not allege that a defendant "participated in the underlying scheme that generated the false statements").  Accordingly, Defendants have failed to suggest a plausible opposing inference that is more likely than the strong inference of scienter here.

## 2.    The CAC Alleges Defendants' Motive to Commit Fraud

Defendants cannot seriously dispute that they had an opportunity to commit the fraud or that the CAC alleges that they did.  *See In re Time Warner*, 9 F.3d at 269 ("[N]o one doubts that the defendants had the opportunity, if they wished, to manipulate the price of Time Warner stock").  Instead, Defendants claim that the CAC does not allege motive.  They are incorrect.

---

[14]    While the *Aspen* court held that scienter was not established with respect to the company's CFO, its decision resulted from the fact that the CFO "plausibly could have been unaware that certain sales executives were making illicit side deals, or improperly booking sales either prematurely or belatedly."  2008 U.S. Dist. LEXIS 20968, at *78.  The connection between the fraud and Riley's position is not so attenuated here.

Contrary to their contentions, Dabah's involvement in the backdating scheme, coupled with his pledge of shares, provides a sufficient motive to commit securities fraud.  As the CAC alleges, Dabah served as the Company's CEO throughout the backdating scheme and until the Company announced the need for the restatements.  *See* ¶¶4-5.  As noted above, Dabah also benefited from the scheme, receiving thousands of spring-loaded options during the Class Period (¶71(b)), and exercising 84,660 *expired* options – representing nearly 85% of his IPO-granted options – at the exceedingly low price of $15.40 per share in April 2006, a month after the Class Period began when the average trading price was almost $62.00 per share.  In doing so, Dabah acquired nearly $5.2 million in stock for only $1.3 million, at a time when Defendants were making positive statements that concealed the problems facing the Company.  "[T]he statements that continued to be made after the [purchases] that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud."  *See Stevelman,* 174 F.3d at 86.

Likewise, Dabah's improper pledge of shares amounted to a clandestine sale of stock which provided him with a financial incentive to conceal the problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit.  ¶¶8, 130; *see also Chemical Bank v. Arthur Andersen & Co*., 726 F.2d 930, 939 (2d Cir. 1984) (holding that "a pledge is a sale and purchase of a security under § 10(b)"), *cert. denied*, 469 U.S. 884 (1984).  Accordingly, both the backdating scheme and the pledge provided Dabah with benefits that differed from those that corporate executives typically receive, further supporting a strong inference of scienter.  *See In re Openwave*, 528 F. Supp. 2d at 250 (executive had received backdated options).

Other than once again advancing purely generic excuses for their involvement in the backdating scheme, "Defendants have not pointed to any 'competing inferences rationally drawn from the facts alleged' that could explain their receipt [or exercise] of options bearing dates other

than the ones on which they received them." *Id.* (quoting *Tellabs*, 127 S. Ct. at 2504; internal citation omitted). Defendants' attempt to use the Company's self-serving statement that no wrongdoing occurred is insufficient to overcome this glaring deficiency. *See Tellabs*, 127 S. Ct. at 2510 (opposing inference must be more *plausible*).

**D.    The CAC Adequately Alleges Loss Causation**

To establish loss causation, a plaintiff need only "'plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2008 U.S. Dist. LEXIS 24148, at *21 (S.D.N.Y. Mar. 26, 2008) ("*IPO II*") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007)). In this regard, the alleged facts must support an inference that the "'misstatements and omissions concealed the circumstances that bear upon the loss,'" and that all or a portion of the loss would not have occurred absent the fraud. *IPO II*, 2008 U.S. Dist. LEXIS 24148, at *24 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). However, "there is no 'requirement that the disclosure take a particular form or be of a particular quality.'" *IPO II*, 2008 U.S. Dist. LEXIS 24148, at *26 (quoting *In re eSpeed*, 457 F. Supp. 2d at 297). Rather, a plaintiff may tie dissipation of the artificial inflation caused by the fraud to a series of disclosing events. *IPO II*, 2008 U.S. Dist. LEXIS 24148, at *26 (citations omitted). Here, the CAC does just that.

