1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ROBERT CARPE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | No. 02-0388-CV-W-FJG |
| ) | |
| AQUILA, INC., et al., ) | |
| ) | |
| Defendants. ) | |

ORDER

Pending before the Court are (1) Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143); (2) Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139); (3) Defendants' Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135); (4) Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176); (5) Defendants' Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. No. 190); (6) Defendants' Motion for Summary Judgment (Doc. No. 164); and (7) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 162). Each will be considered below.

I.   Background

The present lawsuit is a class action alleging that defendants Aquila, Inc., Robert K. Green,[1] Richard C. Green, Jr.,[2] Keith G. Stamm,[3] and UtiliCorp United, Inc., engaged in

---

[1] Robert Green was (among other things) Chairman of the Board of Directors of Aquila, and signed the Registration Statement.

[2] Richard Green was a director of Aquila, and before UtiliCorp's re-acquisition of Aquila, served as the CEO and Chairman of the Board of UtiliCorp. Richard Green also

securities violations. In particular, plaintiffs (a class of purchasers of Aquila Class A common stock) allege that defendant Aquila, Inc. (hereafter "Aquila"), formerly a wholly-owned subsidiary of defendant UtiliCorp United Inc. (hereafter "UtiliCorp), had its initial public offering (IPO) on or about April 25, 2001.[4] In the IPO, Aquila sold 14,225,000 shares of Class A common stock, and UtiliCorp sold 5,250,000 shares of Aquila Class A common stock. UtiliCorp retained Aquila's Class B common stock, representing approximately 80% of the outstanding shares of Aquila's common stock, and approximately 98% of the combined voting power of Aquila's voting stock.

In Aquila's Form S-1/A Registration Statement filed on April 23, 2001, and the accompanying Form 424B4 Final Prospectus, defendants represented that the Board of Directors of Aquila would appoint three independent directors to an audit committee. New York Stock Exchange ("NYSE") rules require two independent members to be appointed to an audit committee within 90 days of a company's IPO, with a third to be added within one year after the IPO. Plaintiffs allege that, at the time of the IPO, defendants, notwithstanding their representations, never intended to appoint independent directors to an audit committee.

On November 7, 2001, UtiliCorp announced that it was commencing an exchange offer for all of Aquila's publicly-held Class A shares. On December 3, 2001, defendants

---

signed the Registration Statement.

[3]Mr. Stamm was a director of Aquila, and was CEO of Aquila at all relevant times until November 26, 2001. Mr. Stamm also signed the registration statement.

[4]It is worth noting that plaintiffs have amended their class period, to include April 24, 2001 as the start date of the class period. See Doc. No. 233.

2

disclosed in a Form S-4 that no independent audit committee members had been appointed. Plaintiffs allege that at the time UtiliCorp completed its tender offer, it re-acquired Aquila for only $17.67 per share, approximately 25% less than the $24 per share IPO price.

Plaintiffs bring the following claims: (1) Violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, brought against defendants other than UtiliCorp in connection with the IPO; (2) Violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, brought against defendants Aquila and UtiliCorp in connection with the IPO; (3) Violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, brought against UtiliCorp and the individual defendants; (4) Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, brought against all defendants; and (5) Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), brought against UtiliCorp and the individual defendants.

II. **Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143)**

Defendants argue that plaintiffs' expert, Michael A. Marek,[5] should be excluded from testifying in this case because (1) he failed to conduct an "event study," making his methodology and proposed opinions fatally flawed; (2) he ignores critical facts in arriving at his opinions, making his opinions unreliable; and (3) the subject matter of his opinions is irrelevant. The Court finds the first two grounds mentioned by defendants to be

---

[5]Mr. Marek is a Chartered Financial Analyst. He has a bachelor's degree in Economics, and for the last twenty years has been in the business of providing litigation support and testimony.

