UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
DEBRA HALL, Individually and on Behalf of :   Civil Action No. 1:07-cv-08252-SAS
All Others Similarly Situated,             :   **(Consolidated)**
                                :
                 Plaintiff,   :   <u>CLASS ACTION</u>
                                :
      vs.                           :
                                :
THE CHILDREN'S PLACE RETAIL       :
STORES, INC., et al.,                :
                                :
                 Defendants.   :
                                :
—————————————————————— x

DECLARATION OF ROBERT M. ROTHMAN IN SUPPORT OF:
(1) FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION
OF SETTLEMENT PROCEEDS; AND (2) AWARD OF ATTORNEYS' FEES AND
EXPENSES AND REIMBURSEMENT OF LEAD PLAINTIFF'S EXPENSES

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ...................................................................................2

II.     SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS.................................................4

        A.      The Option Backdating Scandal ........................................................................5

        B.      The Disney Scandal ...........................................................................................5

        C.      The Violations of Internal Controls Scandal ......................................................7

III.    LEAD PLAINTIFF'S PROSECUTION OF THE CASE..................................................7

        A.      The Filing of the Litigation and Appointment of Lead Plaintiff ...........................7

        B.      The Consolidated Amended Class Action Complaint ..........................................8

        C.      Defendants' Motion to Dismiss .........................................................................8

        D.      Lead Counsel's Factual Investigation and Discovery..........................................9

        E.      Motion for Class Certification .........................................................................10

        F.      Settlement Negotiations ...................................................................................11

IV.     PRELIMINARY APPROVAL OF THE SETTLEMENT ...............................................11

V.      MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT ..............................12

VI.     THE FACTORS AFFECTING SETTLEMENT COUNSEL IN FAVOR OF
        APPROVAL OF THE SETTLEMENT..........................................................................13

                1.      The Range of Reasonableness of the Settlement Fund in Light of
                        the Best Possible Recovery and the Attendant Risks in Litigation............14

                        a.      The Risk of Establishing Liability .................................................15

                        b.      The Risks of Establishing Loss Causation and Damages..............16

                2.      The Complexity, Expense, and Likely Duration of the Litigation ...........17

                3.      The Reaction of the Class to the Settlement ...........................................18

                4.      The Stage of the Proceedings and the Amount of Discovery
                        Completed ..............................................................................................18

**Page**

5.      The Risks of Maintaining the Class Through Trial ....................................19

6.      The Ability of the Defendants to Withstand a Greater Judgment..............19

VII.    THE PLAN OF ALLOCATION ..................................................................................20

VIII.   FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED
        ATTORNEY FEE AWARD..........................................................................................24

        A.      Extent of Litigation ................................................................................25

        B.      The Risks of Litigation and the Need to Ensure the Availability of
                Competent Counsel in High-Risk, Contingent Securities Cases ..........................26

        C.      Standing and Expertise of Lead Plaintiff's Counsel ..............................29

        D.      Standing and Caliber of Opposition Counsel..........................................29

IX.     REIMBURSEMENT AWARD TO LEAD PLAINTIFF .................................29

X.      CONCLUSION............................................................................................................30

ROBERT M. ROTHMAN declares:

1.      I am a member of Coughlin Stoia Geller Rudman & Robbins LLP, the Court appointed Lead Counsel for the Class[1] in this action.  Based upon my active participation in the prosecution and settlement of this action, I have personal knowledge of the matters set forth herein.

2.      I respectfully submit this Declaration pursuant to Federal Rule of Civil Procedure 23(e) in support of lead plaintiff's Laborers Pension Trust Fund for Northern Nevada ("Lead Plaintiff" or "Northern Nevada Laborers Fund") application for (a) final approval of settlement of this action; (b) final approval of the Plan of Allocation of settlement proceeds; (c) an award of attorneys' fees and expenses; and (d) an award of reimbursement of Lead Plaintiff's expenses.

3.      The Stipulation of Settlement dated June 26, 2009 ("Stipulation") provides for the payment of $12,000,000 in cash.  The settlement resolves all claims asserted by Lead Plaintiff and the Class in this action against defendants The Children's Place Retail Stores, Inc. ("TCP" or the "Company"), Ezrah Dabah, and Susan Riley (collectively, "Defendants").

4.      This Declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Lead Counsel, the settlement negotiations, and also demonstrates why the settlement and Plan of Allocation are fair and in the best interests of the Class, and why the application for attorneys' fees and expenses and reimbursement of Lead Plaintiff's expenses are reasonable and should be approved by the Court.

---

[1]      The Class is defined as all persons and entities who purchased or acquired the common stock of TCP during the period from March 9, 2006 through August 23, 2007, inclusive (the "Class Period").

## I.    PRELIMINARY STATEMENT

5.    This case was carefully investigated and vigorously litigated since its commencement. Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding TCP including, but not limited to, its Securities and Exchange Commission ("SEC") filings, financial statements, press releases, and a wealth of analysts' reports and notes rendered by securities firms. Lead Counsel also interviewed several former employees of TCP and companies with which it did business. Moreover, Lead Counsel conducted substantial discovery, including the review of 1.6 million pages of documents produced by Defendants.

6.    Lead Counsel also consulted with experts in accounting, damages, materiality, and loss causation, thoroughly researched the law pertinent to the claims and defenses asserted, and engaged in ongoing communications with the Court-appointed Lead Plaintiff.

7.    The parties discussed settlement following Lead Plaintiff's filing of a motion for class certification. At that time, Lead Plaintiff was engaged in extensive discovery concerning its claims. During settlement negotiations, Lead Counsel made it very clear that, while Lead Plaintiff was prepared to assess the strengths and weaknesses of this case, Lead Plaintiff would continue to litigate rather than settle for less than fair value.

8.    The proposed settlement is the culmination of more than two years of hard-fought litigation followed by arm's-length settlement negotiations, including two formal mediation sessions presided over by the Honorable Nicholas H. Politan, a former United States District Court Judge and experienced mediator. The settlement was obtained only after Lead Plaintiff and Lead Counsel had conducted an extensive independent investigation, successfully opposed Defendants' motions to dismiss, retained experts, moved for class certification, and engaged in contentious merits discovery (including the review of 1.6 million pages of non-public documents produced by Defendants). As

explained in detail below, this settlement represents an excellent recovery for the Class in light of the risks Lead Plaintiff faced in taking this action to trial.