As the CAC alleges, the truth regarding the backdating scheme and false financial results first began leaking out to the market on September 7, 2006, when the Company disclosed that it would delay filing its second quarter Form 10-Q to complete "an analysis of the accounting treatment of its stock option grants." ¶94. At that time, the Company also announced the preliminary results of its investigation into its "stock option practices." *Id*. In response to this news, the stock price dropped by $1.36 per share. ¶¶94-95. Another drop occurred on November 13, 2006, after the Company announced that it would delay its third quarter earnings release pending completion of its

investigation. ¶¶97-98.  At that time, the stock price declined $2.64 per share.  ¶98.  Thus, damages of *at least* $4.00 per share are attributable to removal of artificial inflation from the stock price resulting from the scheme, although other drops may also be linked to it.  *See In re Openwave*, 528 F. Supp. 2d at 252 (finding loss causation where stock drops were tied to announcements).

A marked decline in the stock price also accompanied the intermittent disclosure of the truth regarding the Company's business relationship with Disney.  The first of these disclosures occurred on February 1, 2007, in connection with an earnings release and conference call.  ¶¶103, 105.  At that time, Defendants disclosed that negotiations were underway with Disney regarding "potential modifications" to the License Agreement as a result of certain "defaults" by Children's Place, and that Disney "may reserve its rights and remedies" thereunder.  *Id.*  In response, the Company's stock price declined $1.96 per share.  ¶107.  Stock drops accompanied nearly every subsequent disclosure of information regarding these issues, and their effect on the Company's financials, indicating that the market was slowly becoming aware of the full extent of the problems – including that Disney regarded the breaches as material enough to terminate the License Agreement.  *See, e.g.*, ¶¶111-112, 113, 115; 122-123; 124-125; 127-128.  During that period, the stock price dropped from $53.75 to $27.43 per share – a $26.32 decline.  *See id.*  Accordingly, a loss of *at least* $26.32 per share is attributable to removal of artificial inflation from the stock price resulting from these issues, although, as with the backdating and restatement issues, other drops and resulting damage may also be related to the revelation of the fraud.

Notwithstanding the fact that the CAC establishes that investors paid an inflated price and thereafter suffered an economic loss when the stock price declined after each disclosure of the true facts regarding the fraud, Defendants first attack loss causation on the purported basis that the CAC does not allege that Plaintiff sold "shares at a deflated price after a supposed corrective disclosure" –

a proposition that not even Defendants' cited authorities support.[15]  *See* Def. Mem. at p.22.  As noted

above, a plaintiff need not sell his shares after the disclosure of the fraud in order to capture a loss.[16]

*See IPO II*, 2008 U.S. Dist. LEXIS 24148, at *21 (only materialization of the risk is necessary).

Defendants next argue that the CAC does not allege loss causation because it purportedly

does not identify a sufficient corrective disclosure that linked the issues to the stock's decline, to the

exclusion of all other potential causes for the drops.[17]  *See* Def. Mem. at p.23.  However, a corrective

disclosure need not reveal "the precise loss attributable to [the] fraud" or the precise manner in

which the fraud occurred.  *See Lentell*, 396 F.3d at 177.  Moreover, "a plaintiff is not required to

plead that her economic loss was caused *solely* by the alleged fraudulent scheme."  *In re eSpeed*, 457

F. Supp. 2d at 297 (emphasis in original); *see also In re Openwave*, 528 F. Supp. 2d at 253 (whether

decline linked to backdating scheme "was attributable to some other cause . . . is a matter for proof at

trial.").  Nor is a plaintiff required to demonstrate that the loss materialized through a *single*

corrective disclosure.  *See, e.g., In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 93-94 (D. Conn.

2006) (refusing to narrow a class definition because to do so would require a factual determination

---

[15]     *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (noting that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."); *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 192 (S.D.N.Y. 2006) (holding that a plaintiff must "allege facts indicating the economic loss they claim to have suffered."); *Malin v. XL Capital Ltd.*, No. 3:03-cv-2001 (PCD), 2005 U.S. Dist. LEXIS 27089, at *13 (D. Conn. Sept. 1, 2005) ("[A] sale is not necessary or the only way a plaintiff could plead economic loss under the circumstances").