3

dispositive and considers only those below.[6]

As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). The Court is in possession of ample evidence contained in the written record and does not find it necessary to conduct a hearing regarding the contested expert testimony. Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 152-53 (1999). Additionally,

> Federal Rule of Evidence 702 governs admissibility of expert testimony. See Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440, 120 S. Ct. 1011, 145 L. Ed. 2d 445 (2000); see also Daubert [v. Merrell Dow Pharm., 509 U.S. 579,] 588, 113 S. Ct. 2786 (citing Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)) (highlighting the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony'"). The rule clearly "is one of admissibility rather than exclusion." Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991).
>
> The proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702. 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2001). First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. Id. This is the basic rule of relevance. Second, the proposed witness must be qualified to assist the

---

[6]Defendants also point out other alleged deficiencies in Mr. Marek's report. These alleged deficiencies include: (1) failing to use the industry definition of abnormal stock price return; (2) relying on academic papers that are "not on-point, are not 'peer reviewed,' and are not supported by the research conducted by the discipline as a whole," ignoring numerous other published and peer-reviewed papers finding no causal link between the independence of boards and the value of shares; (3) using an "arbitrage spread" analysis when such analysis is not supported by any peer-reviewed articles, and even if it were, failing to take into account variables in the market including the events surrounding the demise of Enron. Because the Court is able to reach its decision on other grounds, the Court takes no position on these alleged deficiencies with Mr. Marek's expert report.

4

> finder of fact. Id. Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires ...." Id.; see also Daubert, 509 U.S. at 591, 113 S. Ct. 2786.

Lauzon, 270 F.3d at 686.

In the seminal case regarding expert opinion testimony, Daubert v. Merrell Dow Pharmaceuticals,

> the U.S. Supreme Court emphasized the district court's gatekeeper role when screening expert testimony for relevance and reliability.... Daubert provides a number of nonexclusive factors a court can apply in performing this role: 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted.... Daubert's progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

270 F.3d at 686-87 (internal quotation marks and citations omitted). Further, "[t]he trial court must determine whether this particular expert has sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case," and the court must determine the reasonableness of an expert's methodology "regarding *the particular matter to which the expert testimony was directly relevant.*" Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 154, 156 (1999)) (internal quotation marks omitted) (emphasis in original).

Additionally, Federal Rule of Civil Procedure 26(a)(2), in reference to Federal Rule of Evidence 702, states that the proponent of expert testimony must disclose the identity of the proposed expert and said disclosure,

> with respect to a witness who is retained or specially employed to provide expert testimony in the case, ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or

5

> other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2). Further, the Court's Scheduling and Trial Order in effect during the pertinent period (Doc. No. 130) mirrors the mandates of the Federal Rules in regard to proffered expert testimony. Consequently, the Court will review Mr. Marek's proposed testimony and proposed rebuttal testimony under Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702 in relationship to pertinent factors propounded by Daubert and its progeny.

Defendants argue that Mr. Marek failed to complete a proper event study, and that his opinions should be excluded for that reason. "Damages in a securities fraud case are measured by the difference between the price at which the stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions." Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (citing Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 154-55 (1972)). In order to arrive at that calculation, damages must be calculated after eliminating "that portion of the price decline or price difference which is unrelated to the alleged wrong." Imperial Credit, 252 F. Supp. 2d at 1014-15 (citation omitted). As discussed by defendants, the accepted means of distinguishing between fraud-related and non-fraud-related changes in a stock's behavior is an "event study." In re Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993). "An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." Imperial

6

Credit, 252 F. Supp. 2d at 1014.

Defendants state that Mr. Marek has not conducted an appropriate event study because he did not take into account in his analysis other factors that could have affected the price of Aquila's stock. In particular, defendants compare Mr. Marek's report in the present case with the excluded report Mr. Marek prepared in Imperial Credit. In Imperial Credit, the Court found that Mr. Marek failed to take into account significant market events, and that because the defendants could not be held accountable for those market events, the plaintiffs could not "eliminate that portion of the [stock] price decline . . . which is unrelated to the alleged wrong." Id. at 1015. Failure to conduct an event study comparing the stock's price to the market as a whole or a selected index of similar businesses is enough to cause an expert's opinion to be excluded. See Northern Telecom Sec. Litig., 116 F. Supp. 2d 446, 457-60 (S.D. N.Y. 2000); Oracle Sec. Litig., 829 F. Supp. at 1181; Executive Telecard Ltd. Sec. Litig., 979 F. Supp. 1021, 1025 (S.D. N.Y. 1997).