9. The terms of the settlement are set forth in the Stipulation and in the Notice of Proposed Settlement of Shareholder Class Action, Hearing Thereon, and Right to Appear (the "Notice"). A total of 38,542 copies of the Notice were mailed to potential Class Members pursuant to the Order Preliminarily Approving Settlement and Providing for Notice. *See* ¶¶5-12 of the Affidavit of Michelle M. La Count, Esq., submitted on behalf of A.B. Data, Ltd. ("A.B. Data"), the Claims Administrator in this action (the "La Count Aff."), submitted herewith. In addition, a summary notice was published in the national edition of *Investor's Business Daily* on August 6, 2009. *See* La Count Aff., ¶17. A.B. Data also posted information regarding the settlement to the case-specific website, www.ChildrensPlaceSecuritiesLitigation.com, as well as to a case page on its website, www.abdataclassaction.com, which provides access to, among other documents, downloadable copies of the Notice and Proof of Claim and Release form ("Proof of Claim"). *See* La Count Aff., ¶15.

10. The Notice advised potential Class Members of, *inter alia*: (i) their right to exclude themselves from the Class; (ii) their right to object to any aspect of the settlement, including the Plan of Allocation; (iii) the request for an award of attorneys' fees and expenses; and (iv) the manner for submitting a Proof of Claim in order to be eligible for a payment from the Settlement Fund. The Class's reaction thus far to the settlement has been overwhelmingly positive. As of the date of this Declaration, not a single Class Member has filed an objection to any aspect of the settlement and only one potential Class Member has requested exclusion from the Class.

11. Upon approval of the settlement, the claims asserted in the action against the Defendants shall be dismissed with prejudice, subject to the terms of the Stipulation and Order and

Final Judgment of Dismissal with Prejudice. For the reasons set forth below, on behalf of Lead Counsel, I respectfully submit that the terms of the settlement and Plan of Allocation are fair, reasonable, and adequate in all respects, and pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, should be approved by this Court.

12.    In sum, this settlement is the product of extensive investigation, aggressive litigation and negotiation, and takes into account the risks specific to this case. It was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The settlement confers an immediate and substantial benefit on the Class and eliminates the risk of continued litigation. Lead Counsel respectfully submit that under these circumstances the settlement is in the best interest of the Class and should be approved as fair, reasonable, and adequate. The Court should also approve the Plan of Allocation of settlement proceeds and award attorneys' fees in the amount of 27% of the Settlement Fund, or $3,240,000, plus expenses of $291,553.76 for Lead Counsel's efforts in creating this substantial benefit on behalf of the Class and Lead Plaintiff's request for $5,798.10 in expenses reasonably incurred by Lead Plaintiff in connection with its representation of the Class in this action.

## II.    SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

13.    This action was brought by Lead Plaintiff, on behalf of itself and all persons and entities who purchased or acquired the common stock of TCP during the period from March 9, 2006 through August 23, 2007, inclusive, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

14.    Defendant TCP operates as a specialty retailer of merchandise for children ranging from newborn to ten years of age. At all times relevant to this action, the Company designed, contracted to manufacture, and sold apparel and accessories and other children-oriented merchandise under TCP and Disney Stores brand names.

- 4 -

15.    This case concerns a series of misrepresentations and omissions about TCP's earnings, operations, and trends in its business. During the Class Period, TCP reported artificially inflated financial results, failed to disclose significant problems with a major business partner, and had its Chief Executive Officer ("CEO") knowingly violate its internal control policies. As these problems and adverse facts came to light, the price of TCP's common stock fell in response, declining from a Class Period high of $71.08 per share, on October 26, 2006, to $27.43 per share, on August 23, 2007.

16.    The problems at the Company emanated, in material part, from the actions of its former CEO, Defendant Ezra Dabah ("Dabah"). From 1991 until he was forced out of the Company in September 2007, Defendant Dabah served as TCP's CEO.

**A.    The Option Backdating Scandal**

17.    Dabah was at the helm of the Company while it engaged in options backdating and other problematic option-granting practices. As detailed in the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws ("CAC"), TCP admitted: (1) that it improperly backdated option grants; (2) that it improperly accounted for its compensation expense; and (3) that specific option grant dates were selected with a view towards upcoming disclosures. In other words, option grant dates were selected in order to maximize the economic value of the grant in light of upcoming positive news disclosures – a practice often referred to as "spring-loading." The Company has since restated its financial statements for the financial periods 2003, 2004, and 2005, thereby admitting that it materially overstated its reported financial results.

**B.    The Disney Scandal**

18.    In addition, Dabah was in charge of the Company when it was experiencing significant problems with its relationship with The Walt Disney Company ("Disney") and was failing to meet certain deadlines in the agreement between the two companies.

19.     The Company's relationship with Disney began in 2004, when TCP acquired Disney Stores from Disney. Disney Stores sell Disney-related merchandise in malls and shopping centers throughout the country. In April 2006, Defendant Dabah took over direct responsibility of the Company's Disney-related operations. Under the agreement between the companies, TCP was supposed to conduct the business of Disney Stores according to a code of conduct and was required to maintain and remodel Disney Stores at various times.

20.     As part of the acquisition of Disney Stores, TCP created a wholly-owned subsidiary called "Hoop." Hoop was responsible for managing the Company's Disney Stores franchise operations in the United States and Canada. By the start of the Class Period, the Company was experiencing significant problems with Disney and was unable to get new products developed and produced on a timely basis or to follow through on its commitment to remodel and refurbish Disney Stores. As a result, many Disney Stores locations were becoming dated and falling into disrepair. This further exacerbated the difficulties the Company was having with Disney, as Disney was contending that the Company was not properly maintaining the condition of the stores.