[16]     In any event, Defendants disregard the proceedings that have taken place before this Court (of which the Court may take judicial notice), in which Plaintiff disclosed that it sold its shares on August 23, 2007 – the last day of the Class Period, after the truth was fully disclosed – at $26.91 per share.  *See* Docket No. 10, Ex. C; *see also In re MarketXT Holdings Corp.*, No. 04-12078 (ALG), 2007 Bankr. LEXIS 740, at *11 (Bankr. S.D.N.Y. Mar. 1, 2007) (taking judicial notice of a docket entry that reflected a sale of shares).

[17]     The CAC's reference to August 22, 2007 in paragraph 140, which Defendants gratuitously point out, obviously should be to August 23, 2007.  *See* Def. Mem. at p.23; *see also* ¶127.

of whether a shareholder sustained a loss at a particular time).  Moreover, the disclosures here intermittently related to *two* frauds – sometimes at the same time – potentially precluding a definitive determination at this stage of which element of the fraud was responsible for a given drop.  *See In re Openwave*, 528 F. Supp. 2d at 253.  These questions are appropriately reserved for trial.

## IV.    The CAC Adequately Alleges a Control Person Claim

A control person claim is governed by the liberal pleading standards of Rule 8.  *See In re Scottish Re*, 524 F. Supp. 2d at 401.  Here, the CAC adequately alleges both primary and control claims against Dabah and Riley.  *See id*. at 402.  Moreover, although they deny that they are control persons, raising a factual issue that ordinarily may not be resolved at this juncture, the CAC alleges that they had direct involvement in the day-to-day management of the Company and were responsible for its statements to the public – which is all that it must do.  *See, e.g., id.* at 401; *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528, at *28 (S.D.N.Y. Sept. 18, 2002).  Further, to the extent that it must, the CAC alleges that Dabah and Riley were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over Children's Place but also participated in the alleged improprieties with scienter.  *See In re Tower Auto. Sec. Litig*., 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007).

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions should be denied in their entirety.[18]

---

[18]    In the event that the Court grants dismissal, with respect to the primary or control person claim, Plaintiff respectfully requests an opportunity to amend the CAC.  *See Cortec Ind., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

DATED:  April 28, 2008                    COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          ROBERT M. ROTHMAN
                                          JOSEPH RUSSELLO


                                          _____
                                                */s/ Robert M. Rothman*
                                               ROBERT M. ROTHMAN

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)

                                          *Lead Counsel for Plaintiff*

                                          JENKINS & CARTER
                                          NATHAN M. JENKINS
                                          501 Hammill Lane
                                          Reno, NV  89511-1004
                                          Telephone:  775/829-7800
                                          775/829-0511 (fax)

                                          *Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Robert M. Rothman, hereby certify that on April 28, 2008, I caused a true and correct copy of the attached:

Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to any additional counsel.

_/s/ Robert M. Rothman_
Robert M. Rothman

CHILDREN'S PLACE

Service List - 2/28/2008    (07-0201)

Page 1 of  1

**Counsel For Defendant(s)**

Richard P. Swanson

Arnold & Porter LLP

399 Park Avenue

New York, NY  10022

  212/715-1179

  212/715-1399 (Fax)

Michael J. Gilbert

Dechert LLP

30 Rockefeller Plaza

New York, NY  10112

  212/698-3500

  212/698-3599 (Fax)

Jonathan D. Polkes

Anthony J. Albanese

Weil, Gotshal & Manges LLP

767 Fifth Avenue

New York, NY  10153-0119

  212/310-8000

  212/310-8007 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman

David A. Rosenfeld

Mario  Alba, Jr.

Coughlin Stoia Geller Rudman & Robbins LLP

58 South Service Road, Suite 200

Melville, NY  11747

  631/367-7100

  631/367-1173 (Fax)

Nathan M. Jenkins

Jenkins & Carter

501 Hammill Lane

Reno, NV  89511-1004

  775/829-7800

  775/829-0511 (Fax)