In the present case, Mr. Marek's report does not compare Aquila to the rest of the energy-trading industry or the energy industry as a whole; instead, Mr. Marek compares Aquila's performance with that of UtiliCorp.[7] Plaintiffs claim that the returns of UtiliCorp are a more reliable predictor than the industry index used by defendants' expert; however, plaintiffs provide no reasoned analysis as to why this is so. Instead, the Court agrees with defendants that this comparison makes no sense given that UtiliCorp owned 80% of Aquila's stock, and therefore it would be expected that UtiliCorp's price would react to

---

[7]The Court takes judicial notice that in late 2001, the energy industry as a whole experienced a downturn in stock prices (including the very well-publicized demise of Enron).

changes in Aquila's price. The Court finds that here, as with <u>Imperial Credit</u>, the failure to take into account market trends of other energy trading firms renders Mr. Marek's report fatally flawed and not resting on a "reliable basis in the knowledge and experience of [Marek's] discipline." 252 F.Supp.2d at 1016 (citing <u>Daubert</u>, 509 U.S. at 592). On this basis, the Court finds that plaintiffs' expert did not perform a proper event study and failed to follow the accepted methodology of his field, making his opinions in this case inherently unreliable. Defendants' motion to exclude Mr. Marek's testimony and expert report (Doc. No. 143) is **GRANTED**.

III.   **Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139)**

Plaintiffs argue that defendants' expert, Dr. Kenneth Lehn[8], based his opinion on fundamentally flawed assumptions, and therefore his testimony should be stricken. In particular, plaintiffs do not challenge the methodology used by Dr. Lehn in arriving at his conclusions; instead, plaintiffs argue that defendants' expert attached significance to the incorrect dates in reaching his conclusions. Plaintiffs claim that Dr. Lehn incorrectly attached significance to (1) December 3, 2001, and (2) July 24, 2001, in performing his event studies.

However, defendants note that both of these dates were identified in plaintiffs' amended complaint. December 3, 2001, is the date on which plaintiffs assert that the market first learned that no independent directors had been or would be appointed to

---

[8]Among his other qualifications, Dr. Lehn is the former chief economist for the United States Securities and Exchange Commission (1987-1991), where one of his duties was to examine whether certain information releases had a material effect on the stock prices of various companies. Dr. Lehn, who has a Ph.D. in Economics, currently serves as the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh.

defendant Aquila's audit committee. July 24, 2001, is the date 90 days after the IPO, the date on which defendant Aquila allegedly was to have appointed independent directors to its audit committee.

This Court finds plaintiffs' challenges to defendants' expert to be meritless. First of all, December 3, 2001, is obviously a date of great importance, as plaintiffs have alleged that December 3 is the date upon which they and the market first knew that Aquila had not appointed an independent audit committee. The Court finds logical Dr. Lehn's conclusion that if the November 7, 2001 price of Aquila stock was inflated by the impression that Aquila had independent directors, the price should have dropped "on December 3, 2001 as the market revised its expectations about the likelihood that Aquila's board would negotiate a higher exchange ratio from UtiliCorp." See Doc. No. 153, Ex. B (Declaration of Kenneth Lehn) at 6.

With respect to Dr. Lehn's event study on July 24, 2001, the Court agrees with defendants that this date also holds some degree of importance in the present matter. In accordance with plaintiffs' "fraud on the market" theory, which must be premised on an efficient markets hypothesis (see Basic Incorporated v. Levinson, 485 U.S. 224, 246-47, n. 24 (1988)), if the market knew that defendant Aquila had promised to appoint independent directors within ninety days, the market also knew that defendant Aquila had failed to announce the appointment of directors within that time frame. Defendants further note that event studies regarding the failure to make an announcement have been repeatedly documented in the literature.

Therefore, for the foregoing reasons, plaintiffs' motion to strike defendants' expert testimony (Doc. No. 139) is **DENIED**.

9

IV.     Defendants' Motion for Leave to Depose Plaintiffs' Expert (Doc. No. 135)

As the Court has found that plaintiffs' expert Michael A. Marek's opinions should be excluded from this case, defendant's Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135) is **DENIED AS MOOT**.

V.      **Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176)**

The Court finds that defendants' expert materials submitted with defendants' motion for summary judgment should not be stricken for the same reasons that plaintiff's motion to strike defendants' expert (Doc. No. 139) was denied. Therefore, with respect to those materials, plaintiffs' motion to strike (Doc. No. 176) is **DENIED**.