21.     During the Class Period, Defendants concealed the problems with Disney and the full extent of the issues that the Company was facing, that is, it was unable to satisfy Disney's requirements and was struggling to maintain its relationship with the company. Defendants hid these problems until they could no longer do so. Eventually, Disney sent the Company a letter detailing 120 instances of default under the agreement between the companies.

22.     Even then, however, Defendants did not fully and candidly disclose the scope of the problems with Disney to the public.

23.    At the close of the Class Period, TCP was forced to amend its agreement with Disney and sacrifice some of the exclusivity it enjoyed on certain Disney products, among other changes to the agreement.

24.    Ultimately, TCP placed Hoop in bankruptcy and lost control of Disney Stores.

**C.    The Violations of Internal Controls Scandal**

25.    Moreover, during the Class Period, Defendant Dabah knowingly violated the Company's internal policies by, among other things, pledging shares of his common stock as collateral for margin loans in his stock brokerage account at the time that the Company precluded Company insiders from selling shares – the so-called "black-out period." Dabah's pledge of shares, which amounted to a clandestine sale of stock as collateral, provided him with a fiscal motive to conceal the problems at the Company so as not to cause a decrease in the price of TCP stock, which might generate a margin call or a decrease in the amount of margin from which Defendant Dabah could borrow.

26.    Ultimately, Dabah's inability to frankly and fully disclose the true condition of TCP's business to investors and his violation of internal control policies caused the Company's long-time independent auditor, Deloitte & Touche LLP to relinquish its position as the Company's independent auditor, stating that "it was no longer willing to rely on his [Dabah's] representations in connection with its audits."

**III.    LEAD PLAINTIFF'S PROSECUTION OF THE CASE**

**A.    The Filing of the Litigation and Appointment of Lead Plaintiff**

27.    This action was filed on September 21, 2007, seeking to recover damages caused by Defendants' alleged violations of the federal securities laws and to pursue remedies under the Exchange Act.

- 7 -

28.     By Order dated December 17, 2007, the Court consolidated this action with a related action and appointed the Northern Nevada Laborers Fund as Lead Plaintiff. In that Order, the Court also appointed Coughlin Stoia Geller Rudman & Robbins LLP as Lead Counsel.

**B.     The Consolidated Amended Class Action Complaint**

29.     On February 28, 2008, Lead Plaintiff filed the CAC. The 62-page CAC detailed Lead Plaintiff's allegations in 152 paragraphs. Specifically, Lead Plaintiff alleged that Defendants made a series of misrepresentations and omissions concerning: (i) the Company's relationship with Disney, pursuant to which the Company was operating the Disney Stores; (ii) the Company's stock option practices; and (iii) the Company's internal controls.

**C.     Defendants' Motion to Dismiss**

30.     On March 28, 2008, Defendants TCP and Susan Riley filed a joint motion to dismiss the CAC. On the same date, Defendant Dabah filed a separate motion to dismiss the CAC.

31.     Defendants' motions to dismiss argued that, despite Lead Plaintiff's allegations to the contrary, TCP did disclose that its agreement with Disney could be terminated upon any material breach and issued multiple statements when there was even the suggestion of a breach. Defendants further claimed that the backdating of the stock options was unintentional and the resulting restatement resulted in no significant stock price drop, thereby defeating the required element of loss causation. Defendants also contended that Lead Plaintiff would be unable to demonstrate that Defendants made any of the alleged misstatements or omissions with the requisite scienter. Finally, Defendants argued that their misstatements and omissions were immaterial statements of optimism and puffery which were protected by the Private Securities Litigation Reform Act of 1995's ("PSLRA") safe harbor provision and the bespeaks caution doctrine.

32.     By Order dated July 18, 2008, this Court denied Defendants' motions to dismiss in their entirety. The Court held that Lead Plaintiff's claims were supported by several alleged facts and

- 8 -

inferences drawn from those facts. Moreover, the Court also held that Lead Plaintiff adequately alleged scienter.

**D.    Lead Counsel's Factual Investigation and Discovery**

33.    Lead Counsel conducted an extensive investigation and substantial formal discovery into the claims of the Class prior to entering into the agreement to settle the action. This extensive investigation and discovery included, *inter alia*: (i) review and analysis of TCP's filings with the SEC, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, and other public statements issued by the Company; (ii) review of media reports about the Company; (iii) interviews with numerous persons with knowledge of the alleged misconduct, including former employees of TCP, as well as certain of its trading partners; (iv) consultation with damage consultants; (v) retention of experts who issued opinions on issues concerning class certification; and (vi) research of the applicable law with respect to the claims asserted in the action and Defendants' potential defenses thereto.

34.    In addition to the foregoing investigation, formal discovery was well underway when the parties resolved the action. Once the Court sustained the CAC against the Defendants and the automatic stay of discovery imposed by the PSLRA lifted, the Court entered a scheduling order on July 31, 2008.

35.    Pursuant to the Court's scheduling order, on August 20, 2008, Lead Plaintiff served its First Request for the Production of Documents and its Initial Disclosure Statement.

36.    Immediately thereafter, the parties negotiated and entered into a Confidentiality Agreement and Protective Order, which was signed and entered by the Court on September 9, 2008.

37.    The parties negotiated extensively over the scope of discovery. While the parties were able to resolve certain of their issues, several issues remained. Following the receipt of letters

from the parties, the Court held several conferences with the parties, including an in-person conference on November 6, 2008 at which those issues were resolved.

38.    Defendants ultimately provided Lead Plaintiff with 1.6 million pages of documents. Lead Counsel extensively reviewed those documents for support for the claims asserted in the CAC.

39.    In fact, Lead Counsel devoted a significant amount of time to discovery, which proved to be an arduous process. As a result of the investigation and discovery detailed above, Lead Counsel developed an in-depth knowledge of the strengths and weaknesses of the claims asserted in the action, which has permitted us to fully consider and evaluate the fairness of the settlement to the Class.

40.    Lead Counsel also consulted with experts to help analyze the claims and defenses asserted in the action.

41.    These experts included forensic accountants who worked with Lead Counsel in analyzing the claims regarding the backdating of stock options and the resulting accounting implications.

42.    In addition, Lead Plaintiff retained economists, who provided expert advice on issues related to class certification, damages, causation, and materiality.