With respect to the remainder of the materials mentioned in plaintiffs' motion, those materials were not used by the Court in reaching the result in its examination of defendants' motion for summary judgment. Therefore, with respect to those remaining materials, plaintiffs' motion to strike (Doc. No. 176) is **DENIED AS MOOT**.

VI.     Defendants' Motion to Exceed Page Limitation (Doc. No. 190)

Defendants move for leave to file reply suggestions that exceed the page limits imposed by Local Rule 7.1(f). Plaintiffs do not object to the length of defendants' proposed reply suggestions; however, plaintiffs object to an exhibit attached to defendants' reply suggestions. Plaintiffs state that the declaration of Jeffrey P. Bennett, Esquire, should be stricken because (1) the defendants used attorney-client privilege to block certain discovery, so they should not now be able to affirmatively rely upon attorney communications; (2) defendants waived any right to use the Bennett declaration because they did not file it with their opening brief; and (3) the Bennett declaration contains

10

inadmissible hearsay.

Defendants reply that plaintiffs' objections to the Bennett declaration are meritless. First, defendants note that deposition testimony demonstrates that plaintiffs were permitted to inquire into the matters contained in the Bennett declaration. Further, defendants assert that the Bennett declaration was not required to be presented in their opening brief because the Bennett declaration is attached to the reply brief as a reply to an argument made in plaintiffs' response brief. Finally, defendants note that the declaration does not contain hearsay; the testimony contained in the Bennett declaration is used by defendants not to prove the truth of the matter asserted, but simply that the statements were made to defendants.

The Court agrees with the points and authorities cited in defendants' reply. Therefore, defendants' motion for leave to exceed page limitation (Doc. No. 190) is **GRANTED**. To the extent that plaintiffs' response in opposition is a motion to strike the exhibits to defendants' reply brief, that motion (Doc. No. 191) is **DENIED**. In the interests of providing a speedy resolution to this matter, the Court will consider the reply brief attached to Doc. No. 190 as a timely-filed reply to defendants' motion for summary judgment.

### VII.  Defendants' Motion for Summary Judgment (Doc. No. 164)

Defendants state several reasons as to why summary judgment should be granted. First, they indicate that the representation relied upon by plaintiffs cannot form the basis for a federal securities law claim. Second, they state that there is no evidence that the alleged representation was false at the time it was made. Third, defendants state that the

alleged misrepresentation was not material to investors because independent directors would not have resulted in any material added benefit to investors. Fourth, defendants argue that plaintiffs can show no damages caused by the alleged misrepresentation. Fifth, defendant state that the claims under Section 15 of the Securities Act and Section 20 of the Exchange Act are not viable because there are no underlying primary violations under Section 11, 12(a)(2), and 10(b). Because the Court finds defendants' fourth and fifth arguments to be determinative, it considers only those arguments below.

### A.   Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the

disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

### B.  Lack of Damages

As discussed above, plaintiffs' damages expert's opinion does not meet the standards of Daubert and its progeny. In plaintiff's Section 10(b) and Rule 10b-5 claims, plaintiffs have pleaded a "fraud-on-the-market" theory. Under such a theory, it is presumed "that any material misrepresentation made by an issuer of securities will quickly and accurately be reflected in the market price of that issuer's securities." Seagate Technology II Sec. Litig, 843 F. Supp. 1341, 1355 (C.D. Cal. 1994) (citing Basic, 485 U.S. at 247). Therefore, the plaintiffs must show that the market was affected by such material misrepresentation. As part of their case in chief, the plaintiffs must prove that the false statement artificially inflated the market price, and that the false statement thereafter caused a decline in the stock's price when the statement was revealed to be false. See id. at 1348; Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir. 1986).

As discussed in defendants' expert report, there was no decline in Aquila's market-adjusted share price on December 3, 2001, the date when the market learned that Aquila

13

had not appointed independent directors. Additionally, there was a gain in Aquila's price on November 7, 2001, the date when the exchange offer was first announced and when UtiliCorp's Form 8-K filing disclosed that all of Aquila's board was affiliated with UtiliCorp. Finally, the expert's report demonstrates that there was no decline in Aquila's price on or about July 23, 2001, the date by which Aquila should have appointed independent directors but had not yet made any announcements regarding same. Defendants' expert report indicates that Aquila's share price tracked the industry index of other energy-trading firms closely, and that Aquila out-performed many of these firms.