**E.    Motion for Class Certification**

43.    On November 14, 2008, Lead Plaintiff filed its motion to certify the class. The motion was supported by the Declaration of Steven P. Feinstein, who served as Lead Plaintiff's expert on issues concerning class certification.

44.    On December 31, 2008, Defendants filed their opposition to the motion to certify the class. Defendants supported their opposition with the declaration of their expert, Vincent Warther.

45.    On January 20, 2009, Lead Plaintiff filed its reply in further support of its motion to certify the class.

46.     In light of settlement negotiations between the parties, following a telephonic conference with the Court, Lead Plaintiff withdrew, without prejudice, its motion for class certification.

**F.     Settlement Negotiations**

47.     The negotiations that produced this settlement were substantial. Following the filing of Lead Plaintiff's motion for class certification, the parties discussed the possibility of settling the action. These negotiations, which at times were contentious, were always conducted at arm's length.

48.     The parties agreed to attempt to mediate the case before the Honorable Nicholas H. Politan (Ret.).

49.     The first mediation session with Judge Politan was held on March 26, 2009. Although the parties made progress at that first session, they did not reach agreement on the terms of the settlement. At the Judge's suggestion, the parties agreed to return for a second day of mediation.

50.     Thereafter, Lead Plaintiff had several telephone conversations with Judge Politan concerning a possible resolution to the action.

51.     On April 30, 2009, the parties attended the second mediation session. At the end of that day, the parties reached an agreement-in-principle to settle the case for a cash payment of $12,000,000.

## IV.    PRELIMINARY APPROVAL OF THE SETTLEMENT

52.     Immediately following the mediation, the parties engaged in extensive negotiations concerning the terms of the Stipulation.

53.     On June 26, 2009, Lead Plaintiff filed its motion for preliminary approval of the settlement. In connection therewith, Lead Plaintiff requested that the Court approve forms of notice, which, among other things, described the terms of the settlement, advised Class Members of their rights, set forth the proposed Plan of Allocation of settlement proceeds, informed Class Members of

the maximum amount of attorneys' fees and expenses that Lead Counsel would request, and explained the procedure for filing Proofs of Claim.

54.    In addition, Lead Plaintiff requested that the Court certify the Class.

55.    Thereafter, in further support of the preliminary approval motion, Lead Plaintiff filed a supplemental memorandum of law on July 14, 2009.

56.    By Order dated July 17, 2009, the Court preliminarily approved the terms of the settlement and directed that Lead Counsel cause the mailing of the Notice and the Proof of Claim to all potential Class Members identifiable with reasonable effort (the "Notice Order").

57.    The Court's Notice Order also directed Lead Counsel to cause the Summary Notice for publication ("Summary Notice") to be published in *Investor's Business Daily*.

## V.    MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

58.    Submitted herewith is the La Count Affidavit, which attests that Notices have been mailed to over 38,500 potential Class Members and that the Summary Notice was published on August 6, 2009, as directed by the Court.

59.    The Notice informed Class Members of the terms of the settlement, the Plan of Allocation of the settlement proceeds, and that Lead Counsel would apply for an award of attorneys' fees not to exceed 27% of the Settlement Fund, or $3,240,000, and expenses not to exceed $400,000.

60.    The Notice also provided that any objections to the settlement, the Plan of Allocation, or the application for attorneys' fees and expenses had to be filed by September 25, 2009. As of the date of this Declaration, to my knowledge, no objections have been filed by any member of the Class to the settlement, the Plan of Allocation of settlement proceeds, or to the application for attorneys' fees and expenses.

## VI.    THE FACTORS AFFECTING SETTLEMENT COUNSEL IN FAVOR OF APPROVAL OF THE SETTLEMENT

61.    The settlement is the result of hard-fought negotiations between experienced counsel, including two formal mediation sessions with the assistance of a retired federal judge, who have concluded that the settlement is fair, reasonable, and adequate and should be approved by the Court. The settlement avoids the hurdles Lead Plaintiff would have to clear not only with respect to proving loss causation and the full amount of the Class's damages, but liability as well, and avoids the significant costs associated with further litigation of this complex securities action, particularly the completion of discovery and trial. In view of the significant risks and additional time and expense involved in taking this action further in litigation, I respectfully submit that the settlement is fair, reasonable, and adequate.

62.    Through the review of the discovery provided by Defendants, Lead Counsel were better able to evaluate the claims and confirm that the settlement is fair, reasonable, and adequate.

63.    In view of the discovery efforts of Lead Plaintiff, the advice of its experts, and the discussions that occurred during the parties' settlement negotiations, Lead Counsel were able to identify the issues that are critical to the outcome of this case. Lead Counsel have considered the risks of continued litigation, the likelihood of getting past summary judgment after expensive fact and expert discovery and, if successful, the risk, expense, and length of time to prosecute the litigation through trial and the inevitable subsequent appeals. Lead Counsel have also considered the substantial monetary benefit provided by the settlement in light of the risk of taking the case to trial. Lead Plaintiff was a participant in this assessment and was consulted with, and kept apprised concerning the settlement negotiations.

64.    Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. We believe that our reputations as attorneys who are unafraid to

- 13 -

zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants, even under the difficult and challenging circumstances presented here.

65.    Lead Counsel respectfully submit that, under the circumstances, the settlement represents an excellent result for the Class. The settlement will provide Class Members with a benefit without the risk of no recovery if the litigation were to continue.

66.    Indeed, the following factors, which have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed settlement, counsel in favor of approval of the settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Each of these factors supports approval of the settlement.

### 1.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks in Litigation

67.    The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks in litigation were important factors in Lead Plaintiff's decision to settle the action and weigh heavily in favor of the settlement. The Class will receive $12 million in cash in exchange for the release of all claims against Defendants – a significant result for the Class both in absolute terms and when viewed in light of the risks of litigation. According to a preliminary damage calculation performed by Lead Plaintiff's damage consultants, depending on whether certain

intra-class period disclosures could be read to reveal that certain of Defendants' prior statements were fraudulent, the maximum recoverable damages for the Class could range from $104 - $245 million. The $12 million recovery, therefore, represents approximately 5% – 12% of the Class's maximum provable damages. Without exposing the Class to the risks of further litigation, Lead Plaintiff has obtained a recovery representing a substantial portion of the Class's theoretical damages and a recovery which exceeds the median settlement recovery in comparable securities cases.