As discussed above, plaintiffs' expert does not take into account market forces related to the downfall of Enron and the difficulties experienced industry-wide by energy-trading firms. This failure makes plaintiffs' expert report unreliable. In a Section 10(b) and Rule 10b-5 case, expert testimony is required in order for plaintiffs to meet their burden of proof in establishing the fact of damages and the means of calculation of same. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991); Warner Communications Sec. Litig., 618 F. Supp. 735, 744 (S.D. N.Y. 1985); Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir. 1986). Therefore, summary judgment should be granted in defendants' favor as to plaintiffs' Section 10(b) and Rule 10b-5 claims.

With respect to plaintiffs' Section 11 claims, the statute explicitly provides that loss caused by something other than an untrue statement is not recoverable. "[I]f the defendant proves that any portion or all" of a decline of a stock price was caused by something other than the false statement, then "such portion of or all of such damages shall not be recoverable." 15 U.S.C. § 77k(e). Although plaintiffs are not obligated under Section 11 to proves damages as part of their case in chief, when a defendant affirmatively

14

demonstrates that "a lower share value did not result from any non-disclosure or false statement," that defendant is entitled to dismissal of the Section 11 claim. Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 277 (3d Cir. 2004).[9]

As discussed above, plaintiffs' expert's conclusions have been excluded. Defendants' expert opines that the decline in stock price entirely was due to market factors. The Court agrees with defendant that the facts establish a "negative causation" affirmative defense, and plaintiffs are without a means of demonstrating that any portion of the decline (or difference) in stock price is due to any alleged fraud. Defendants are entitled to summary judgment on the Section 11 claims.

With respect to plaintiffs' Section 12(a)(2) claims, as with plaintiffs' Section 11. Section 12(b) provides:

> In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77l(b). As discussed above, defendants' expert proffered that all of the decrease in Aquila's share value was attributable to market conditions affecting the energy-trading industry. Plaintiffs have no admissible contradictory evidence. Therefore, defendants have prove that the value of Aquila's price decreases "shall not be recoverable," pursuant to the terms of Section 12(b). The Court **GRANTS** defendants' motion for

---

[9]This defense is called "negative causation" by several courts. See, e.g., Adams Golf, 381 F.3d at 277.

15

summary judgment as to this issue.

### C.  Section 15 and Section 20 Claims

Claims made under Section 15 of the Securities Act and Section 20 of the Exchange Act are claims in which individual defendants are alleged to be liable as "control persons" for alleged violations of Sections 11, 12(a)(2) and 10(b). As discussed by defendants, for control person liability to exist, there first must be liability for the primary violations of Sections 11, 12(a)(2) and/or 10(b). See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 n. 12 (8th Cir. 1997); Diviries v. Prudential-Bache Sec., Inc., 805 F.2d 326, 329 (8th Cir. 1986). Because defendants are entitled to summary judgment on the claims of primary violations (see above), the individual defendants are entitled to dismissal of the Section 15 and Section 20 claims. Therefore, defendants' motion for summary judgment is **GRANTED** as to this issue.

### VIII.  Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 161)

As plaintiffs are unable to demonstrate damages (as discussed above), plaintiffs' motion for partial summary judgment (Doc. No. 161) is **DENIED.**

Therefore, for the foregoing reasons:

(1) Defendants' Motion in Limine to Exclude Mr. Michael A. Marek's Testimony and Expert Report (Doc. No. 143) is **GRANTED**;

(2) Plaintiffs' Motion to Strike Defendants' Expert Testimony (Doc. No. 139) is **DENIED**;

(3) Defendants' Motion for Leave to Depose Plaintiffs' Expert Michael A. Marek (Doc. No. 135) is **DENIED AS MOOT**;

16

(4) Plaintiffs' Motion to Strike Various Materials Submitted by Defendants in Support of Defendants' Motion for Summary Judgment (Doc. No. 176) is **DENIED** in part, and **DENIED AS MOOT** in part;

(5) Defendants' Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. No. 190) is **GRANTED**;

(6) Defendants' Motion for Summary Judgment (Doc. No. 164) is **GRANTED**;

(7) Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 161) is **DENIED**; and

(8) All other pending motions are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

/s/ FERNANDO J. GAITAN, JR.
Fernando J. Gaitan, Jr.
United States District Judge

Dated: March 23, 2005
Kansas City, Missouri.

17