68.    Moreover, assessing the merits of this class action settlement – whether serious questions of law and fact exist – supports the conclusion that the settlement is fair, reasonable, and adequate to the Class. As in every complex case of this kind, Lead Plaintiff and the Class faced obstacles to recovery, both with respect to liability and damages. While Lead Plaintiff and its counsel believe that the allegations in the CAC have substantial merit, Defendants have denied liability and assert that they possess absolute defenses to the claims alleged.

### a.    The Risk of Establishing Liability

69.    While the Court sustained Lead Plaintiff's claims against Defendants, Lead Plaintiff, nevertheless, recognized that it faced substantial risks if the action continued. Lead Plaintiff and Lead Counsel heavily considered and analyzed potential risks to continued litigation of the action in determining the settlement's fairness, and in light of such risks, believe the settlement is in the best interests of the Class.

70.    If the action were to proceed, Lead Plaintiff faced hurdles with respect to establishing liability. For example, as they did in the motions to dismiss, Defendants undoubtedly would contend that none of their alleged misstatements were material. According to Defendants, the dispute with Disney was an ordinary business dispute that Defendants were not obligated to disclose. Throughout the litigation, Defendants attempted to support that argument by claiming that Disney had not

- 15 -

actually exercised its option to cancel its agreement with TCP prior to Defendants' disclosures. Rather, according to Defendants, Disney and TCP had been attempting to resolve their issues amicably. Thus, Defendants' position was that the disagreements were normal immaterial business disputes that did not warrant disclosure.

71.    In addition, Defendants claimed throughout the litigation that the statements upon which Lead Plaintiff based the CAC fell squarely within the PSLRA's definition of forward-looking statements because they concerned management's plans and objectives for future operations; were statements of future economic performance; or were statements concerning management's expectations, beliefs, and optimistic anticipations.  Defendants also contended that many of the alleged misstatements were non-actionable statements of optimism or puffery.

72.    Defendants also took the position that their statements were protected by the so-called "truth-on-the-market" defense because, according to Defendants, much of the allegedly misrepresented information previously had been disclosed by Defendants or was otherwise publicly known.

73.    Defendants further continued to challenge Lead Plaintiff's allegations concerning scienter.  According to Defendants, Lead Plaintiff would be able to prove neither that Defendants possessed the requisite motive and opportunity to commit fraud nor that Defendants made their alleged misstatements with a reckless disregard for the truth.

74.    Although Lead Plaintiff had developed strong facts through discovery that it could use to establish liability, as with any case, there existed the very real possibility that a jury would agree with Defendants and render a verdict in their favor.

### b.    The Risks of Establishing Loss Causation and Damages

75.    Lead Plaintiff also faced risks in establishing loss causation and damages. Defendants argued forcefully, both in their motions to dismiss and their opposition to class

certification, that Lead Plaintiff would not be able to demonstrate loss causation because Lead Plaintiff would be unable to prove that the decline in the Company's stock price was related to, or proximately caused by, revelations concerning the alleged misstatements or omissions as opposed to other potential causes. Defendants attempted to support their contention through the opinion and testimony of their expert, Vincent Warther of LEXICON, who on class certification opined that the Company revealed no facts on July 9, 2007, or August 22, 2007, that concerned the allegedly concealed information.

76.     Lead Plaintiff remained confident that it could establish loss causation and damages and already had secured the opinion of its own expert on those issues. However, one cannot predict how a jury would weigh competing experts' testimony.

77.     In fact, the crucial element of damages would likely be reduced at trial to a "battle of the experts." As a result, if this action were to continue, Defendants would challenge Lead Plaintiff's damage figure and the Class's damages would be substantially reduced if Lead Plaintiff could not prove all of the misrepresentations alleged in the CAC, or if a jury were to believe that the misrepresentations alleged in the CAC did not cause 100% of the stock drop. Therefore, Lead Counsel submit that where, as here, the Class will receive a substantial portion of their theoretical damages without undertaking the risk that the Class might receive a much smaller recovery, or no recovery at all, after further litigation, an analysis of this factor weighs heavily in favor of the settlement.

### 2.     The Complexity, Expense, and Likely Duration of the Litigation

78.     Lead Plaintiff's claims involve numerous complex issues relating to accounting rules concerning stock options, the Company's internal controls, and the Company's relationship with Disney. Although Lead Plaintiff completed substantial document discovery and retained experts on

issues concerning class certification, loss causation, and damages, Lead Counsel anticipated that formal expert discovery into the merits of the case to be no less time-consuming and expensive than percipient discovery. Moreover, the costs associated with the completion of merits discovery, not to mention the costs associated with formal expert discovery, summary judgment, including *Daubert* motions, preparation for trial, a trial, and the inevitable appeals, would be excessive, and the process would require many hours of the Court's time and resources. As a result, it could be years before the Class would receive a recovery, if any. Thus, this factor also supports the approval of the settlement.

### 3.    The Reaction of the Class to the Settlement

79.    To date, the reaction of the Class to the settlement has been overwhelmingly positive and strongly supports the settlement. A.B. Data, in accordance with the procedures for mailing and publication established by the Court's Notice Order, undertook an extensive program to ensure that notice of the action and the proposed settlement was widely disseminated to TCP's Class Period shareholders. Following the dissemination of more than 38,500 copies of the Notice to potential Class Members, not a single recipient of the Notice has objected to the settlement, and only one Class Member has requested exclusion from the Class. The absence of dissent combined with the minimal number of exclusions militates strongly in favor of the Court's final approval of the settlement.

80.    Moreover, Lead Plaintiff – a sophisticated institutional investor that has been heavily involved in the litigation throughout its pendency – fully supports the settlement and is pleased with the recovery obtained for the Class.

### 4.    The Stage of the Proceedings and the Amount of Discovery Completed

81.    The stage of the proceedings and the amount of discovery completed at the time the action was resolved fully supports the settlement. By the time the settlement was reached, Lead

Plaintiff and Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the action and the defenses that would be asserted by Defendants to determine that the settlement is in the Class's best interests. Lead Counsel obtained this knowledge by conducting an in-depth investigation, including interviews with numerous former TCP and Disney employees; drafting the detailed CAC; briefing and successfully opposing motions to dismiss; retaining experts on issues concerning class certification and loss causation; briefing a motion for class certification; consulting with damage consultants; and engaging in substantial and contentious document discovery – which included several conferences with the Court. Lead Counsel then used the information at their disposal to participate in hard-fought arm's-length settlement negotiations with Defendants, including two days of formal mediation with the assistance of a retired federal judge. The knowledge and insight gained by Lead Plaintiff and Lead Counsel following nearly two years of investigating, litigating, and negotiating a settlement of the action provided Lead Plaintiff and Lead Counsel with more than sufficient information to evaluate the strengths and weaknesses of the Class's claims and Defendants' defenses.

### 5.    The Risks of Maintaining the Class Through Trial

82.    Although Lead Plaintiff and its expert were extremely confident that the Court would certify the Class, there is no assurance that this would be the case or that the Class would maintain its status as a class through judgment. Thus, there was a risk that the Class would not be maintained through trial.

### 6.    The Ability of the Defendants to Withstand a Greater Judgment

83.    Finally, with respect to the ability of Defendants to withstand a greater judgment, Lead Counsel does not dispute the viability of the Company's financial resources and has no reason to believe that Defendants could not withstand a greater judgment if obtained. Courts, however,

generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement, and in fact, the ability of a defendant to pay potentially more money does not render a settlement unreasonable.

## VII.    THE PLAN OF ALLOCATION

84.    Pursuant to the Notice Order and as set forth in the Notice, all members of the Class who wish to participate in the distribution of the settlement proceeds must submit a proper Proof of Claim. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, and attorneys' fees and expenses, the remainder of the settlement fund (the "Net Settlement Fund") shall be distributed according to the Plan of Allocation.

85.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among the members of the Class who submit valid Proofs of Claim. The proposed Plan of Allocation provides that to qualify for payment, a claimant must be an eligible member of the Class and must send in a Proof of Claim that provides all of the requested information.

86.    The Plan of Allocation was based on an analysis of economic factors and designed to equitably distribute the settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud, as opposed to market losses caused by market, industry, or other non-fraud related Company specific factors.

87.    Pursuant to the Plan of Allocation, a claim will be calculated as follows:

An Authorized Claimant's "recognized claim" shall mean:

The allocation below is based on the following price declines as well as the statutory PSLRA 90-day look back amount of $25.30:

| | |
|---|---|
| July 9, 2007 Price Decline: | $6.12 |
| August 23, 2007 Price Decline: | $5.59 |

**Proposed Allocation**

For shares of TCP common stock *purchased or acquired on or between March 9, 2006 through July 8, 2007*, the claim per share shall be as follows:

a) If sold prior to July 9, 2007, the claim per share is zero.

b) If sold on or between July 9, 2007 through August 22, 2007, the claim per share shall be the lesser of (i) $6.12 (July 9, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price.

c) If sold on August 23, 2007, the claim per share shall be the lesser of (i) $11.71 (July 9, 2007 and August 23, 2007 Price Declines), or (ii) the difference between the purchase price and the selling price.

d) If retained at the end of August 23, 2007, and sold before November 22, 2007, the claim per share shall be the lesser of (i) $11.71 (July 9, 2007 and August 23, 2007 Price Declines), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

e) If retained, or sold, on or after November 22, 2007, the claim per share shall be the lesser of (i) $11.71 (July 9, 2007 and August 23, 2007 Price Declines), or (ii) the difference between the purchase price per share and $25.30 per share.

For shares of TCP common stock *purchased or acquired on or between July 9, 2007 through August 22, 2007*, the claim per share shall be as follows:

a) If sold prior to August 23, 2007, the claim per share is zero.

b) If sold on August 23, 2007, the claim per share shall be the lesser of (i) $5.59 (August 23, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price.

c) If retained at the end of August 23, 2007 and sold before November 22, 2007, the claim per share shall be the lesser of (i) $5.59 (August 23, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

d) If retained, or sold, on or after November 22, 2007, the claim per share shall be the lesser of (i) $5.59 (August 23, 2007 Price Decline),

- 21 -

or (ii) the difference between the purchase price per share and $25.30 per share.

For shares of TCP common stock **_purchased or acquired on August 23, 2007_**, the claim per share shall be as follows:

    a)  If sold prior to August 24, 2007, the claim per share is zero.

    b)  If retained at the end of August 23, 2007 and sold before November 22, 2007, the claim per share shall be the lesser of (i) $5.59 (August 23, 2007 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

    c)  If retained, or sold, on or after November 22, 2007, the claim per share shall be the lesser of (i) $5.59 (August 23, 2007 Price Decline), or (ii) the difference between the purchase price per share and $25.30 per share.

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 24-Aug-07 | $28.30 | $28.30 |
| 27-Aug-07 | $27.96 | $28.13 |
| 28-Aug-07 | $27.68 | $27.98 |
| 29-Aug-07 | $28.50 | $28.11 |
| 30-Aug-07 | $28.14 | $28.12 |
| 31-Aug-07 | $28.76 | $28.22 |
| 4-Sep-07 | $28.97 | $28.33 |
| 5-Sep-07 | $27.97 | $28.29 |
| 6-Sep-07 | $27.68 | $28.22 |
| 7-Sep-07 | $27.11 | $28.11 |
| 10-Sep-07 | $25.97 | $27.91 |
| 11-Sep-07 | $25.95 | $27.75 |
| 12-Sep-07 | $25.55 | $27.58 |
| 13-Sep-07 | $25.56 | $27.44 |
| 14-Sep-07 | $25.85 | $27.33 |
| 17-Sep-07 | $25.81 | $27.24 |
| 18-Sep-07 | $26.75 | $27.21 |
| 19-Sep-07 | $26.24 | $27.15 |
| 20-Sep-07 | $25.53 | $27.07 |
| 21-Sep-07 | $25.08 | $26.97 |
| 24-Sep-07 | $24.79 | $26.86 |
| 25-Sep-07 | $23.99 | $26.73 |
| 26-Sep-07 | $25.80 | $26.69 |
| 27-Sep-07 | $24.33 | $26.59 |

| Date | Closing Price | Average Closing Price |
|------|------|------|
| 28-Sep-07 | $24.28 | $26.50 |
| 1-Oct-07 | $25.13 | $26.45 |
| 2-Oct-07 | $24.98 | $26.39 |
| 3-Oct-07 | $24.76 | $26.34 |
| 4-Oct-07 | $24.22 | $26.26 |
| 5-Oct-07 | $24.58 | $26.21 |
| 8-Oct-07 | $24.32 | $26.15 |
| 9-Oct-07 | $22.88 | $26.04 |
| 10-Oct-07 | $23.40 | $25.96 |
| 11-Oct-07 | $22.75 | $25.87 |
| 12-Oct-07 | $23.92 | $25.81 |
| 15-Oct-07 | $24.73 | $25.78 |
| 16-Oct-07 | $23.80 | $25.73 |
| 17-Oct-07 | $24.27 | $25.69 |
| 18-Oct-07 | $23.80 | $25.64 |
| 19-Oct-07 | $22.52 | $25.57 |
| 22-Oct-07 | $22.65 | $25.49 |
| 23-Oct-07 | $23.70 | $25.45 |
| 24-Oct-07 | $25.49 | $25.45 |
| 25-Oct-07 | $25.08 | $25.44 |
| 26-Oct-07 | $26.03 | $25.46 |
| 29-Oct-07 | $26.12 | $25.47 |
| 30-Oct-07 | $25.18 | $25.47 |
| 31-Oct-07 | $25.60 | $25.47 |
| 1-Nov-07 | $24.26 | $25.44 |
| 2-Nov-07 | $23.87 | $25.41 |
| 5-Nov-07 | $24.54 | $25.39 |
| 6-Nov-07 | $24.75 | $25.38 |
| 7-Nov-07 | $23.17 | $25.34 |
| 8-Nov-07 | $23.87 | $25.31 |
| 9-Nov-07 | $25.58 | $25.32 |
| 12-Nov-07 | $25.46 | $25.32 |
| 13-Nov-07 | $26.69 | $25.34 |
| 14-Nov-07 | $25.85 | $25.35 |
| 15-Nov-07 | $25.74 | $25.36 |
| 16-Nov-07 | $25.81 | $25.37 |
| 19-Nov-07 | $24.62 | $25.36 |
| 20-Nov-07 | $23.95 | $25.33 |
| 21-Nov-07 | $23.26 | $25.30 |

88.    This proposed Plan of Allocation was formulated after consultation with Lead

Plaintiff's materiality and damages consultants in order to calculate a fair method to divide the Net

- 23 -

Settlement Fund for distribution among the Class. The proposed Plan of Allocation attempts to eliminate the effects of market forces unrelated to the alleged misrepresentations and omissions as well as simplify claims administration with attendant reduced cost to the Class. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this settlement among the Class.

## VIII.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEY FEE AWARD

89.     The Notice provides that Lead Counsel may apply for an award of attorneys' fees not to exceed 27% of the Settlement Fund, or $3,240,000, plus expenses of up to $400,000.

90.     As set forth in Lead Plaintiff's Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses and Reimbursement of Lead Plaintiff's Expenses, Lead Counsel is requesting fees in the amount of $3,240,000 but expenses of only $291,553.76.

91.     Lead Counsel achieved this very favorable result for the Class at great risk and substantial expense to themselves. They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this litigation to a successful conclusion. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for the Class.

92.     The prosecution of this action required Lead Plaintiff's counsel and their paraprofessionals to perform 1,881.65 hours of work and incur $291,553.76 in expenses.

93.     The resulting lodestar totals $864,070.50. A 27% fee represents a 3.75 multiplier, which is well within the range of multipliers awarded in similar cases.

94.     This case was vigorously litigated and settled only after Lead Counsel had, *inter alia*: (a) drafted and filed the extensive CAC; (b) opposed and defeated Defendants' motions to dismiss; (c) consulted with experts; (d) reviewed voluminous materials provided by Defendants; (e) assessed

the risks of prevailing on their claims at trial; (f) filed a motion for class certification; and (g) participated in settlement negotiations that were mediated by retired United States District Court Judge Nicholas H. Politan. These efforts and others on the part of Lead Counsel are described in detail throughout this Declaration.

95.    For our extensive efforts on behalf of the Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis, and seek the Court's approval of the fee percentage negotiated between Lead Counsel and Lead Plaintiff. The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery. In addition, here the percentage method is particularly appropriate given the outstanding result and the circumstances under which it was achieved.

96.    Lead Counsel's compensation for the services rendered is wholly contingent on obtaining a favorable result for the Class. The expenses incurred in the prosecution of the litigation are set forth in the accompanying declarations and were advanced by the firms on a purely contingent basis. Counsel, in seeking expenses, have declared that the expenses are reflected in the books and records maintained by the firms and are an accurate recording of the expenses incurred. In total, Lead Plaintiff's counsel have incurred expenses in the amount of $291,553.76. Included in this amount are the fees paid to the consultants, investigators, and experts, all of whom provided Lead Plaintiff and its counsel with extensive assistance during this litigation. We respectfully submit that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this litigation.

**A.    Extent of Litigation**

97.    As described above, this case was settled only after Lead Counsel had conducted an investigation into the Class's claims, conducted extensive document discovery, thoroughly

- 25 -

researched the facts and law applicable to the Class's claims and Defendants' defenses, consulted

with experts, considered the risks of continued litigation, and engaged in mediated settlement

negotiations with Defendants' counsel, resulting in a settlement for the Class.

**B.    The Risks of Litigation and the Need to Ensure the Availability of
Competent Counsel in High-Risk, Contingent Securities Cases**

98.    This litigation was undertaken by Lead Counsel on a wholly-contingent basis. From

the outset, we understood that we were embarking on a complex, expensive, and lengthy litigation

with no guarantee of ever being compensated for the enormous investment of time and money the

case would require. In undertaking that responsibility, we were obligated to assure that sufficient

attorney and para-professional resources were dedicated to the prosecution of the litigation and that

funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a

case such as this entails.

99.    Because of the nature of a contingent practice where cases are predominantly "big

cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but

they also must advance the expenses of the litigation. With this case having already taken more than

two years, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on

an ongoing basis.

100.    In addition to advancing litigation expenses and paying overhead, we faced the

possibility of no recovery. It is incorrect to presume that a law firm handling complex contingent

litigation always wins. Tens of thousands of hours have been expended in losing efforts. The

so-called "risk of litigation" is very real in this type of case.

101.    There are numerous cases where plaintiffs' counsel in contingent cases such as this,

after the expenditure of thousands of hours, have received no compensation. It is only because

defendants and their counsel know that the leading members of the plaintiffs' securities bar are

prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

102.    We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases. *See, e.g., Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2d Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994); *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993); *Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).

103.    The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery. *See In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

104.    Losses such as those cited above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state, and local authorities. Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting all of contingent-fee counsel's pending cases.

105.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can occur only if private plaintiffs can obtain parity in representation with that

available to large corporate interests. If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

106.    Lead Counsel undertook to act for the Lead Plaintiff and the Class in this matter aware that they would be compensated only by obtaining a successful result. The benefits conferred on the Class by this settlement are particularly noteworthy in that a cash Settlement Fund worth $12 million (plus accrued interest) was obtained for the Class.

### C.    Standing and Expertise of Lead Plaintiff's Counsel

107.    The expertise and experience of Lead Plaintiff's counsel are described in the declarations of counsel submitted herewith. We are well-known among our peers and courts across the country as among the most experienced and skilled practitioners in the securities litigation field.

### D.    Standing and Caliber of Opposition Counsel

108.    The Defendants are represented by very experienced counsel from Weil, Gotshal & Manges LLP and Dechert LLP, which firms possess substantial experience, expertise, and resources in the defense of complex securities litigation. In the face of this formidable opposition, Lead Counsel developed their case so as to persuade the Defendants to settle the case on a basis favorable to the Class.

## IX.    REIMBURSEMENT AWARD TO LEAD PLAINTIFF

109.    Lead Plaintiff has been fully committed to pursuing the claims of the Class against Defendants since the commencement of this action. Lead Plaintiff has actively and effectively fulfilled its obligations, complying with all reasonable demands placed upon it during the litigation and settlement of this action, and has provided invaluable assistance to Lead Counsel throughout the duration of the action. In devoting substantial effort to the commencement of, oversight of, and participation in this action on behalf of the Class, Lead Plaintiff responded to Defendants' discovery

requests, produced all documents reasonably requested by Defendants, reviewed filings, and communicated regularly with counsel, including through the settlement negotiations and formal mediation resulting in the resolution of the action.

110.   Further, a representative of Lead Plaintiff flew from Reno, Nevada, to New York City to sit on the day before Christmas Eve for a lengthy deposition in furtherance of Lead Plaintiff's motion for class certification.

111.   These are precisely the types of activities courts have found to support reimbursement to class representatives.

112.   Lead Plaintiff devoted significant time to the litigation – time that could otherwise have been spent pursuing independent business activities.  Overall, Lead Plaintiff was instrumental in achieving this excellent result.  If individual shareholders are unwilling to step forward and pursue a claim on behalf of similarly situated investors, unredressed violations of law will become far more common.

113.   Lead Counsel respectfully request that an award be made to Lead Plaintiff as reimbursement for its reasonable costs and expenses directly relating to its representation of the Class during the prosecution and resolution of this action in the amount of $5,798.10.  Lead Counsel believe that the requested compensatory award to the Lead Plaintiff is both fair and reasonable and warrant the Court's approval.

## X.    CONCLUSION

114.   For the reasons set forth above and in the accompanying Memorandum of Law in Support of Motion for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, and Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses and Reimbursement of Lead Plaintiff's Expenses, we respectfully submit that (a) the settlement is fair, reasonable, and adequate and should be approved; (b) the Plan of Allocation represents a fair method

for distribution of the Net Settlement Fund among Class Members and should also be approved; (c) the application for attorneys' fees and expenses should be granted; and (d) the award of reimbursement of Lead Plaintiff's expenses should be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. If called as a witness, I could and would competently testify thereto.

Executed under the penalties of perjury under the laws of the United States of America in Melville, New York, this 2nd day of October, 2009.

_____
ROBERT M. ROTHMAN

CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 2, 2009.

<div style="margin-left:40%">

*s/ Ellen Gusikoff Stewart*
ELLEN GUSIKOFF STEWART

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:elleng@csgrr.com

</div>

# Mailing Information for a Case 1:07-cv-08252-SAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@csgrr.com,e_file_ny@csgrr.com,drosenfeld@csgrr.com

- **Michael J. Gilbert**
  michael.gilbert@dechert.com,bryan.block@dechert.com,luis.lopez@dechert.com

- **Jonah H. Goldstein**
  Jgoldstein@csgrr.com

- **Robert Jeffrey Jossen**
  robert.jossen@dechert.com,bryan.block@dechert.com,luis.lopez@dechert.com

- **Fainna Kagan**
  fkagan@csgrr.com

- **Jonathan D Polkes**
  scott.woller@weil.com,jonathan.polkes@weil.com,georgia.magno@weil.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com

- **Robert M. Rothman**
  rrothman@csgrr.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Ellen Anne Gusikoff Stewart**
  elleng@csgrr.com

- **Richard P. Swanson**
  richard_swanson@aporter.com,anthony_boccanfuso@aporter.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Manual List
*Hall v. The Children's Place Retail Stores, Inc., et al.*
Civil Action No. 1:07-cv-08252-SAS


Nathan M. Jenkins
Jenkins & Carter
501 Hammill Lane
Reno, NV  89511-1004